D.C. Courts Home

# Court Cases Online

Case Search for Company: KESHER

**Click here to view search criteria**

Search retrieved 4 cases in 1.86 seconds.

**Click here to view search results**

Selected 1 cases to view

Viewing single case; Details retrieved in less than a second.

**Click here to view case summary**

| 2014 CA 007644 B: DOE, JANE, et al. Vs. THE GEORGETOWN UNIVERSITY, et al. | |
|---|---|
| Case Type: Civil II | File Date: 12/02/2014 |
| Status: Open | Status Date: 12/02/2014 |
| Disposition: Undisposed | Disposition Date: |

| Party Name | Party Alias(es) | Party Type | Attorney(s) |
|---|---|---|---|
| DOE, JANE | | PLAINTIFF | CAMMARATA, Mr JOSEPH<br>HENGERER, GEOFFREY G<br>KELLY, STEVEN J.<br>TIEVSKY, MATTHEW W |
| SHULEVITZ, EMMA | | PLAINTIFF | HENGERER, GEOFFREY G<br>KELLY, STEVEN J. |
| SMITH, STEPHANIE | | PLAINTIFF | HENGERER, GEOFFREY G<br>KELLY, STEVEN J. |
| THE GEORGETOWN UNIVERSITY | BROWN, LISA | Defendant | |
| THE GEORGETOWN SYNAGOGUE–KESHER ISRAEL CONGREGATION | | Defendant | |
| THE NATIONAL CAPITAL MIKVAH, INC., | BARAK, SARAH | Defendant | |
| SHULEVITZ, EMMA | | Defendant | |
| HISTADRUTH HORABONIM DEAMERICA–RABBINICAL COUNCIL | | Defendant | |
| DOE 2, JANE | | Witness/NonParty | CAMMARATA, Mr JOSEPH |

| Schedule Date | Schedule Time | Description |
|---|---|---|
| 03/06/2015 | 09:30 AM | Initial Scheduling Conference-60 |

| Docket Date | Description | Messages |
|---|---|---|
| 12/29/2014 | Proof of Service | Proof of Service<br>Method : Service Issued<br>Issued : 12/02/2014<br>Service : Summons Issued<br>Served : 12/19/2014<br>Return : 12/29/2014<br>On : THE GEORGETOWN UNIVERSITY<br>Signed By : Lisa Brown<br><br>Reason : Proof of Service<br>Comment :<br><br>Tracking #: 5000153434 |
| 12/29/2014 | Affidavit of Service of Summons & Complaint on | Affidavit of Service of Summons & Complaint on THE GEORGETOWN UNIVERSITY (Defendant); |
| 12/24/2014 | Proof of Service | Proof of Service<br>Method : Service Issued<br>Issued : 12/02/2014<br>Service : Summons Issued<br>Served : 12/22/2014<br>Return : 12/31/2014<br>On : THE GEORGETOWN SYNAGOGUE–KESHER ISRAEL CONGREGATION<br>Signed By : Jessica Pelt<br><br>Reason : Proof of Service |

| | | |
|---|---|---|
| | | Comment : |
| | | Tracking #: 5000153435 |
| 12/24/2014 | Affidavit of Service of Summons & Complaint on | Affidavit of Service of Summons & Complaint on THE GEORGETOWN SYNAGOGUE-KESHER ISRAEL CONGREATION (Defendant); |
| 12/24/2014 | Proof of Service | Proof of Service Method : Service Issued Issued : 12/02/2014 Service : Summons Issued Served : 12/19/2014 Return : 12/24/2014 On : THE NATIONAL CAPITAL MIKVAH, INC., Signed By : Sarah Barak<br><br>Reason : Proof of Service Comment :<br><br>Tracking #: 5000153436 |
| 12/24/2014 | Affidavit of Service of Summons & Complaint on | Affidavit of Service of Summons & Complaint on THE NATIONAL CAPITAL MIKVAH, INC., (Defendant); |
| 12/23/2014 | Praecipe to Enter Appearance Filed | Praecipe to Enter Appearance Filed. Submitted 12/23/2014 15:05. ts. Attorney: HENGERER, GEOFFREY G (495994) JANE DOE (PLAINTIFF); |
| 12/18/2014 | Praecipe Filed: | Praecipe Filed. submitted 12/18/2014 16:26.rp Attorney: TIEVSKY, MATTHEW W (1004955) JANE DOE (PLAINTIFF); |
| 12/18/2014 | Miscellaneous Docket | Alias Summons Issued on Histadruth Horabonim Deamerica--Rabbinical Council of America, Inc. Filed |
| 12/18/2014 | Service Issued | Issue Date: 12/18/2014 Service: Summons Issued Method: Service Issued Cost Per: $<br><br>HISTADRUTH HORABONIM DEAMERICA-RABBINICAL COUNCIL 305 Seventh Avenue 12th Floor NEW YORK, NY 10001 Tracking No: 5000153989 |
| 12/18/2014 | Amended Complaint Filed | Amended Complaint Filed (44 Pgs) Attorney: KELLY, STEVEN J. (1021534) JANE DOE (PLAINTIFF); |
| 12/16/2014 | Motion Filed: | Plaintiff Jane Doe 2's Motion to Clarify December 15, 2014 Order Granting Plaintiff Jane Doe's Motions for Leave to Proceed Under Pseudonym and to Seal Exhibit A Filed. Submitted 12/16/2014 16:41. ajm Attorney: TIEVSKY, MATTHEW W (1004955) JANE DOE 2 (Witness/NonParty); Receipt: 298505 Date: 12/17/2014 |
| 12/15/2014 | Order Filed | Order Granting Plaintiff Jane Doe 2's Motions for Leave to proceed Under Pseudonym & to Seal Exhibit A signed byJ/. Dixon, Jr. on 12/15/14. submitted 12/15/2014 12:04.rp |
| 12/15/2014 | Order Granting Motion to Seal Entered on the Docket | Order Granting Plaintiff Jane Doe 2's Motions for Leave to Proceed under Pseudonym & to Seal Exhibit A Entered on the Docket Date signed: December 15, 2014 Date docketed: December 15, 2014 Date efiled/eserved/mailed: December 15, 2014 JUDGE DIXON/bmj |
| 12/10/2014 | Motion to Seal Filed | Plaintiff Jane Doe 2's Motion to Seal Exhibit A to Motion for Leave to Proceed Under a Pseudonym Filed. Submitted 12/10/2014 13:15 jhc. Attorney: TIEVSKY, MATTHEW W (1004955) JANE DOE (PLAINTIFF); Receipt: 298077 Date: 12/11/2014 |
| 12/10/2014 | Motion Filed: | Plaintiff Jane Doe 2's Motion for Leave to Proceed Under a Pseudonym Filed. Submitted 12/10/2014 11:56 jhc. Attorney: CAMMARATA, Mr JOSEPH (389254) JANE DOE (PLAINTIFF); Receipt: 298055 Date: 12/11/2014 |
| 12/10/2014 | Praecipe to Enter Appearance Filed | Praecipe Entering Appearances Filed. Submitted 12/10/2014 10:43 jhc. Mr JOSEPH CAMMARATA (Attorney) on behalf of JANE DOE (PLAINTIFF); MATTHEW W TIEVSKY (Attorney) on behalf of JANE DOE (PLAINTIFF) |
| 12/02/2014 | Service Issued | Issue Date: 12/02/2014 Service: Summons Issued Method: Service Issued Cost Per: $<br><br>THE GEORGETOWN UNIVERSITY 37th & O Street, NW 204 Healy Hall WASHINGTON, DC 20057 Tracking No: 5000153434<br><br>THE GEORGETOWN SYNAGOGUE-KESHER ISRAEL CONGREATION 2801 N Street, NW WASHINGTON, DC 20007 Tracking No: 5000153435<br><br>THE NATIONAL CAPITAL MIKVAH, INC., 1308 28th Street, NW WASHINGTON, DC 20007 Tracking No: 5000153436 |
| 12/02/2014 | Order Granting Motion * Entered on the Docket | Order Granting Motion for Leave to Proceed Under a Pseudonym signed by J/King on 12/1/14. |
| 12/02/2014 | Motion Filed: | Plaintiff's Motion for Leave to Proceed Under a Pseudonym and Memorandum of Points and Authorities in Support Thereof Filed. Attorney: KELLY, STEVEN J. (1021534) JANE DOE (PLAINTIFF); Receipt: 297298 Date: 12/02/2014 |
| 12/02/2014 | Order Granting Motion * Entered on the Docket | Order Granting Motion to Seal signed by J/King on 12/1/14. |

| 12/02/2014 | Motion to Seal Filed | Plaintiff's Motion to Seal and Memorandum of Points and Authorities in Support Thereof Filed.<br>Attorney: KELLY, STEVEN J. (1021534)<br>JANE DOE (PLAINTIFF); Receipt: 297298 Date: 12/02/2014 |
| 12/02/2014 | Event Scheduled | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 03/06/2015 Time: 9:30 am<br>Judge: DIXON JR, HERBERT B Location: Courtroom 415 |
| 12/02/2014 | Complaint for Negligence Filed | Complaint for Negligence Filed.<br>Attorney: KELLY, STEVEN J. (1021534)<br>JANE DOE (PLAINTIFF); Receipt: 297298 Date: 12/02/2014 |

| Receipt # | Date | From | Payments | | Fee | | Amount Paid |
|---|---|---|---|---|---|---|---|
| 298505 | 12/17/2014 | TIEVSKY, MATTHEW W | Efile | $20.00 | Cost | $20.00 | $20.00 |
| 298077 | 12/11/2014 | TIEVSKY, MATTHEW W | Efile | $20.00 | Cost | $20.00 | $20.00 |
| 298055 | 12/11/2014 | TIEVSKY, MATTHEW W | Efile | $20.00 | Cost | $20.00 | $20.00 |
| 297298 | 12/02/2014 | KELLY, STEVEN J. | Check | $160.00 | Cost | $160.00 | $160.00 |

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

**14 - 0007644**

Jane Doe

vs

The Georgetown University, et al.

Case Number: _____

Date: December 1, 2014

☐ One of the defendants is being sued
in their official capacity.

Name: *(Please Print)*
Steven J. Kelly

Firm Name:
Silverman, Thompson, Slutkin & White, LLC

Telephone No.:        Six digit Unified Bar No.:
410.385.2225          1021534

**Relationship to Lawsuit**

☒ Attorney for Plaintiff

☐ Self (Pro Se)

☐ Other: _____

TYPE OF CASE: ☐ Non-Jury      ☒ 6 Person Jury      ☐ 12 Person Jury
Demand: $ In Excess of Jurisdictional Amt.      Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED
Case No.: N/A _____      Judge: _____      Calendar #: _____

Case No.: _____      Judge: _____      Calendar#: _____

---

**NATURE OF SUIT:** *(Check One Box Only)*

**A. CONTRACTS**

☐ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 15 Special Education Fees
☐ 10 Mortgage Foreclosure/Judicial Sale

☐ 07 Personal Property
☐ 09 Real Property-Real Estate
☐ 12 Specific Performance
☐ 13 Employment Discrimination

**COLLECTION CASES**

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 16 Under $25,000 Consent Denied
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 18 OVER $25,000 Consent Denied

**B. PROPERTY TORTS**

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass
☐ 06 Traffic Adjudication

**C. PERSONAL TORTS**

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 09 Harassment
☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☒ 16 Negligence- (Not Automobile,
        Not Malpractice)

☐ 17 Personal Injury- (Not Automobile,
        Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE ☐ IF USED

CV-496/Oct 14

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 04 Condemnation (Emin. Domain)
- ☐ 05 Ejectment
- ☐ 07 Insurance/Subrogation
  Under $25,000 Pltf.
  Grants Consent
- ☐ 08 Quiet Title
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)

- ☐ 10 T.R.O./ Injunction
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment
- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability
- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award
  (DC Code § 16-4401)

- ☐ 25 Liens: Tax/Water Consent Granted
- ☐ 26 Insurance/ Subrogation
  Under $25,000 Consent Denied
- ☐ 27 Insurance/ Subrogation
  Over $25,000 Pltf. Grants Consent
- ☐ 28 Motion to Confirm Arbitration
  Award (Collection Cases Only)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 30 Liens: Tax/ Water Consent Denied
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower
- ☐ 34 Insurance/Subrogation
  Over $25,000 Consent Denied

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-1519 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a) (1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

_____
Attorney's Signature

December 1, 2014
_____
Date

CV-496/Oct 14



## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| Jane Doe, | * | |
| *Plaintiff,* | * | |
| v. | * | Case No. 14-0007644 _____ |
| The Georgetown University, *et al.* | * | |
| *Defendants.* | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PLAINTIFF'S MOTION TO SEAL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Plaintiff, Jane Doe, by and through her undersigned attorneys and pursuant to District of Columbia Superior Court Rule of Civil Procedure 5-III, hereby moves this Court to file under seal Exhibit A to Plaintiff's Motion for Leave to Proceed under Pseudonym ("Exhibit A"), and in support thereof state as follows:

Contemporaneously with this Motion, Jane Doe is filing a Motion for Leave to Proceed under Pseudonym and Memorandum of Points and Authorities in Support Thereof, and Exhibit A. In Exhibit A, Plaintiff discloses to Defendant her identity, which Plaintiff requests remain confidential for the same reasons set forth in the Memorandum in support of her Motion to Proceed under Pseudonym.

District of Columbia Superior Court Rule of Civil Procedure 5-III provides that "[a]ny document filed with the intention of being sealed shall be accompanied by a motion to seal or an existing order. The document will be treated as sealed pending the ruling on the motion." D.C. Super. Ct. R. Civ. P. 5-III.

This Court has broad discretion to order the sealing of a court document, and in doing so should consider the "relevant facts and circumstances of the particular case." *See Nixon v.*





*Warner Communications, Inc.*, 435 U.S. 589, 598-99 (1978). However, its discretion is exercised in light of the presumptive right to access to court records, which "extends to the motions and oppositions filed with the court, including their supporting exhibits." *See Mokhiber v. Davis*, 537 A.2d 1100, 1113 (D.C. 1988). In determining whether a seal order is appropriate, District of Columbia courts engage in an "open-ended inquiry . . . to determine whether there are reasons for closure that outweigh the interests favoring access." *Mokhiber*, 537 A.2d at 1116. Factors considered in this inquiry include: "the need to ensure a fair trial, the need to obtain the cooperation of witnesses and other sources of information, and the inequity of exposing parties or witnesses who acted in reliance on continuing confidentiality." *Id.*

All these factors strongly weigh in favor of sealing Exhibit A in this case. Notwithstanding her strong privacy interests in this highly sensitive matter, Plaintiff discloses her identifying information in good faith and voluntarily based on the genuine belief that the information will remain sealed from the public record. Further, the interests of justice and judicial administration are served by permitting victims of sex offenses to pursue their legal rights without the added emotional distress and humiliation attendant to public exposure. The precise legal authorities supporting Plaintiff's privacy interests are discussed in the accompanying Memorandum of Points and Authorities in Support of Plaintiff's Motion for Leave to Proceed under a Pseudonym.

The overwhelming special and compelling interest in protecting Plaintiff's identity outweighs any interest which the public may have in obtaining access to the identity of the Plaintiff. Therefore, in accordance with Rule 5-III, Plaintiff requests that the enclosed materials be filed under seal.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant her Motion to Seal and permit the filing under seal of Exhibit A to Plaintiff's Motion for Leave to File under Pseudonym.

Dated:  December 1, 2014

Respectfully submitted,

Steven J. Kelly (D.C. Bar No. 1021534)
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel:     (410) 385-2225
Fax:     (410) 547-2432
amckenna@silvermckenna.com
skelly@mdattorney.com


Steven D. Silverman (*Pro Hac Vice* Pending)
ssilverman@mdattorney.com
Stephen G. Grygiel (*Pro Hac Vice* Pending)
sgrygiel@mdattorney.com
201 North Charles Street, Suite 2600
Baltimore, Maryland 21201
Telephone:     (410) 385-2225
Telecopier:     (410) 547-2432

*Attorneys for Plaintiff*

3

## <u>RULE 12-I CERTIFICATION</u>

I certify that all the Defendants in this action are corporations and the undersigned is unaware of which, if any, attorneys are representing Defendants in this action. The undersigned was therefore unable to confer with counsel pursuant to Rule 12-I, but the undersigned will supplement this certification when, and if, he is made aware of Defendants' position through counsel or otherwise.

Steven J. Kelly, Bar No. 1021534

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of December 2014, a copy of Plaintiff's foregoing Motion for Leave to Proceed under a Pseudonym and Memorandum of Points and Authorities in Support Thereof, Exhibit A to Plaintiff's Motion, and the proposed order will be served upon Defendants along with the Complaint and other documents initiating this action.

Steven J. Kelly, Bar No. 1021534

*1 p g ~*

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

Jane Doe,                                    *

    *Plaintiff,*                          *                    **14 - 0 0 0 7 6 4 4**

    v.                                   *                    Case No. _____

The Georgetown University, *et al.*          *

    *Defendants.*                         *

*   *   *   *   *   *   *   *   *   *   *   *   *   *

### [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION TO SEAL

Upon consideration of Plaintiff's foregoing Motion to Seal, it is this 1 day of

Dec., 2014 hereby

**ORDERED** that Plaintiff's Motion to Seal Exhibit A to Plaintiff's Motion for Leave to

Proceed under a Pseudonym is **GRANTED.**  It is further

**ORDERED** that any future documents referring to Plaintiff by her actual name be filed

under seal and that, for all records filed with the Court, Plaintiff's address shall be listed as: Jane

Doe, c/o Silverman, Thompson, Slutkin & White, LLC, 201 North Charles Street, 26th Floor,

Baltimore, MD  21201.

SO ORDERED.

_____
Judge
Superior Court for the District of Columbia





11 pgs

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | | |
|---|---|---|
| Jane Doe, | * | |
| *Plaintiff,* | * | 14 - 0 0 0 7 6 4 4 |
| v. | * | Case No. _____ |
| The Georgetown University, *et al.* | * | |
| *Defendants.* | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PLAINTIFF'S MOTION FOR LEAVE TO PROCEED UNDER A PSEUDONYM AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Plaintiff, Jane Doe, by and through her undersigned counsel, respectfully requests that this Court grant her leave to proceed under a pseudonym. Plaintiff requests this leave to prevent the disclosure of her identity, which would cause her irreparable harm. The relevant facts and points and authorities supporting this Motion are set forth herein.

### FACTUAL & PROCEDURAL BACKGROUND

This action arises out of an unfathomable breach of trust by respected Rabbi and religious scholar, Bernard "Barry" Freundel, Ph.D. ("Freundel") who used surveillance equipment to capture naked images of his students and congregants during a sacred religious ritual. Freundel was the Rabbi for Defendant The Georgetown Synagogue – Kesher Israel Congregation ("Kesher Israel") and was also the founder and principal of Defendant The National Capital Mikvah, Inc. ("NCM"). Further, Freundel was a longtime professor at Defendant The Georgetown University ("Georgetown"). Plaintiff brings this action individually against Georgetown. Plaintiff asserts class action claims against Kesher Israel and NCM on behalf of the class of similarly situated women.





The vast majority of the wrongful acts giving rise to this action were performed in a "mikvah" that is nominally owned and operated by NCM in a building adjacent to Kesher Israel. A mikvah is a pool of water in which members of the Jewish faith totally immerse themselves (the immersion is of the entire body including one's hair) while they are completely naked and stripped of all "barriers," including jewelry, makeup, and any other beauty products on the hair or skin. However, upon information and belief, NCM is substantially controlled by Kesher Israel and was built using Kesher Israel funds and assets. Accordingly, the mikvah purportedly operated by NCM is referenced herein as the "NCM/Kesher Israel Mikvah." The NCM/Kesher Israel Mikvah, like most mikvahs, has a changing room connected to the room with the mikvah's ritual batch, where participants shower and change prior to immersing. Traditionally, the mikvah has been used by Orthodox Jewish women to purify themselves prior to resuming marital relations with their husbands after their menstrual cycles and childbirth. Jewish men also use the mikvah to purify themselves. The mikvah also plays an important role in an individual's conversion to Judaism, as immersion in the mikvah is the final step in the conversion process. In recent years, survivors of sexual assault have also used the mikvah to help them heal emotionally and spiritually from the pain associated with sexual assault.

Plaintiff is a third-year law student at Georgetown University Law Center ("Georgetown Law"), which is owned and operated by Georgetown. Plaintiff was enrolled in Freundel's "Jewish Law Seminar" course (the "Jewish Studies" class) during the 2014 Spring Semester at Georgetown Law. Plaintiff was excited to enroll in a Jewish Studies class co-taught by Freundel, a leader in the national Orthodox community, and Rabbi David Saperstein, a highly respected religious and civic leader. The Jewish Studies class required a final research paper and Plaintiff

2

approached Freundel for suggested topics. Freundel eagerly suggested that Plaintiff write her Georgetown Law research paper on the mikvah.

On the same night Freundel strongly encouraged Plaintiff to do a paper on the mikvah, Freundel encouraged Plaintiff to set up a time when he could take her to the NCM/Kesher Israel Mikvah as part of her research assignment. Plaintiff went to the NCM/Kesher Israel Mikvah twice as part of her official research for her Georgetown Law paper. Plaintiff completed the paper and was awarded an "A" by Freundel and Rabbi Saperstein. An award for the highest course grade was also conferred upon Plaintiff by Georgetown Law.

Plaintiff was horrified when Freundel's criminal wrongdoing came to light. On September 28, 2014, a woman in charge of maintaining the NCM/Kesher Israel Mikvah's changing area and showers who, upon information and belief, is or was an employee of NCM and/or Kesher Israel, noticed Freundel plugging in a clock inside the changing area of the Mikvah, adjacent to the shower. The woman advised Freundel that there was already a clock on the wall to which Freundel responded "this clock will help with the ventilation in the shower." On or about October 12, 2014, the same employee removed the clock, examined it, and found that it contained a hidden camera and memory card. On or about October 14, 2014, District of Columbia Metropolitan Police Department ("MPD") officers arrested Freundel and criminally charged him with, among other things, voyeurism. MPD's investigation is ongoing. Subsequent searches of Freundel's home and offices yielded, among other things, several laptop computers, desktop computers, external computer hard drives, digital cameras, memory cards, flash drives, electronically deleted files labeled with women's names, a second clock with a hidden camera and memory card, a tissue box containing a hidden camera, a computer charger containing a hidden camera, and nude photographs of women.

Based on Freundel's strange behavior, Plaintiff has little doubt Freundel was manipulating her into using the NCM/Kesher Israel Mikvah in order to sexually exploit her. Plaintiff was devastated when she learned that, under the guise of his positions with Georgetown, Kesher Israel, and NCM, Freundel had lured her to the mikvah for the purposes of sexual exploitation. Freundel's breach of trust has cut Plaintiff to her core—shattering her trust in religious and educational institutions that have failed to live up to their reputations for excellence.

Moreover, from the evidence revealed by police and in media reports, it is evident that Freundel used his various positions to lure attractive and unsuspecting young women to the NCM/Kesher Israel Mikvah for the express purpose of sexually exploiting them. Plaintiff, and scores of women like her, have suffered, and will continue to suffer, grave emotional distress and other harm and damages as a direct result of Freundel's actions and Defendants' utter failure to take any steps to prevent Freundel from engaging in those actions.

To avoid any further humiliation, Plaintiff seeks to shield her public identity. Given the sexual nature of the conduct at issue and the highly personal and sensitive nature of Defendant's breach of trust, such relief is plainly warranted.

## **ARGUMENT**

The District of Columbia Superior Court Rules of Civil Procedure require that the title of the complaint "include the names of all the parties" and further states that "[e]very action shall be prosecuted in the name of the real party in interest." D.C. Super. Ct. R. Civ. P. 10(a), 17(a). The District of Columbia courts have seldom had occasion to interpret these rules in the context of a request by a party to proceed pseudonymously. However, federal courts have frequently addressed the issue when interpreting the virtually identical federal counterparts to these rules. Where, as here, the District of Columbia Rules and their federal counterparts are virtually

4

identical, District of Columbia courts may consider federal precedent as persuasive in interpreting District of Columbia rules. *See e.g.*, *Walker v. District of Columbia*, 656 A.2d. 722, 725 (D.C. 1995).

Although the Supreme Court has never formally acknowledged[1] the permissibility of using a pseudonym, federal trial and appellate courts have allowed parties to proceed anonymously under circumstances such as those presented here. *See Doe v. Megless*, 654 F.3d 404, 408 (3d. Cir. 2011). Determining whether to allow a plaintiff to file under a pseudonym is within the sound discretion of the trial court. *United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995); *see also James v. Jacobsen*, 6 F.3d 233, 238 (4th Cir. 1993). In considering a request to allow a plaintiff to proceed pseudonymously, courts balance the public interest in access to trials with the legitimate interests of the party making the request. *See Nat'l Ass'n of Waterfront Emp'rs v. Chao*, 587 F. Supp. 2d 90, 98 (D.D.C. 2008). The U.S. District Court for the District of Columbia has employed a five-factor balancing test that considers:

> (1) Whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of a sensitive and highly personal nature; (2) whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; (3) the ages of the persons whose privacy interests are sought to be protected; (4) whether the action is against a governmental or private party; and (5) the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Id.* at 99. A party may proceed anonymously where, as here, the majority of the factors militate in that party's favor. *See id.* Here, four[2] of these factors weigh strongly in favor of this Court granting Plaintiff's request for leave to proceed pseudonymously.

---

[1]  The Court has implicitly approved the practice of permitting plaintiffs to proceed under pseudonym in a number of cases. *See, e.g., Roe v. Wade*, 410 U.S. 113 (1973); *Doe v. Bolton*, 410 U.S. 179 (1973); *Poe v. Ullman*, 367 U.S. 497 (1961).

[2]  The age factor does not apply here because the named Plaintiff is an adult.

First, Plaintiff's objective in proceeding in this manner is primarily to preserve her privacy in this highly sensitive and personal matter. This case involves a particularly humiliating act of sexual exploitation in the context of a highly personal religious observance. Future pleadings are likely to include highly personal and embarrassing accounts of Plaintiff's private, religious observance and Freundel's exploitation of that observance for his own sexual gratification. Commentators have recognized that involuntarily disclosing the identity of victims of such acts results in real psychological harm to victims far more severe than "mere embarrassment." *See* Paul Marcus & Tara L McMahon, *Limiting Disclosure of Rape Victims' Identities*, 64 S. Cal. L. Rev. 1020, 1049 (1991). Further, many courts have held that the victim's privacy interest in matters relating to sexual health and reproduction warrant permitting the victim to proceed under a pseudonym. *See, e.g., Doe v. Bodwin*, 326 N.W. 2d 473, 476 (Mich. Ct. App. 1982) (permitting plaintiff to proceed anonymously in case involving sexual impropriety of defendant); *E.E.O.C. v. ABM Indus., Inc.*, 249 F.R.D. 588, 593-94 (E.D. Cal. 2008) (permitting plaintiff to proceed under pseudonym in sexual harassment case); *Roe*, 410 U.S. at 152-153 (recognizing constitutional right of "personal privacy" in such matters).

Second, Ms. Doe has a reasonable fear Freundel and/or his supporters will retaliate against her for bringing this claim. Freundel has been released pending trial and himself may well pose a physical threat to Plaintiff. Recognizing this potential danger, this Court has issued stay away orders against Freundel as to Kesher Israel and NCM as a condition of his pretrial release. *See* Release Order, *United States of America v. Bernard Freundel,* Crim. Case No. 14-CMD-18262 (D.C. Super. Ct. Oct. 15, 2014).

Moreover, Plaintiff justifiably fears retaliation from the broader Orthodox community. The cultural norms of the Orthodox Jewish community forbid its members of speaking poorly of

a rabbi—even where that rabbi has committed wrongful acts against the member. According to the Washington Post and other news media, approximately ten (10) years ago, around the same time Freundel was leading the charge to construct the NCM/Kesher Israel Mikvah, Kesher Israel responded to persistent complaints, concerns, and criticism of Freundel from members of its congregation by issuing a statement to the congregation, essentially a religious "gag" order. The Board of Directors' statement ordered Kesher Israel congregants "to cease to participate in any Lashon Hara,[3] to stop listening to insinuations and attacks, and to disassociate [themselves] from [such slanderous and negative talk about Freundel], and finally to respond forcefully in opposition to Lashon Hara" against Freundel.[4] Orthodox norms also generally do not permit taking legal action against members of the community. Because Plaintiff has sued Kesher Israel and NCM, she is therefore in reasonable fear of retaliation by supporters and followers of Freundel, Kesher Israel, and/or NCM.

Third, because all parties to this action are private parties, the fourth factor articulated by the court in *Chao* favors allowing Plaintiff to proceed pseudonymously. *See generally Chao*, 587 F. Supp. 2d at 98. All the Defendants are publicly recognized corporations. This Court has recognized the reputational concerns apparent with individual defendants do not generally apply to corporations. *See Doe v. De Amigos, LLC*, Civ. Action No. 11-1755 (ABJ) (U.S.D.C. Apr. 30, 2012).

Finally, there is no risk of unfairness to the opposing parties. Plaintiff has attached, as **Exhibit A** (filed under seal), an affidavit that sets forth her identity. The sealed Affidavit will be served, along with this Motion and the Complaint and all other documents required to be served

---

[3] "Lashon Hara" is slanderous, negative talk, which is considered sinful in Judaism.

[4] *See* Peter Herman, *Prominent D.C. Rabbi Accused of Voyeurism Presents a Disturbing Paradox,* Washington Post, Nov. 8, 2014.

as initial process by this Court, on Defendants. In addition, Plaintiff will not object to engaging in any discovery otherwise permitted by the District of Columbia rules as long as the parties are able to agree to a protective order that protects Plaintiff's identity from public disclosure. Conducting this case in this manner results in no risk of unfairness to the Defendant. *See Plaintiff B. v. Francis*, 631 F.3d 1310, 1315 (11th Cir. 2011) (citing *Doe v. Smith*, 429 F.3d 706, 710 (7th Cir. 2005)).

## CONCLUSION

This case falls squarely within the class of cases in which courts have permitted plaintiffs to proceed pseudonymously. The highly sensitive nature of the factual allegations paired with Plaintiff's reasonable fears of physical or mental harm weigh strongly in favor of allowing Plaintiff to proceed pseudonymously. Moreover, because Plaintiff is willing to disclose her identity in a sealed affidavit and to cooperate with Defendant's reasonable discovery requests, there is no real risk of unfairness to Defendant. Accordingly, Plaintiff respectfully requests that this Court grant this Motion.

Dated:  December 1, 2014

Respectfully submitted,


Steven J. Kelly (D.C. Bar No. 1021534)
Anne T. McKenna (D.C. Bar No. 450414)
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel:  (410) 385-2225
Fax: (410) 547-2432
skelly@mdattorney.com
amckenna@silvermckenna.com


Steven D. Silverman (*Pro Hac Vice* Pending)
Stephen G. Grygiel (*Pro Hac Vice* Pending)
Sima G. Fried (*Pro Hac Vice* Pending)
201 North Charles Street, Suite 2600
Baltimore, Maryland 21201
Telephone:  (410) 385-2225
Telecopier:  (410) 547-2432
ssilverman@mdattorney.com
sgrygiel@mdattorney.com
sfried@mdattorney.com


*Attorneys for Plaintiff*

## **RULE 12-I CERTIFICATION**

I certify that all the Defendants in this action are corporations and the undersigned is unaware of which, if any, attorneys are representing Defendants in this action.  The undersigned was therefore unable to confer with counsel pursuant to Rule 12-I, but the undersigned will supplement this certification when, and if, he is made aware of Defendants' position through counsel or otherwise.

Steven J. Kelly, Bar No. 1021534

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of December, a copy of Plaintiff's foregoing Motion for Leave to Proceed under a Pseudonym and Memorandum of Points and Authorities in Support Thereof, Exhibit A to Plaintiff's Motion, and the proposed order will be served upon Defendants along with the Complaint initiating this action.

Steven J. Kelly, Bar No. 1021534



## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

Jane Doe,                                         *

    *Plaintiff,*                            *

    v.                                       *         14 - 0 0 0 7 6 4 4

                                  *         Case No. _____

The Georgetown University, *et al.*               *

    *Defendants.*                           *

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED UNDER A PSEUDONYM

Upon consideration of Plaintiff's Motion to For Leave to Proceed Under a Pseudonym and finding good cause supporting the same, it is on this 1st day of Dec, 2014, hereby ORDERED that the Motion is GRANTED as follows:

    A.  The name of the Plaintiff shall be "Jane Doe" on all pleadings and papers contained in the public record; and

    B.  The address for Plaintiff used by the Clerk of this Court for the Complaint and in all pleadings or documents filed with the Court shall be:

        JANE DOE
        c/o Silverman, Thompson, Slutkin & While, LLC
        201 North Charles Street, 26th Floor
        Baltimore, MD  21201

SO ORDERED.

_____
Judge
Superior Court for the District of Columbia







## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

**JANE DOE,**
c/o SILVERMAN, THOMPSON, SLUTKIN & WHITE,
LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201

      *Plaintiff,*

v.

**THE GEORGETOWN UNIVERSITY,**
37th & O Streets, NW
204 Healy Hall
Washington, D.C. 20057

**SERVE ON:**

    Lisa Brown, Registered Agent
    37th & O Streets, NW
    202 Healy Hall
    Washington, D.C. 20057

and

**THE GEORGETOWN SYNAGOGUE –
KESHER ISRAEL CONGREGATION,**
2801 N Street, NW
Washington, D.C. 20007

**SERVE ON:**

    The Georgetown Synagogue – Kesher
    Israel Congregation
    2801 N Street, NW
    Washington, D.C. 20007

and

**THE NATIONAL CAPITAL MIKVAH, INC.,**
1308 28th Street, NW
Washington, D.C. 20007

**SERVE ON:**

    Sarah Barak, Registered Agent
    1559 33rd Street, NW
    Washington, D.C. 20007

      *Defendants.*

FILED
CIVIL ACTIONS BRANCH

DEC 02 2014

Superior Court of the
District of Columbia
Washington, D.C.

CIVIL ACTION NO. **14 - 0 0 0 7 6 4 4**



Case: 2014 CA 007644 B



1

## CLASS ACTION & INDIVIDUAL COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff Jane Doe ("Plaintiff" or "Named Plaintiff"),[1] individually and on behalf of the class of similarly situated individuals,[2] by and through her undersigned attorneys, hereby sues Defendants, The Georgetown University ("Georgetown"), The Georgetown Synagogue – Kesher Israel Congregation ("Kesher Israel"), and The National Capital Mikvah, Inc. ("NCM") (collectively, the "Defendants"), and states as follows:

### I.   INTRODUCTION

1.   This case arises from an unfathomable breach of trust by a Georgetown professor and religious leader and Defendants' utter failure to prevent and/or to stop it. Rabbi Bernard "Barry" Freundel, Ph.D. ("Freundel") lured his students, congregants, and others into the sacred religious cleansing ritual of "mikvah" to sexually exploit the women by capturing their naked images using concealed cameras and recording devices without their knowledge or consent. For years, Defendants turned a blind eye to obvious signs of Freundel's increasingly bizarre behavior, ignoring the bright red flags that Freundel was acting inappropriately with women subjected to his authority. Defendants were derelict in their duties to their congregants and students, thereby permitting Freundel's devastating sexual exploitation of Plaintiff and other similarly situated women.

2.   Plaintiff is a third-year law student at Georgetown University Law Center ("Georgetown Law") who is devoted to her Jewish faith and who selected Georgetown Law because of its reputation for excellence and diversity.

---

[1]   Pursuant to the D.C. Superior Court Rules of Civil Procedure, contemporaneous with the filing of this Complaint, Plaintiff has filed a motion to proceed under a pseudonym that sets forth the precise legal and factual basis for Plaintiff's need to conduct this litigation in this manner.

[2]   Plaintiff asserts class action claims against The Georgetown Synagogue – Kesher Israel Congregation and The National Capital Mikvah, Inc. only. The claims against The Georgetown University are brought solely in Plaintiff's individual capacity at this stage of the proceedings.

3.    Plaintiff was excited to enroll in a "Jewish Law Seminar" course (the "Jewish Studies" class) co-taught by Freundel and Rabbi David Saperstein. Freundel suggested that Plaintiff write the mandatory research paper on the mikvah ritual and, as part of her Georgetown Law Jewish Studies class, Freundel required Plaintiff to participate in the immersion ritual at the mikvah built by Kesher Israel and owned and operated by NCM (the "NCM/Kesher Israel Mikvah"). Freundel also invited Plaintiff to attend services at Kesher Israel on numerous occasions. Freundel further invited Plaintiff to join his family and the Kesher Israel community at various religious dinners at the Kesher Israel Rabbinical Residence where Freundel resided (hereinafter defined), including Friday night Sabbath dinner and Passover Seder. Plaintiff was delighted to be part of a religious community and to be integrating her legal education with her Jewish faith.

4.    Plaintiff was devastated when she learned that, under the guise of his positions with Georgetown Law, Kesher Israel, and NCM, Freundel had lured her to the NCM/Kesher Israel Mikvah to sexually exploit her. Freundel's breach of trust has cut Plaintiff to her core— shattering her trust in religious and educational institutions that have failed to live up to their reputations for excellence.

5.    Plaintiff asserts this claim against Georgetown for its obvious lack of due diligence in hiring, training, retaining, and supervising Freundel and/or investigating the NCM/Kesher Israel Mikvah in any manner.

6.    Plaintiff also asserts this claim against Georgetown for its liability for the acts of its professor, employee, and/or agent – Freundel.

7.    Plaintiff asserts this claim against Kesher Israel and NCM on behalf of the entire class of women who were sexually exploited at the NCM/Kesher Israel Mikvah based on these

Defendants' utter failure to investigate Freundel prior to hiring him and their utter failure to take any meaningful action to prevent the obvious harm Freundel posed to congregants and conversion students.

8.     Plaintiff also asserts this claim against Kesher Israel and NCM on behalf of the entire class of women who were sexually exploited at the NCM/Kesher Israel Mikvah through the acts of their employee, agent, and/or servant – Freundel.

## II.     PARTIES, JURISDICTION, & VENUE

9.     Plaintiff Jane Doe is a natural person who resides in the District of Columbia.

10.     Defendant Georgetown is a private educational institution organized and existing under the laws of the District of Columbia with its principal place of business at 37th & O Streets, NW, 204 Healy Hall, Washington, D.C. 20057.

11.     Defendant Kesher Israel is a private religious institution organized and existing under the laws of the District of Columbia with its principal place of business at 2801 N Street, NW, Washington, D.C. 20007. Kesher Israel raised the money necessary to build the mikvah owned and operated by NCM.

12.     Defendant NCM owns and operates the NCM/Kesher Israel Mikvah and is organized and existing under the laws of the District of Columbia with its principal place of business at 1308 28th Street, NW, Washington, D.C. 20007.

13.     This Court has subject matter jurisdiction over this action pursuant to D.C. Code Ann. § 11–921(a) because this action is being brought in the District of Columbia.

14.     This Court has personal jurisdiction over each of the above-named Defendants pursuant to D.C. Code Ann. § 13–422 because each of the Defendants is organized under the laws of the District of Columbia and is domiciled in the District of Columbia.

15.    In addition and in the alternative, this Court has personal jurisdiction over each of the above-named Defendants pursuant to D.C. Code Ann. § 13–423(a)(1) and (3) because each Defendant transacts business in the District of Columbia and caused tortious injury to Plaintiff in the District of Columbia by an act or omission in the District of Columbia.

16.    Venue in this Court is proper because each of the above-mentioned Defendants' acts and omissions described in this Complaint occurred within the District of Columbia.

### III.    FACTS COMMON TO ALL COUNTS

17.    At all relevant times, Freundel was an Adjunct Professor at Georgetown, where he taught Georgetown Law school students, including Plaintiff, educational courses including, but not limited to, the Jewish Studies class. Freundel did so at all times as an actual and/or apparent agent, servant, and/or employee of Georgetown.

18.    At all relevant times, Freundel also served as the Rabbi at Kesher Israel. Freundel did so as an actual and/or apparent agent, servant, and/or employee of Kesher Israel.

19.    At all relevant times, Freundel also served as the supervising Rabbi of the NCM/Kesher Israel Mikvah. Freundel did so at all times as an actual and/or apparent agent, servant, and/or employee of NCM.

### A.    FREUNDEL CREATES FOR HIMSELF A POWERFUL LEADERSHIP POSITION IN THE WASHINGTON METROPOLITAN JEWISH COMMUNITY

20.    Kesher Israel selected Freundel to be its leader in 1987. According to Kesher Israel's website, "with his exceptional intellectual mind, Rabbi Freundel helped Kesher Israel become a beacon of modern orthodoxy and a shul that sees traditional Judaism as essential, while also understanding the value of modern society." Kesher Israel's website also indicates: "During Rabbi Freundel's tenure, Kesher Israel experienced growth in membership and the expansion of

the congregant demographic to include college and graduate students, young professionals, interns . . . ."

21.     At all relevant times, Freundel resided at 2801 N Street, NW, Washington, D.C. 20007, in a dwelling that was owned, operated and managed by Kesher Israel and that was used by Freundel in connection with his official Kesher Israel functions (the "Rabbinical Residence").

22.     In addition to leading the Kesher Israel congregation, Freundel also maintained a leadership role in the broader Orthodox community.

23.     Most notably, Freundel was a leader in the Rabbinical Council of America ("RCA"), a national non-profit organization whose mission is "to advance the cause and voice of the Torah and the rabbinic tradition by promoting the welfare, interests, and professionalism of Orthodox rabbis all around the world."

24.     In particular, Freundel was the architect of the RCA's Gerus Policies and Standards ("GPS") system, and served as the long-time chair of that committee within the RCA.

25.     The GPS's primary mission is to provide a centralized system of standards Orthodox rabbis must follow for "converts" and/or individuals not recognized by the RCA as "Jewish" who wish to convert to Judaism. Conversion is critical to certain individuals because in the Orthodox community it serves as a prerequisite to a Jewish marriage, can determine whether an individual's offspring are considered to be "Jewish," is a prerequisite to Israeli citizenship, and it can affect an individual's right to purchase real property in Israel.

26.     Freundel devised a system of regional "courts" that function under the direction and leadership of local rabbis and that are sanctioned by the RCA's GPS program, which Freundel headed.

27.     Because of his leadership position, Freundel served as the ultimate arbiter for any person seeking to convert to Judaism in the Washington Metropolitan area and, with the full knowledge and support of Kesher Israel, Freundel placed himself in an excellent position to sexually and otherwise exploit converts, over whom he exercised great power and control.

28.     Freundel also served as the head of the Rabbinical Council of Greater Washington, the Orthodox body that supervises kosher dietary laws in the greater Washington area.

### B.     FREUNDEL OPENS A MIKVAH AS A SEXUAL EXPLOITATION DEVICE

29.     A "mikvah" is a pool of water in which members of the Jewish faith completely immerse themselves (the immersion is of the entire body including one's hair) while they are completely naked and stripped of all "barriers," including jewelry, makeup, and any other beauty products on the hair or skin. The purpose of the immersion ritual is to cleanse the soul and purify the participant. In recent years, survivors of sexual assault have participated in the mikvah ritual to help them heal emotionally and spiritually from the pain associated with sexual assault. The pool of water at the NCM/Kesher Israel Mikvah resembles a large bathtub and is adjacent to a bathroom that participants use to shower and prepare for the immersion ritual (the "Changing Room").

30.     Converts to Judaism are required to immerse in a mikvah as the final step in the conversion process. Although a mikvah is traditionally used only by Jewish persons and those persons about to convert to Judaism, Freundel often urged individuals traditionally not welcome in a mikvah, including non-Jews and unmarried women, to use the NCM/Kesher Israel Mikvah.

31.     Despite serious concerns within Kesher Israel and in the greater Jewish Orthodox community concerning Freundel's behavior toward converts, Kesher Israel permitted Freundel to establish a mikvah that would essentially be controlled by Freundel under the auspices of Kesher

Israel. Upon information and belief, Freundel wanted to set up a mikvah that would be completely under his control, that no other Orthodox rabbi would be permitted to use, and that would be open to conversion students and converts to Judaism.

32.     Upon information and belief, Freundel used Kesher Israel's assets to plan and fund the proposed mikvah and, with Kesher Israel's knowledge and consent, he began diverting donations made to Kesher Israel to his effort to found and construct what ultimately became the NCM/Kesher Israel Mikvah.

33.     According to public filings with the Department of Consumer and Regulatory Affairs for the District of Columbia ("DCRA"), NCM incorporated in 2000 for the sole purpose of operating the mikvah.

34.     DCRA filings indicate that NCM's "business address" is the same as the address used by Kesher Israel: 2801 N. Street, NW, Washington, D.C. 20007.

35.     Further, DCRA filings reveal that NCM's Director and Resident Agent is Sarah Barak. Upon information and belief, Sarah Barak is the wife of David Barak, who sat on Kesher Israel's Board of Directors, is a former President of the NCM/Kesher Israel Mikvah, and who has maintained a leadership role in the Kesher Israel congregation.

36.     Upon information and belief, Defendants Kesher Israel and NCM opened the NCM/Kesher Israel Mikvah in 2005 in the basement of the building adjacent to Kesher Israel.

37.     At all relevant times, Freundel was in charge of performing and overseeing the sacred religious immersion rituals at the NCM/Kesher Israel Mikvah.[3]

38.     Defendants Kesher Israel and NCM operated the NCM/Kesher Israel Mikvah with the assistance of their agent/employee Freundel and Freundel oversaw and performed the

---

[3]     Pursuant to the law associated with mikvah, Freundel was not present in the mikvah bathing area during the immersion. Instead, a female attendant was present throughout the ritual and Freudel remained in the building.

immersion rituals on the property of NCM and/or Kesher Israel. Freundel did so as an actual and/or apparent agent, servant, and/or employee of NCM and/or Kesher Israel.

## C.   FREUNDEL USES HIS POSITION AT GEORGETOWN LAW TO LURE PLAINTIFF TO THE NCM/KESHER ISRAEL MIKVAH

39.    In 2014, Plaintiff was enrolled in Freundel's Jewish Studies class at Georgetown Law, which is co-taught by Rabbi David Saperstein, President Obama's recent nominee to serve as Ambassador-at-Large for International Religious Freedom. The Jewish Studies class requires, among other things, that each student write a 25-page research paper on an approved topic that is related to Jewish law.

40.    On or about January 22, 2014, and prior to the start of that evening's class, Plaintiff approached Freundel seeking assistance in selecting a topic for her research paper. While acting in his capacity as a Georgetown Adjunct Professor, Freundel immediately, and without hesitation, urged the Plaintiff to write her research paper about the mikvah ritual. Freundel advised Plaintiff that one of his former Georgetown Law students previously wrote a research paper about mikvah, that the paper was "very successful," and that the former student "got an A." Freundel insisted that Plaintiff write about mikvah, going so far as to, on the spot, provide Plaintiff with an outline of the various issues to be addressed in her research paper. After that evening's class, Freundel approached Plaintiff and invited her to immerse at the NCM/Kesher Israel Mikvah. Freundel urged Plaintiff, as research for her paper, to call him to set up a time to attend the NCM/Kesher Israel Mikvah.

41.    By virtue of Plaintiff seeking Rabbi Freundel's assistance in selecting a topic for her research paper, Plaintiff became one of a handful of students assigned to be mentored by Freundel in the Jewish Studies class.

42.   Plaintiff visited the NCM/Kesher Israel Mikvah and immersed two separate times as part of the research for her Georgetown Law-required research paper.

43.   In February 2014, Freundel and Plaintiff communicated via e-mail regarding scheduling Plaintiff's first visit to the NCM/Kesher Israel Mikvah.

44.   On or about March 2, 2014, Plaintiff went to the NCM/Kesher Israel Mikvah. Before the immersion rituals began, Freundel entered the Changing Room to prepare it for the participants in the mikvah ritual. Thereafter, Freundel accompanied Plaintiff into the Changing Room and specifically directed Plaintiff as to where she should place her clothing when she undressed, where and how to shower, and what shower products to use. Once Freundel had exited the Changing Room area, Plaintiff disrobed, showered, entered the mikvah's ritual bath area, and immersed herself while fully nude in the NCM/Kesher Israel Mikvah in accordance with Freundel's instructions. Following her immersion, Freundel invited Plaintiff to Passover services at Kesher Israel and to a Passover Seder being held at the Kesher Israel Rabbinical Residence.

45.   In or around March 2014, Freundel approached Plaintiff and inquired about her experience immersing in the NCM/Kesher Israel Mikvah. After discussing Plaintiff's first mikvah experience, Freundel urged that Plaintiff participate in a second immersion at the NCM/Kehser Israel Mikvah where just Plaintiff and Freundel would be present.  Plaintiff did not follow up on Freundel's invitation.

46.   On or about March 31, 2014, and without request or prior inquiry from Plaintiff, Freundel e-mailed Plaintiff and asked her to return to the NCM/Kesher Israel Mikvah on the following Thursday to participate in a second immersion.

47.     On or about April 2, 2014, Freundel called Plaintiff to confirm she would attend the NCM/Kesher Israel Mikvah on April 3, 2014 because Freundel wanted to make sure he was present during Plaintiff's second visit.

48.     On or about April 3, 2014, Plaintiff returned to the NCM/Kesher Israel Mikvah. As he had before, Freundel entered the Changing Room to organize it for Plaintiff's pre-immersion preparations. Freundel once again accompanied Plaintiff into the Changing Room and, again, specifically directed her where she should place her clothing when she undressed, where and how to shower, and what shower products to use. As before, once Freundel had exited the Changing Room, Plaintiff disrobed, showered, went into the mikvah's ritual bath area, and immersed herself while fully nude in the NCM/Kesher Israel Mikvah in accordance with Freundel's instructions.

49.     Following her second immersion in the NCM/Kesher Israel Mikvah, Freundel reiterated his prior invitation of Plaintiff to attend Passover services at Kesher Israel and, after the services, to attend a Passover Seder with his family and others at the Kesher Israel Rabbinical Residence. On several occasions, Freundel had also invited Plaintiff to attend Shabbat services at Kesher Israel and, following those services, to attend Shabbat dinners with his family and others at the Kesher Israel Rabbinical Residence.

50.     Upon information and belief, on each of Plaintiff's visits to the NCM/Kesher Israel Mikvah, Freundel intentionally placed in the Changing Room a clock-radio containing an electronic recording device capable of capturing video, audio, and/or still images. Freundel did so for the purpose of surreptitiously observing, electronically recording, and intentionally capturing video, audio, and still images of Plaintiff's private areas while Plaintiff was using the Changing Room, was disrobing and showering, and was totally or partially undressed in both the

11

Changing Room and the ritual bath area of the mikvah. Freundel further willfully and intentionally intercepted, or in the alternative, willfully endeavored to intercept, through the means of an electronic recording device, Plaintiff's oral communications while Plaintiff was using the Changing Room and the mikvah. Freundel committed all of these acts without notice to Plaintiff and without Plaintiff's knowledge or consent.

51.     Upon information and belief, on each of Plaintiff's visits to the NCM/Kesher Israel Mikvah, Freundel had installed cameras and/or other electronic surveillance and recording devices in the ritual bath area of the NCM/Kesher Israel Mikvah and, without Plaintiff's knowledge or consent, Freundel captured images and/or recorded video and audio of Plaintiff while she was completely naked for the express purpose of sexually exploiting her.

52.     Upon information and belief, Freundel willfully and intentionally captured, possessed, and/or distributed images, audio-recordings, and/or video depicting Plaintiff while in a state of undress, without her knowledge or consent.

53.     Upon information and belief, Freundel used equipment owned by Kesher Israel to capture Plaintiff's images, oral communications, and/or video and, upon information and belief, Freundel stored the video, audio-recordings, and/or photographs depicting Plaintiff in or on devices and/or equipment owned by Kesher Israel in his Kesher Israel office and/or at the Rabbinical Residence.

54.     In or around May 2014, Plaintiff submitted her research paper to Georgetown Law as her official final examination in the Jewish Studies class. Plaintiff's research paper was entitled: "The *Mikveh*: Expanding the Ritual for Jewish Women" (the "Paper").

55.     In her Paper, Plaintiff explicitly states she immersed in the NCM/Kesher Israel Mikvah "as a research tool for this paper."

12

56.     Indeed, the Paper details how Plaintiff twice immersed herself in the NCM/Kesher Israel Mikvah at the request of her Georgetown Law professor. Plaintiff notes that her second immersion was to "continue my research for this paper" and "to connect to Judaism on a deeper level." Plaintiff notes, with the facilitation of her trusted Georgetown Law professor, "I transformed the meanings of those waters and made it my own. I reinterpreted the ritual to purify my soul."

57.     Freundel and Saperstein gave Plaintiff's Paper an "A" and conferred on Plaintiff an award for achieving the highest grade of all final research papers submitted in the Jewish Studies class. Georgetown Law also posted Plaintiff's Paper to an electronic database permitting other students to view the Paper as a "model examination."

**D.      FREUNDEL'S CRIMINAL WRONGDOING COMES TO LIGHT**

58.     On or about September 28, 2014, a woman in charge of maintaining the NCM/Kesher Israel Mikvah's Changing Room who, upon information and belief, is or was an employee of Kesher Israel and/or NCM, noticed Freundel place a "Dream Machine" clock-radio in the Changing Room adjacent to the shower. The woman advised Freundel that there was already a clock on the wall of the Changing Room, to which Freundel responded "this clock will help with the ventilation in the shower."

59.     On or about October 12, 2014, the same Kesher Israel/NCM employee removed the "Dream Machine" clock-radio she had seen Freundel place in the Changing Room, examined it, and discovered that it contained hidden electronic recording devices including, but not limited to, a hidden camera and memory card.

60.     On or about October 14, 2014, officers of the District of Columbia Metropolitan Police Department ("MPD") arrested Freundel and criminally charged him with, among other charges, voyeurism. MPD's investigation is ongoing.

13

61. Also on or about October 14, 2014, MPD officers executed search warrants on both Kesher Israel and the Rabbinical Residence.

62. To date, police searches of the Rabbinical Residence, Kesher Israel, and other offices maintained by Freundel have revealed, among other things, the following: several laptop computers, desktop computers, external computer hard drives, digital cameras, memory cards, flash drives, electronically deleted files labeled with women's names, a second clock with a hidden camera and memory card, a tissue box containing a hidden camera, a computer charger containing a hidden camera, and nude photographs of women.

63. MPD and several other area law enforcement agencies are conducting investigations into Freundel's criminal sexual exploitation.

E. **RED FLAGS IGNORED BY KESHER ISRAEL AND NCM**

64. Based upon Freundel's planning and urging, Defendants Kesher Israel and NCM opened the NCM/Kesher Israel Mikvah in 2005 under the name "National Capital Mikvah."

65. The manner in which the NCM/Kesher Israel Mikvah was operated and Freundel's use and management of it raised serious concern both within Kesher Israel and NCM and in the community at large.

66. Fundamentally, although Freundel purported to be an Orthodox rabbi, he used the NCM/Kesher Israel Mikvah in ways that were directly at odds with Kesher Israel's Orthodox Jewish foundations, including (without limitation):

    a. Freundel opened the NCM/Kesher Israel Mikvah to non-Jews and unmarried women, who ordinarily are not welcomed at an Orthodox mikvah.

    b. The unmarried women and conversion candidates Freundel encouraged to attend the NCM/Kesher Israel Mikvah were predominately young attractive women and

it was common knowledge and openly remarked upon at Kesher Israel and NCM that Freundel's "converts" were predominately attractive young women.

c.  Freundel developed an entirely new exercise, which he called "practice dunks," to encourage conversion candidates to come to the NCM/Kesher Israel Mikvah more than once – a practice completely at odds with Orthodox Judaism and the conversion process – as emergence from the mikvah completes an individual's conversion from non-Jew to Jew.

d.  Since Freundel's arrest, the RCA has publicly rebuked the concept of "practice dunking," confirming the practice has no basis in Judaism.

e.  Freundel brought so many young attractive young women through the NCM/Kesher Israel Mikvah, a member of Kesher Israel's own staff stated that Freundel "treated that mikvah like a car wash. Every Sunday, six students at a time."

67.  Kesher Israel congregants had also launched numerous complaints regarding Freundel's "constant" comments praising female congregant's appearance, remarking on their dating life, and discouraging them from dressing "so modestly."

68.  Freundel generally behaved in an inappropriate manner with young female converts and congregants and he was commonly described by female members of the Kesher Israel and NCM communities as "creepy."

69.  Defendants were, or should have been, aware of public accusations of impropriety by Freundel.

70.     Upon information and belief, Kesher Israel received numerous complaints that Freundel was using the NCM/Kesher Israel Mikvah in an inappropriate manner and was otherwise acting not in accordance with Orthodox Jewish tenets, including (without limitation):

a.   As early as 2006, Kesher Israel congregants, other rabbis, and Orthodox religious leaders were made aware of accusations that Freundel was intimidating, extorting, and otherwise mistreating his conversion students, who were mostly attractive young women.

b.   Reports were made that Freundel had brought his young female conversion students to his home, where they were alone with him, and forced them to perform various clerical and other duties at the Kesher Israel Rabbinical Residence.

c.   Freundel's exercise of "practice dunks" was also brought to the attention of Kesher Israel, other rabbis, and other Orthodox religious leaders.

d.   Media reports indicate that, as early as 2009, the former Vice President of Kesher Israel's Board of Directors was aware of inappropriate conduct by Freundel against his conversion students.

e.   Kesher Israel congregants complained that Freundel routinely made inappropriate comments to young women, treated attractive young women preferentially, and "manipulated and controlled" conversion students in his care.

71.     According to media reports, approximately ten (10) years ago around the same time Freundel was leading the charge to construct the NCM/Kesher Israel Mikvah, Kesher Israel responded to persistent complaints, concerns, and criticism of Freundel from members of its congregation by issuing a statement to the congregation, essentially a religious "gag" order,

16

ordering congregants "to cease to participate in any Lashon Hara,[4] to stop listening to insinuations and attacks, to disassociate ourselves from them, and finally to respond forcefully in opposition to Lashon Hara" against Freundel. From that point on, Kesher Israel congregants were forbidden from complaining about or criticizing Freundel and were further *required* to affirmatively support Freundel if they overheard any such complaints.

72.     In addition, Kesher Israel was made aware of two formal complaints launched against Freundel with the RCA. Although the full details of the complaints are not known, it is clear that Freundel was accused of abusing converts and of potential sexual impropriety with at least one convert. The RCA's investigations into the complaints involving one of its own leaders were handled by two prominent attorneys who now head major Jewish organizations: Allen Fagin of the Orthodox Union and Eric Goldstein of UJA-Federation of New York. The RCA's investigation and the subsequent slap on the wrist it administered to Freundel were described by one critic as "totally incompetent."

73.     Kesher Israel was specifically aware of the complaints to the RCA and it was further advised of the RCA's failure to take any meaningful action.

74.     MPD's investigation has revealed that the "Dream Machine" clock-radio that ultimately led to Freundel's downfall was observed in the NCM/Kesher Israel Mikvah Changing Room at least two years before any action was taken to investigate the out-of-place item.

75.     Kesher Israel and/or NCM negligently and/or recklessly permitted Freundel to place the "Dream Machine" clock-radio and/or other electronic recording devices in the Changing Room and the ritual bath area of the NCM/Kesher Israel Mikvah. Kesher Israel and/or NCM, with negligent and/or reckless disregard for the safety, privacy, and well-being of the

---

[4]   "Lashon Hara" means slanderous, negative talk, which is considered sinful in Judaism.

17

Kesher Israel congregants, female conversion candidates, and other women using the NCM/Kesher Israel Mikvah, including, but not limited to, Plaintiff and other students, failed to inquire, inspect, or investigate why Freundel was placing electronic devices in the Changing Room and the ritual bath area of the mikvah.

**F.    GEORGETOWN'S WILLFUL BLINDNESS TOWARD THE PLAIN WARNING SIGNS**

76.    Georgetown has a long association with Freundel, who has taught classes and has been involved in Jewish life in various capacities at both Georgetown's main campus and at Georgetown Law.

77.    Kesher Israel is located in the same community as Georgetown's main campus, where members of Washington's elite reside and socialize.

78.    Upon information and belief, members of the Georgetown faculty were congregants at Kesher Israel and were active in the congregation throughout Freundel's tenure as Kesher Israel's Rabbi.

79.    Freundel generally behaved in an inappropriate manner with young female students and congregants and, like the female members of the Kesher Israel and NCM communities, the female members of the Georgetown community commonly described Freundel as "creepy."

80.    Upon information and belief, Freundel had lured other Georgetown Law students before Plaintiff to the NCM/Kesher Israel Mikvah using his position at Georgetown Law to sexually exploit these young women.

81.    Upon information and belief, despite Freundel's widespread reputation for abusing his young female students and conversion candidates and for engaging in other inappropriate behaviors, Georgetown undertook no investigation into Freundel's background prior to hiring him as an adjunct professor at Georgetown Law.

18

82.     Furthermore, upon information and belief, Georgetown undertook no investigation prior to allowing Freundel to invite Georgetown Law students to participate in the immersion ritual at the NCM/Kesher Israel Mikvah, despite widespread public controversy concerning the NCM/Kesher Israel Mikvah and Freundel's practices and policies with regard to the same.

83.     Upon information and belief, Georgetown undertook no efforts to warn its students and/or members of its community about widespread public concerns surrounding Freundel and/or the NCM/Kesher Israel Mikvah.

## IV.     CLASS ALLEGATIONS AGAINST KESHER ISRAEL AND NCM

### A.     MAINTAINABILITY OF CLASS ACTION

84.     Plaintiff adopts by reference all allegations contained in the paragraphs above as if fully set forth herein.

85.     The "Class" consists of all women who participated in an immersion ritual at the NCM/Kesher Israel Mikvah (the "immersion"): (i) while Freundel was an actual and/or apparent agent, servant, and/or employee of Kesher Israel and/or NCM, (ii) where Freundel initiated, arranged, participated in or was otherwise involved in the immersion, and (iii) who were involuntarily and secretly photographed by any means or otherwise subjected to invasions of their privacy in connection with the immersion. The Class is maintainable under D.C. Super. Ct. Civ. P. Rule 23(a) for the reasons that follow.

86.     The identity of the members of the Class will be readily ascertainable through the records of Defendants NCM and/or Kesher Israel in conjunction with records and documents obtained by the MPD and other law enforcement organizations.

87.     The members of the Class are likely to exceed 100 or more individuals and, therefore, are so numerous that joinder of all members is impracticable.

19

88.    The questions of law and fact in this action are common to the Class and predominate over any question affecting only individual Class members. These common questions include (without limitation):

    a.  Whether Freundel was an actual and/or apparent agent, servant, and/or employee of Kesher Israel and/or NCM at any or all relevant times;

    b.  Whether Freundel obtained consent to take videos and/or photographs of the Class members;

    c.  Whether Freundel acted within the scope of his employment and/or agency when he captured videos and/or photographs of the Class members while the Class members were participating in the immersion ritual and the "practice dunks" that Freundel supervised and oversaw at the NCM/Kesher Israel Mikvah;

    d.  Whether Kesher Israel and/or NCM's actions and/or failures to act, including (without limitation) their failure to properly investigate, qualify, select, monitor, and/or supervise Freundel, resulted in foreseeable injuries or damages to the Class members;

    e.  Whether Defendants had actual knowledge of or were on notice of Freundel's illicit behavior;

    f.  Whether sufficient indicia of Freundel's wrongdoing existed to put the Defendant's on notice of Freundel's wrongdoing;

    g.  Whether Defendants are directly liable to Plaintiff and the Class members for failing to prevent Freundel's wrongdoing that harmed Plaintiff and the members of the Class;

h.  Whether Defendants are vicariously liable for failing to prevent the wrongdoing of their agent, employee, and servant; and

i.  Whether Freundel's wrongdoing took place within the scope and performance of his duties as an employee, agent and servant of the Defendants.

89.  The claims of the Named Plaintiff, who is representative of the other members of the Class, is typical of the claims of the Class members and the defenses applicable to Plaintiff's claims are typical of the defenses likely to be asserted as to the claims asserted by members of the Class.

90.  Because the Named Plaintiff shares legal interests identical to those of the Class members, the Named Plaintiff will fairly and adequately protect the interests of the Class.

**B.  DESIRABILITY OF CLASS ACTION**

91.  This action should proceed as a class action as to Kesher Israel and NCM under D.C. Super. R. Civ. P. 23(b)(1) because separate actions by individual members of the Class would create a risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

92.  Alternatively, this action should proceed as a class action as to Kesher Israel and NCM under D.C. Super. R. Civ. P. 23(b)(1) because questions of law or fact common to the Class predominate over any questions affecting individual plaintiffs and class action treatment is superior to other available methods for the fair and efficient adjudication of this controversy between the Class and Defendants Kesher Israel and NCM.

93.  No member of the Class has a substantial interest in individually controlling the prosecution of a separate action but if she does, she may exclude herself from the Class upon the receipt of notice under D.C. Super. R. Civ. P. 23(c).

94.    This class action can be managed without undue difficulty because the Class representatives will vigorously pursue the interests of the Class by virtue of, and as evidenced by, their actions in initiating this proceeding.

95.    Furthermore, Plaintiff's counsel is experienced in class actions and in complex civil litigation, recently having been counsel in a similar class action and currently litigating two national class actions against the National Hockey League and the National Football League. Plaintiff's counsel will adequately represent the interests of the Class.

## V.    CAUSES OF ACTION

### COUNT I

### NEGLIGENT HIRING, TRAINING, RETENTION AND SUPERVISION

96.    Plaintiff adopts by reference all allegations contained in the paragraphs above as if fully set forth herein.

97.    Plaintiff asserts this claim against Defendants Kesher Israel and NCM individually and on behalf of the Class.

98.    Plaintiff asserts this claim against Defendant Georgetown in her individual capacity.

99.    At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted him to remain as such for all relevant periods.

100.    At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi and/or professor and, thereby, to render spiritual and educational services to their students and/or congregants, including Plaintiff.

101.    At all relevant times, Defendants acted by and through Freundel – their agent, servant, and/or employee – acting within the scope and course of his agency and/or employment.

102.   At all relevant times, Defendants owed a continuing duty to: reasonably, carefully, and conscientiously secure the services of qualified and well-trained agents, servants, and/or employees; to properly investigate, credential, qualify, select, monitor, and supervise their agents, servants, and/or employees; to promulgate and enforce proper and effective standards, procedures, protocols, systems, and rules to ensure quality care, safety, and privacy of Plaintiff and members of the Class; and to otherwise assure and maintain the safety and privacy of Plaintiff and members of the Class.

103.   Defendants negligently breached the above-mentioned duties by hiring, retaining, failing to properly train, and failing to properly supervise Freundel, despite his reputation for improper, unlawful, inappropriate, lewd, and unprofessional conduct.

104.   Defendants knew or should have known that Freundel engaged in improper, unlawful, inappropriate, lewd, and unprofessional conduct, including, but not limited to, photographing and/or videotaping Plaintiff and other Class Members while naked and without consent or authorization, and distributing and/or publishing those images and/or videos without consent or authorization.

105.   As a direct and proximate result of Defendants' negligent hiring, training, retention, and supervision of Freundel, Plaintiff and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

## COUNT II

### NEGLIGENT ENTRUSTMENT

106.   Plaintiff adopts by reference all allegations contained in the paragraphs above as if fully set forth herein.

107.   Plaintiff asserts this claim against Defendants Kesher Israel and NCM individually and on behalf of the Class.

108.   Plaintiff asserts this claim against Defendant Georgetown in her individual capacity.

109.   At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted him to remain as such for all relevant periods.

110.   At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi and/or professor and, thereby, to render spiritual and educational services to their students and/or congregants, including Plaintiff.

111.   At all relevant times, Defendant Georgetown owed a continuing duty to Plaintiff to use reasonable care to ensure Freundel was trustworthy, competent, and fit to safely and appropriately utilize the facilities, devices, equipment, machines, and/or supplies entrusted to him for spiritual and/or educational purposes.

112.   At all relevant times, Defendants Kesher Israel and NCM owed a continuing duty to Plaintiff and the Class to use reasonable care to ensure Freundel was trustworthy, competent, and fit to safely and appropriately utilize the facilities, devices, equipment, machines, and/or supplies entrusted to him for spiritual and/or educational purposes.

113.   At all relevant times, Defendants knew or should have known, and/or had actual knowledge, constructive knowledge, and/or reasonable suspicion that Freundel was using the

Defendants' facilities, devices, equipment, machines, and/or supplies to engage in unprofessional, unlawful, and outrageous conduct by photographing and/or video-recording his (and Defendants') congregants and/or students, including Plaintiff and, for Kesher Israel and NCM, members of the Class, without authorization or consent.

114.    Defendants breached these duties by entrusting Freundel with the facilities, devices, equipment, machines, and/or supplies that he used to perform the tortious and illegal acts alleged herein, and Defendants knew or should have known Freundel would use the facilities, devices, equipment, machines, and/or supplies entrusted to him to harm his (and Defendants') congregants and/or students.

115.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

## COUNT III
### VICARIOUS LIABILITY – *RESPONDEAT SUPERIOR* NEGLIGENCE & NEGLIGENCE *PER SE*

116.    Plaintiff adopts by reference all allegations contained in the paragraphs above as if fully set forth herein.

117.    Plaintiff asserts this claim against Defendants Kesher Israel and NCM individually and on behalf of the Class.

118.   Plaintiff asserts this claim against Defendant Georgetown in her individual capacity.

119.   At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Freundel to remain as such for all relevant periods.

120.   At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi and/or professor and, thereby, to render spiritual and educational services to their students and/or congregants, including Plaintiff.

121.   At all relevant times, Freundel owed a continuing duty to assure and maintain the safety and privacy of his Georgetown Law students, Kesher Israel congregants, participants in the immersion ritual at the NCM/Kesher Israel Mikvah, and various other members of the public.

122.   Freundel breached this duty by, among other things, photographing, videotaping, and/or otherwise sexually exploiting Plaintiff when she participated in the immersion ritual at the NCM/Kesher Israel Mikvah in furtherance of her research paper for the Jewish Studies class she was enrolled in at Georgetown Law.

123.   Freundel breached this duty by, among other things, photographing, videotaping, and/or otherwise sexually exploiting members of the Class other than the Named Plaintiff while they participated in the immersion ritual and/or "practice dunks" at the mikvah owned and/or controlled by Kesher Israel and/or NCM.

124.   In addition and in the alternative, Defendants owed Plaintiff duties grounded in criminal statutes designed to protect Plaintiff and members of the Class from sexual exploitation including, without limitation: D.C. Code Ann. §§ 22–3531(b), (c), (d), and, upon information and belief, (f)(2).

125.   Defendants breached these duties by virtue of Freundel's violation of these statutes while he was Defendants' agent, employee, and/or servant. Freundel's violation of those statutes constitutes negligence *per se* as a matter of the law of the District of Columbia.

126.   As a direct, proximate, immediate, and foreseeable result of the foregoing breaches of Defendants' duties, Plaintiff and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

127.   As the principals, masters, and/or employers of Freundel, Defendants are liable for all of the injuries and damages caused by the negligent acts committed by Freundel within the scope of his employment and/or for his negligence *per se* in violating wiretapping and criminal voyeurism statutes while acting as Defendants' agent, employee, and/or servant.

## COUNT IV
## DIRECT NEGLIGENCE

128.   Plaintiff adopts by reference all allegations contained in the paragraphs above as if fully set forth herein.

129.   Plaintiff asserts this claim against Defendants Kesher Israel and NCM individually and on behalf of the Class.

130.   Plaintiff asserts this claim against Defendant Georgetown in her individual capacity.

131.   At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Freundel to remain as such for all relevant periods.

132.   At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi and/or professor and, thereby, to render spiritual and educational services to their students and/or congregants, including Plaintiff.

133.   At all relevant times, Defendants owed a continuing duty to assure and maintain the safety and privacy of their students, congregants, and participants in the immersion ritual at the NCM/Kesher Israel Mikvah.

134.   In addition and in the alternative, Defendants owed Plaintiff and the Class a duty to exercise reasonable care under all of the circumstances to protect persons lawfully on their premises from dangers of which they were or should have been aware and over which they had the ability to exercise control. As discussed above, Defendants had actual and/or constructive knowledge and/or notice of the danger posed by Freundel and had the ability to exercise control over him.

135.   In addition and in the alternative, Defendants Kesher Israel and/or NCM owed Plaintiff and the Class special legal duties to preserve and protect the sanctity of religious exercise.

136.   In addition and in the alternative, Georgetown owed Plaintiff a special duty of care by virtue of Plaintiff's relationship as a student enrolled at Georgetown Law.

137.   Defendants breached these duties by failing to take any meaningful action to prevent Freundel from sexually exploiting Plaintiff and members of the Class, despite clear warning signs and numerous red flags.

28

138.     As a direct, proximate, immediate, and foreseeable result of Defendants' conduct, Plaintiff and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

## COUNT V

### VICARIOUS LIABILITY – *RESPONDEAT SUPERIOR*
### INVASION OF PRIVACY—INTRUSION UPON SECLUSION

139.     Plaintiff adopts by reference all allegations contained in the paragraphs above as if fully set forth herein.

140.     Plaintiff asserts this claim against Defendants Kesher Israel and NCM individually and on behalf of the Class.

141.     Plaintiff asserts this claim against Defendant Georgetown in her individual capacity.

142.     At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Freundel to remain as such for all relevant periods.

143.     At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi and/or professor and, thereby, to render spiritual and educational services to their students and/or congregants, including Plaintiff.

144.     Freundel invaded the privacy of Plaintiff by, among other things, photographing, videotaping, and/or otherwise sexually exploiting Plaintiff when she participated in the immersion ritual at the NCM/Kesher Israel Mikvah in furtherance of her research paper for the Jewish Studies class she was enrolled in at Georgetown Law.

145.     Freundel invaded the privacy of members of the Class other than the Named Plaintiff by, among other things, photographing, videotaping, and/or otherwise sexually exploiting them while they were in the Changing Room and participated in the immersion ritual and/or "practice dunks" at the mikvah owned and/or controlled by Kesher Israel and/or NCM.

146.     The Changing Room and the mikvah's ritual bath areas are objectively and subjectively private, secure, and intimate places and Plaintiff and the Class reasonably expected that they would have privacy in the NCM/Kesher Isreal Mikvah's Changing Room and ritual bath area because, among other things, the individual participating disrobes, showers naked, and participates naked in the mikvah ritual. In addition, only one person at a time is permitted to participate in the mikvah ritual, so the participant reasonably assumes she is alone in a private, secure, and intimate setting.

147.     Freundel's conduct is and would be highly offensive to an ordinary, reasonable person.

148.     As a direct, proximate, immediate, and foreseeable result of Freundel's conduct, Plaintiff and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological

counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

149.    As the principals, masters, and/or employers of Freundel, Defendants are liable for all of the injuries and damages caused by the intentional acts committed by Freundel within the scope of his employment.

**COUNT VI**

**VICARIOUS LIABILITY – *RESPONDEAT SUPERIOR***
**VIOLATION OF D.C. CODE ANN. § 23–542(a)--WIRETAPPING**

150.    Plaintiff adopts by reference all allegations contained in the paragraphs above as if fully set forth herein.

151.    Plaintiff asserts this claim against Defendants Kesher Israel and NCM individually and on behalf of the Class.

152.    Plaintiff asserts this claim against Defendant Georgetown in her individual capacity.

153.    This Count is brought pursuant to D.C. Code Ann. § 23-554(a).

154.    At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Freundel to remain as such for all relevant periods.

155.    At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi and/or professor and, thereby, to render spiritual and educational services to their students and/or congregants, including Plaintiff.

156.    Freundel willfully intercepted and/or willfully endeavored to intercept Plaintiff's oral communications by means of one or more audio electronic recording devices while Plaintiff

participated in the immersion ritual at the NCM/Kesher Israel Mikvah in furtherance of her research paper for the Jewish Studies class she was enrolled in at Georgetown Law.

157.    Freundel willfully intercepted and/or willfully endeavored to intercept the oral communications of the members of the Class other than the Named Plaintiff by means of one or more audio electronic recording devices while they were in the Changing Room and participated in the immersion ritual and/or "practice dunks" at the mikvah owned and/or controlled by Kesher Israel and/or NCM.

158.    The Changing Room and the mikvah's ritual bath areas are objectively and subjectively private, secure, and intimate places and Plaintiff and the Class reasonably expected that they would have privacy in the NCM/Kesher Isreal Mikvah's Changing Room and ritual bath area because, among other things, the individual participating disrobes, showers naked, and participates naked in the mikvah ritual. In addition, only one person at a time is permitted to participate in the mikvah ritual, so the participant reasonably assumes she is alone in a private, secure, and intimate setting.

159.    As a direct, proximate, immediate, and foreseeable result of Freundel's conduct, Plaintiff and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

160.    As the principals, masters, and/or employers of Freundel, Defendants are liable for all of the injuries and damages caused by the intentional acts committed by Freundel within the scope of his employment.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

a.      Awarding Plaintiff compensatory damages against Defendant Georgetown in excess of the jurisdictional minimum in an amount to be proven at trial;

b.      Awarding Plaintiff and the Class compensatory damages against Defendants Kesher Israel and NCM in excess of the jurisdictional minimum in an amount to be proven at trial;

c.      Awarding Plaintiff and the Class such other relief as may be appropriate; and

d.      Granting Plaintiff and the Class their prejudgment interest, costs, and reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiff demands that this case be tried by a jury on all counts.

Dated: December 1, 2014

Respectfully submitted,

_____

Steven J. Kelly (D.C. Bar No. 1021534)
Anne T. McKenna (D.C. Bar No. 450414)
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel:  (410) 385-2225
Fax:  (410) 547-2432
skelly@mdattorney.com
amckenna@silvermckenna.com

*Counsel for Plaintiff*

Steven D. Silverman (*Pro Hac Vice* Pending)
Stephen G. Grygiel (*Pro Hac Vice* Pending)
Sima G. Fried (*Pro Hac Vice* Pending)
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel:  (410) 385-2225
Fax:  (410) 547-2432
ssilverman@mdattorney.com
sgrygiel@mdattorney.com
sfried@mdattorney.com

*Counsel for Plaintiff*



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

JANE DOE
   Vs.                                           C.A. No.       2014 CA 007644 B
THE GEORGETOWN UNIVERSITY

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to:  Judge HERBERT B DIXON JR
Date:  December 2, 2014
Initial Conference: 9:30 am, Friday, March 06, 2015
Location:   Courtroom 415
              500 Indiana Avenue N.W.
              WASHINGTON, DC  20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| **Jane Doe 2, et al.** | * | |
| *Plaintiffs,* | * | |
| **v.** | * | **Case No. 2014 CA 007644 B** |
| **The Georgetown Synagogue --.** | * | |
| **Kesher Israel Congregation,** *et al* | | |
| | * | |
| *Defendants.* | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## PRAECIPE ENTERING APPEARANCES

TO THE CLERK OF THE COURT:

Please enter the appearances of Joseph Cammarata, Esquire, and Matthew W. Tievsky, Esquire, as counsel for the Plaintiff designated as Jane Doe 2.

Respectfully submitted,

**CHAIKIN, SHERMAN,**
       **CAMMARATA & SIEGEL, P.C.**


*/s/ Joseph Cammarata*
Joseph Cammarata
D.C. Bar No. 389254

*/s/ Matthew W. Tievsky*
Matthew W. Tievsky
D.C. Bar No. 1004955
1232 17th Street, N.W.
Washington, D.C. 20036
Tel: (202) 659-8600
Fax: (202) 659-8680
joe@dc-law.net
matthew@dc-law.net
Attorneys for Plaintiff Jane Doe 2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of December, 2014, a copy of the Praecipe Entering

Appearances was e-filed and e-served to:

> Steven J. Kelly (D.C. Bar No. 1021534)
> Anne T. McKenna (D.C. Bar No. 450414)
> SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
> 201 N. Charles Street, Suite 2600
> Baltimore, Maryland 21201

> _/s/ Matthew W. Tievsky_____
> Matthew W. Tievsky

Filed
D.C. Superior Court
12/10/2014 13:15PM
Clerk of the Court

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| Jane Doe 2, <u>et al.</u> | * | |
| *Plaintiffs,* | * | |
| v. | * | Judge Herbert B. Dixon<br>Case No. 2014 CA 007644 B |
| The Georgetown Synagogue --<br>Kesher Israel Congregation, <u>et al.</u> | * | Next Event: ISC 03/06/15 |
| | * | |
| *Defendants.* | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## PLAINTIFF JANE DOE 2'S MOTION TO SEAL *EXHIBIT A* TO MOTION FOR LEAVE TO PROCEED UNDER A PSEUDONYM

Plaintiff, Jane Doe 2, by and through her undersigned counsel, respectfully requests that this Court seal *Exhibit A* to her pending Motion for Leave to Proceed Under a Pseudonym. *Exhibit A* is an affidavit by undersigned counsel, identifying Jane Doe 2.  Plaintiff Jane Doe 2 requests relief for the reasons and based on the authorities cited in the Motion for Leave to Proceed Under a Pseudonym, which Plaintiff Jane Doe 2 hereby adopts and incorporates herein.

WHEREFORE, Plaintiff Jane Doe 2 respectfully requests that the Court grant the foregoing Motion.

Respectfully submitted,

**CHAIKIN, SHERMAN,
    CAMMARATA & SIEGEL, P.C.**

*/s/ Matthew W. Tievsky*
Joseph Cammarata
D.C. Bar No. 389254
Matthew W. Tievsky
D.C. Bar No. 1004955
1232 17th Street, N.W.
Washington, D.C. 20036
Tel: (202) 659-8600
Fax: (202) 659-8680
joe@dc-law.net
matthew@dc-law.net
Attorneys for Plaintiff Jane Doe 2

## **RULE 12-I CERTIFICATION**

I certify that all the Defendants in this action are corporations and no attorney has entered an appearance on their behalf. The undersigned was therefore unable to confer with counsel pursuant to Rule 12-I.

*/s/ Matthew W. Tievsky*
Matthew W. Tievsky

## CERTIFICATE OF SERVICE

I further hereby certify that on this 10th day of December, 2014 a copy of Plaintif Jane Doe 2's Motion to Seal *Exhibit A* to Motion for Leave to proceed Under a Pseudonym was e-filed and e-served to:

> Steven J. Kelly (D.C. Bar No. 1021534)
> Anne T. McKenna (D.C. Bar No. 450414)
> SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
> 201 N. Charles Street, Suite 2600
> Baltimore, Maryland 21201

and mailed first class, postage pre-paid, to:

> Steven D. Silverman (*Pro Hac Vice* Pending)
> Stephen G. Grygiel (*Pro Hac Vice* Pending)
> Sima G. Fried (*Pro Hac Vice* Pending)
> 201 North Charles Street, Suite 2600
> Baltimore, Maryland 21201

> */s/ Matthew W. Tievsky*
> Matthew W. Tievsky

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | | |
|---|---|---|
| **Jane Doe 2, <u>et al</u>.** | * | |
| *Plaintiffs,* | * | |
| **v.** | * | **Judge Herbert B. Dixon**<br>**Case No. 2014 CA 007644 B** |
| **The Georgetown Synagogue --**<br>**Kesher Israel Congregation, <u>et al</u>.** | * | **Next Event: ISC 03/06/15** |
| | * | |
| *Defendants.* | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## ORDER GRANTING PLAINTIFF JANE DOE 2'S MOTION TO SEAL *EXHIBIT A* TO MOTION FOR LEAVE TO PROCEED UNDER A PSEUDONYM

Upon consideration of Plaintiff Jane Doe 2's Motion to Seal *Exhibit A* to Motion For Leave to Proceed Under a Pseudonym and finding good cause supporting the same, it is on this ___ day of _____, 2014, hereby ORDERED that the Motion is GRANTED as follows:

*Exhibit A* to Plaintiff Jane Doe 2's Motion For Leave to Proceed Under a Pseudonym is hereby sealed. The parties and their counsel in this case may not distribute the Exhibit except to other parties and their counsel.

_____
Judge Herbert B. Dixon
Superior Court for the District of Columbia

*Cont'd*

CC:

Joseph Cammarata
Matthew W. Tievsky
CHAIKIN, SHERMAN, CAMMARATA &
 SIEGEL, P.C.
1232 17th Street, N.W.
Washington, D.C. 20036


Steven J. Kelly
Anne T. McKenna
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201

Steven D. Silverman
Stephen G. Grygiel
Sima G. Fried
201 North Charles Street, Suite 2600
Baltimore, Maryland 21201

Filed
D.C. Superior Court
12/10/2014 11:56AM
Clerk of the Court

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| **Jane Doe 2, <u>et al</u>.** | * | |
| *Plaintiffs,* | * | |
| | | **Judge Herbert B. Dixon** |
| **v.** | * | **Case No. 2014 CA 007644 B** |
| **The Georgetown Synagogue --** | * | **Next Event: ISC 03/06/15** |
| **Kesher Israel Congregation, <u>et al</u>.** | | |
| | * | |
| *Defendants.* | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### <u>PLAINTIFF JANE DOE 2'S MOTION FOR LEAVE TO PROCEED UNDER A PSEUDONYM</u>

Plaintiff, Jane Doe 2, by and through her undersigned counsel, respectfully requests that this Court grant her leave to proceed under a pseudonym. Plaintiff Jane Doe 2 – who is either newly joining this suit as a class action representative, or will file a class action in her own right -- requests this leave to prevent the disclosure of her identity, which would cause her irreparable harm.  Plaintiff Jane Doe 2 is asking for the same relief that this Court previously granted to her expected co-representative, Plaintiff Jane Doe, the original class representative in this action.

The relevant facts and points and authorities supporting this Motion are set forth herein.

### <u>FACTUAL & PROCEDURAL BACKGROUND</u>

This action arises out of an unfathomable breach of trust by respected Rabbi and religious scholar, Bernard "Barry" Freundel, Ph.D. ("Freundel"), who used surveillance equipment to capture naked images of his students and congregants during a sacred religious ritual. Freundel was the Rabbi for Defendant The Georgetown Synagogue – Kesher Israel Congregation ("Kesher Israel") and was also the founder and principal of Defendant The

National Capital Mikvah, Inc. ("NCM").   Plaintiff Jane Doe 2 asserts class action claims against Kesher Israel and NCM on behalf of the class of similarly situated women.

The vast majority of the wrongful acts giving rise to this action were performed in a "mikvah" that is nominally owned and operated by NCM in a building adjacent to Kesher Israel. A mikvah is a pool of water in which members of the Jewish faith totally immerse themselves (the immersion is of the entire body including one's hair) while they are completely naked and stripped of all "barriers," including jewelry, makeup, and any other beauty products on the hair or skin.

However, upon information and belief, NCM is substantially controlled by Kesher Israel and was built using Kesher Israel funds and assets. Accordingly, the mikvah purportedly operated by NCM is referenced herein as the "NCM/Kesher Israel Mikvah."

The NCM/Kesher Israel Mikvah, like most mikvahs, has a changing room connected to the room with the mikvah's ritual bath, where participants shower and change prior to immersing. Traditionally, the mikvah has been used by Orthodox Jewish women to purify themselves prior to resuming marital relations with their husbands after their menstrual cycles and childbirth. Jewish men also use the mikvah to purify themselves. The mikvah also plays an important role in an individual's conversion to Judaism, as immersion in the mikvah is the final step in the conversion process. In recent years, survivors of sexual assault have also used the mikvah to help themselves heal emotionally and spiritually from the pain associated with sexual assault.

Plaintiff Jane Doe 2 is a 24 year-old woman and resident of North Carolina who recently converted to the Orthodox Jewish faith.  As explained herein, Freundel and the NCM/Kesher Israel Mikvah each played critical roles in Plaintiff Jane Doe 2's conversion,

which for her was a spiritually moving and highly sensitive experience.  Freundel's betrayal of Plaintiff Jane Doe 2, and his perversion of the NCM/Kesher Israel Mikvah where she literally and figuratively bared herself in order to complete her conversion, have already inflicted great emotional harm upon Plaintiff Jane Doe 2 and would put her at severe risk of further harm if the transgressions against her, specifically, were made widely public.

Plaintiff Jane Doe 2's conversion was a process that lasted years.  Plaintiff Jane Doe 2 first became intimately familiar with Judaism in 2009 when she met her neighbor and future husband in Paris.  Plaintiff Jane Doe 2 joined him and his family for the Passover Seder, and was so moved by the experience that she resolved to learn more about Judaism.

After returning to her home state of North Carolina, in 2010 Plaintiff Jane Doe 2 began to research the requirements for converting to Orthodox Judaism, and she learned that the process is prolonged and presents many trials.  To begin with, Plaintiff Jane Doe 2 joined a local Orthodox Jewish synagogue.  Additionally, Plaintiff Jane Doe 2 began a long-distance correspondence with the nearest *beit din*, located in Washington, D.C.  A *beit din* is an Orthodox Jewish rabbinical court.  In this case, the *beit din* was composed of three rabbis, and the senior among them (the *av beit din*) was Freundel.

While studying in North Carolina in connection with her own synagogue, as the conversion process required, in 2010 Plaintiff Jane Doe 2 began making periodic trips to Washington, D.C. to appear before the *beit din*.  Plaintiff Jane Doe 2 was also communicating long-distance with Freundel personally.  As Plaintiff Jane Doe 2 knew, Freundel was highly revered and respected as an intellect and religious authority within the world Orthodox Jewish community.  Over the years as Plaintiff Jane Doe 2's conversion proceeded, Freundel became a

3

father figure to her, as he more than anyone else guided her entry into the Orthodox Jewish faith.

In or about September of 2012, during one of Plaintiff Jane Doe 2's visits to Washington, D.C., Freundel (alone with Plaintiff Jane Doe 2 for the first time) gave her a tour of the NCM/Kesher Israel Mikvah; her immersion in the mikvah would ultimately be the final act and consummation of her conversion.

On October 6, 2013, at the direct encouragement of Freundel, Plaintiff Jane Doe 2 performed a "practice dunk" at the NCM/Kesher Israel Mikvah. This was a simulation of what would be the final act of conversion; Plaintiff Jane Doe 2 disrobed in the mikvah's changing room and immersed herself in the mikvah pool. Orthodox Jewish tradition does not provide for any "practice dunk," but Plaintiff Jane Doe 2 performed it to emotionally prepare herself for consummation of her conversion, which she expected to find nerveracking.

That final act came on February 9, 2014. At Freundel's direction, again Plaintiff Jane Doe 2 disrobed and, unclothed, immersed herself in the waters of the mikvah. At the time, this was a signature moment in the life of Plaintiff Jane Doe 2. She had now entered the Orthodox Jewish faith and completed her journey of several years.

But Plaintiff Jane Doe 2's experience on both occasions at the mikvah was forever poisoned approximately eight months later. On or about October 14, 2014, District of Columbia Metropolitan Police Department ("MPD") officers arrested Freundel and charged him with voyeurism, as Plaintiff Jane Doe 2 learned that same day. A woman in charge of the NCM/Kesher Israel Mikvah's changing area and showers had discovered that Freundel had placed a radio clock with a secret video recording device in the changing area. Subsequent searches of Freundel's home and offices yielded, among other things, several laptop

computers, desktop computers, external computer hard drives, digital cameras, memory cards, flash drives, electronically deleted files labeled with women's names, a second clock with a hidden camera and memory card, a tissue box containing a hidden camera, a computer charger containing a hidden camera, and nude photographs of women.

In retrospect, Plaintiff Jane Doe 2 has little doubt that Freundel, while appearing to act as her spiritual guide, was in fact manipulating her into using the NCM/Kesher Israel Mikvah in order to sexually exploit her. Freundel's breach of trust has cut Plaintiff Jane Doe 2 to her core; she feels as if she was raped by a man she trusted dearly, while she engaged in what she believed was a sacred act. Plaintiff Jane Doe 2 has lost much of her enthusiasm for her new religion. Plaintiff Jane Doe 2 finds it difficult to trust other people, and to interact with (or even look at) rabbis in particular. Plaintiff Jane Doe 2 is now undergoing psychological counseling to try to recover from Freudel's betrayal. Plaintiff Jane Doe 2 has not disclosed her victimization publicly, not even to her own rabbi in North Carolina, as this would worsen her emotional distress.

Moreover, from the evidence revealed by police and in media reports, it is evident that Freundel used his religious authority to lure attractive and unsuspecting young women to the NCM/Kesher Israel Mikvah for the express purpose of sexually exploiting them. Plaintiff, and scores of women like her, have suffered, and will continue to suffer, grave emotional distress and other harm and damages as a direct result of Freundel's actions and Defendants' utter failure to take any steps to prevent Freundel from engaging in those actions.

On December 2, 2014, a different alleged victim, Plaintiff Jane Doe – as the sole class representative – filed a class action lawsuit against the Defendants on behalf all victimized women. On that same date, the Court *ex parte* granted her motion to proceed under a

pseudonym, to protect her from further severe emotional distress and retaliation by Freundel and/or the Orthodox Jewish community.  For similar reasons, Plaintiff Jane Doe 2, who expects to enter the case as an additional class action representative, now requests the same relief.

## ARGUMENT

The District of Columbia Superior Court Rules of Civil Procedure require that the title of the complaint "include the names of all the parties" and further state that "[e]very action shall be prosecuted in the name of the real party in interest." D.C. Super. Ct. R. Civ. P. 10(a), 17(a). The District of Columbia courts have seldom had occasion to interpret these rules in the context of a request by a party to proceed pseudonymously. However, federal courts have frequently addressed the issue when interpreting the virtually identical federal counterparts to these rules. Where, as here, the District of Columbia Rules and their federal counterparts are virtually identical, District of Columbia courts may consider federal precedent as persuasive in interpreting District of Columbia rules. *See e.g.*, *Walker v. District of Columbia*, 656 A.2d. 722, 725 (D.C. 1995).

Although the Supreme Court has never formally acknowledged[1] the permissibility of using a pseudonym, federal trial and appellate courts have allowed parties to proceed anonymously under circumstances such as those presented here. *See Doe v. Megless*, 654 F.3d 404, 408 (3d. Cir. 2011). Determining whether to allow a plaintiff to file under a pseudonym is within the sound discretion of the trial court. *United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995); *see also James v. Jacobsen*, 6 F.3d 233, 238 (4th Cir. 1993). In considering a request to allow a plaintiff to proceed pseudonymously, courts balance the public

---

[1]   The Court has implicitly approved the practice of permitting plaintiffs to proceed under pseudonym in a number
of cases. *See, e.g., Roe v. Wade,* 410 U.S. 113 (1973), *overruled in part on other grounds*, ; *Doe v. Bolton,* 410 U.S.
179 (1973); *Poe v. Ullman,* 367 U.S. 497 (1961).

interest in access to trials with the legitimate interests of the party making the request. *See Nat'l Ass'n of Waterfront Emp'rs v. Chao*, 587 F. Supp. 2d 90, 98 (D.D.C. 2008). The U.S. District Court for the District of Columbia has employed a five-factor balancing test that considers:

> (1) Whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of a sensitive and highly personal nature; (2) whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; (3) the ages of the persons whose privacy interests are sought to be protected; (4) whether the action is against a governmental or private party; and (5) the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Id.* at 99. Here, four[2] of these factors weigh strongly in favor of this Court granting Plaintiff's request for leave to proceed pseudonymously.

First, Plaintiff's objective in proceeding in this manner is primarily to preserve her privacy in this highly sensitive and personal matter. This case involves a particularly humiliating act of sexual exploitation in the context of a highly personal religious observance. Future pleadings are likely to include highly personal and embarrassing accounts of Plaintiff's private, religious observance and Freundel's exploitation of that observance for his own sexual gratification. Commentators have recognized that involuntarily disclosing the identity of victims of such acts results in real psychological harm to victims far more severe than "mere embarrassment." *See* Paul Marcus & Tara L McMahon, *Limiting Disclosure of Rape Victims' Identities*, 64 S. CAL. L. REV. 1020, 1048-49 (1991). Further, many courts have held that the victim's interest in his or her sexual privacy may permit the victim to proceed under a pseudonym. *See, e.g., Doe v. Blue Cross & Blue Shield United*, 112 F.3d 869, 872 (7th Cir.

---

[2]   The age factor does not apply here because the named Plaintiff is an adult, albeit she was only 23 to 24 years old at the time that she was victimized by Freundel.

1997) ("fictitious names are allowed when necessary to protect the privacy of children, rape victims, and other particularly vulnerable parties or witnesses"); *E.E.O.C. v. ABM Indus., Inc.,* 249 F.R.D. 588, 593-94 (E.D. Cal. 2008) (permitting plaintiffs to proceed under pseudonyms in sexual harassment case); *Doe v. Bodwin,* 326 N.W. 2d 473, 476 (Mich. Ct. App. 1982) (recognizing court's discretion to allow plaintiff to proceed anonymously in case involving sexual impropriety of defendant); *see also Roe,* 410 U.S. at 152-153 (recognizing constitutional right of "personal privacy" in such matters).

Second, Ms. Doe has a reasonable fear that Freundel and/or his supporters will retaliate against her for bringing this claim. Freundel has been released pending trial and himself may well pose a physical threat to Plaintiff. Recognizing this potential danger, this Court has issued stay away orders against Freundel as to Kesher Israel and NCM as a condition of his pretrial release. *See* Release Order, *United States of America v. Bernard Freundel,* Crim. Case No. 14-CMD-18262 (D.C. Super. Ct. Oct. 15, 2014).

Moreover, Plaintiff justifiably fears retaliation from the broader Orthodox community. The cultural norms of the Orthodox Jewish community forbid its members from speaking poorly of a rabbi—even where that rabbi has committed wrongful acts against the member. According to the Washington Post and other news media, approximately ten (10) years ago, around the same time Freundel was leading the charge to construct the NCM/Kesher Israel Mikvah, Kesher Israel responded to persistent complaints, concerns, and criticism of Freundel from members of its congregation by issuing a statement to the congregation, essentially a religious "gag" order. The Board of Directors' statement ordered Kesher Israel congregants "to cease to participate in any Lashon Hara,[3] to stop listening to insinuations and attacks, and to

---

[3] "Lashon Hara" is slanderous, negative talk, which is considered sinful in Judaism.

disassociate [themselves] from [such slanderous and negative talk about Freundel], and finally to respond forcefully in opposition to Lashon Hara" against Freundel.[4] Orthodox norms also generally do not permit taking legal action against members of the community. Because Plaintiff has sued Kesher Israel and NCM, she is therefore in reasonable fear of retaliation by supporters and followers of Freundel, Kesher Israel, and/or NCM.

Third, because all parties to this action are private parties, the fourth factor articulated by the court in *Chao* favors allowing Plaintiff to proceed pseudonymously. Though not governmental entities, neither are the Defendants private individuals. *Cf. Chao*, 587 F. Supp. 2d at 99 n.9 ("When a plaintiff challenges the government or government activity, courts are more like[ly] to permit plaintiffs to proceed under a pseudonym than if an individual has been accused publicly of wrongdoing." (quoting *Yacovelli v. Moeser*, 2004 U.S. Dist. LEXIS 9152, *24-25 (M.D.N.C. 2004)). Rather, the Defendants are publicly recognized corporations, and in particular Defendants Kesher Israel and NCM are entities that serve important religious roles in the surrounding Orthodox Jewish community. Such Defendants are considered akin to governmental entities for the purpose of applying the fourth *Chao* factor. *See Doe No. 2 v. Kolko*, 242 F.R.D. 193, 195-96 (E.D.N.Y. 2006) (permitting plaintiff to proceed anonymously in sexual assault suit against Orthodox Jewish religious school and rabbi).

Finally, there is no risk of unfairness to the opposing parties. Plaintiff has attached, as **Exhibit A**,[5] an affidavit that sets forth her identity. The sealed Affidavit will be served, along with this Motion and the Complaint and all other documents required to be served as initial process by this Court, on Defendants. In addition, Plaintiff will not object to any discovery

---

[4] *See* Peter Herman, *Prominent D.C. Rabbi Accused of Voyeurism Presents a Disturbing Paradox,* Washington Post, Nov. 8, 2014.

[5] The Exhibit is being filed under seal. Therefore, it will not be e-filed. Copies of this Motion with the Exhibit will be mailed to counsel listed on the Certificate of Service and a copy of this Motion with the Exhibit will be hand-delivered to Judge's chambers today.

otherwise permitted by the District of Columbia rules as long as the parties are able to agree to a protective order that protects Plaintiff's identity from public disclosure.  Conducting the case in this manner results in no risk of unfairness to the Defendants.

Additionally, Plaintiff Jane Doe 2 reiterates that the Court has *already granted* the requested relief to her co-representative of the class Plaintiffs, Jane Doe.  Plaintiff Jane Doe 2 respectfully submits that she is entitled to the same protection.

## CONCLUSION

This case falls squarely within the class of cases in which courts have permitted plaintiffs to proceed pseudonymously. The highly sensitive nature of the factual allegations paired with Plaintiff Jane Doe 2's reasonable fears of physical or mental harm weigh strongly in favor of allowing Plaintiff to proceed pseudonymously. Moreover, because Plaintiff Jane Doe 2 is willing to disclose her identity in a sealed affidavit and to cooperate with Defendants' reasonable discovery requests, there is no real risk of unfairness to Defendants. Accordingly, Plaintiff Jane Doe 2 respectfully requests that the Court allow her (like Plaintiff Jane Doe) to proceed under a pseudonym.

WHEREFORE, Plaintiff Jane Doe 2 respectfully requests that the Court grant the foregoing Motion.

Respectfully submitted,

**CHAIKIN, SHERMAN,**
**CAMMARATA & SIEGEL, P.C.**

_/s/ Joseph Cammarata_
Joseph Cammarata
D.C. Bar No. 389254
Matthew W. Tievsky
D.C. Bar No. 1004955
1232 17th Street, N.W.
Washington, D.C. 20036
Tel: (202) 659-8600
Fax: (202) 659-8680
joe@dc-law.net
matthew@dc-law.net
Attorneys for Plaintiff Jane Doe 2

## RULE 12-I CERTIFICATION

I certify that all the Defendants in this action are corporations and no attorney has entered an appearance on their behalf. The undersigned was therefore unable to confer with counsel pursuant to Rule 12-I.

_/s/ Joseph Cammarata_
Joseph Cammarata

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiff Jane Doe 2's Motion for Leave to Proceed Under a Pseudonym, Exhibit A to Plaintiff's Motion, and the proposed order will be served upon Defendants along with the Complaint initiating this action.

I further hereby certify that on this 10th day of December, 2014 a copy of the above papers were e-filed and served electronically on:

> Steven J. Kelly (D.C. Bar No. 1021534)
> Anne T. McKenna (D.C. Bar No. 450414)
> SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
> 201 N. Charles Street, Suite 2600
> Baltimore, Maryland 21201

and mailed first class, postage pre-paid, to:

> Steven D. Silverman (*Pro Hac Vice* Pending)
> Stephen G. Grygiel (*Pro Hac Vice* Pending)
> Sima G. Fried (*Pro Hac Vice* Pending)
> 201 North Charles Street, Suite 2600
> Baltimore, Maryland 21201

> /s/ Joseph Cammarata
> Joseph Cammarata

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | | |
|---|---|---|
| Jane Doe 2, <u>et al</u>. | * | |
| *Plaintiffs,* | * | |
| | * | Judge Herbert B. Dixon |
| **v.** | * | Case No. 2014 CA 007644 B |
| The Georgetown Synagogue -- | * | Next Event: ISC 03/06/15 |
| Kesher Israel Congregation, <u>et al</u>. | * | |
| | * | |
| *Defendants.* | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### ORDER GRANTING PLAINTIFF JANE DOE 2'S MOTION FOR LEAVE TO PROCEED UNDER A PSEUDONYM

Upon consideration of Plaintiff Jane Doe 2's Motion to For Leave to Proceed Under a Pseudonym and finding good cause supporting the same, it is on this ___ day of December, 2014, hereby ORDERED that the Motion is GRANTED as follows:

    A. The name of the moving Plaintiff shall be "Jane Doe 2" on all pleadings and papers contained in the public record; and

    B. The address for the moving Plaintiff used by the Clerk of this Court for the Complaint and in all pleadings or documents filed with the Court shall be:

        JANE DOE 2
        c/o Chaikin, Sherman, Cammarata & Siegel, P.C.
        1232 17th Street NW
        Washington, D.C. 20036

                                      _____
                                        Judge Herbert B. Dixon
                                        Superior Court for the District of Columbia

*Cont'd*

CC:

Joseph Cammarata
Matthew W. Tievsky
CHAIKIN, SHERMAN,
   CAMMARATA & SIEGEL, P.C.
1232 17th Street, N.W.
Washington, D.C. 20036

Steven J. Kelly
Anne T. McKenna
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201

Steven D. Silverman
Stephen G. Grygiel
Sima G. Fried
201 North Charles Street, Suite 2600
Baltimore, Maryland 21201

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | | |
|---|---|---|
| **JANE DOE**, *et al.*, | ) | |
| Plaintiffs, | ) | |
| **v.** | ) | **Case No. 2014 CA 007644 B** |
| | ) | **Judge Herbert B. Dixon, Jr.** |
| **GEORGETOWN UNIVERSITY**, *et al.*, | ) | |
| Defendants. | ) | |

### <u>ORDER GRANTING PLAINTIFF JANE DOE 2'S MOTIONS FOR LEAVE TO PROCEED UNDER PSEUDONYM & TO SEAL EXHIBIT A</u>

This matter is before the court on Plaintiff Jane Doe 2's *Motion for Leave to Proceed under a Pseudonym* and *Motion to Seal Exhibit A to Motion for Leave to Proceed under a Pseudonym*. It appearing that the underlying complaint involves the alleged sexual exploitation of the plaintiffs by Rabbi Bernard Freundel and, as a preliminary determination, that Plaintiff Jane Doe 2's privacy interests outweigh the public's common law right to access records in civil actions, it is by the court this ___15th___ day of December 2014

**ORDERED**, that Plaintiff Jane Doe 2's *Motion for Leave to Proceed under a Pseudonym* and *Motion to Seal Exhibit A to Motion for Leave to Proceed under a Pseudonym* shall be and are hereby **GRANTED**; and it is further

**ORDERED**, that Exhibit A to Plaintiff Jane Doe 2's *Motion for Leave to Proceed under a Pseudonym* shall be and is hereby **SEALED**; and it is further

**ORDERED**, that the name of the moving plaintiff shall be and is hereby **SEALED** on the public record; and it is further

**ORDERED**, that the moving plaintiff shall be referred to as "Jane Doe 2" in all pleadings and papers filed in the above-captioned matter; and it is further

**ORDERED**, that the Clerk of the Court and all pleadings and other documents filed with

the Court shall reflect address for the moving plaintiff to be:

    JANE DOE 2
    c/o Chaikin, Sherman, Cammarata & Siegel, P.C.
    1232 17th Street NW
    Washington, D.C. 20036.




_____
                    **Herbert B. Dixon, Jr.**
                    **Judge**
                    **(Signed in Chambers)**

<u>Copies to:</u>

Joseph Cammarata, Esq.
Matthew W. Tievsky, Esq.
Steven J. Kelly, Esq.
Anne T. McKenna, Esq.

Steven D. Silverman, Esq.
Stephen G. Grygiel, Esq.
Sima G. Fried, Esq.
201 North Charles Street, Suite 2600
Baltimore, MD 21201

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

Jane Doe 2, <u>et al</u>.                              *

    *Plaintiffs,*                              *

                             **Judge Herbert B. Dixon**

      v.                              *   **Case No. 2014 CA 007644 B**

The Georgetown Synagogue --            *   **Next Event: ISC 03/06/15**
Kesher Israel Congregation, <u>et al</u>.
                                *

    *Defendants.*                              *

                                *

*  *  *  *  *  *  *  *  *  *  *  *  *

**PLAINTIFF JANE DOE 2'S MOTION TO CLARIFY DECEMBER 15, 2014 ORDER
GRANTING PLAINTIFF JANE DOE 2'S MOTIONS FOR LEAVE TO PROCEED
UNDER PSEUDONYM AND TO SEAL EXHIBIT A**

COMES NOW Plaintiff Jane Doe 2, by and through her counsel, pursuant to Super. Ct. Civ. Pro. R. 54(b), and respectfully requests that this Court clarify its December 15, 2014 Order Granting Plaintiff Jane Doe 2's Motions for Leave to Proceed Under Pseudonym & to Seal Exhbit A, to ensure that the Order fulfills Plaintiff Jane Doe 2's original intent in filing the Motion for Leave to Proceed Under Pseudonym, and presumably the intent of the Court in granting it.  Plaintiff Jane Doe 2 respectfully requests that the Court clarify that the December 15, 2014 Order shall have effect, whether Plaintiff Jane Doe 2 joins the class action Complaint pending under the above case number, *or* if she files her own separate class action complaint, as she explained she might, in her original Motion for Leave to Proceed Under Pseudonym. Plaintiff Jane Doe 2 explains further, as follows:

1.  On December 2, 2014, the original Plaintiff Jane Doe filed a class action complaint on behalf of certain women who utilized the National Capital Mikvah.  Plaintiff Jane Doe is represented by Silverman, Thompson, Slutkin & White, LLC.

2.   Plaintiff Jane Doe 2 is a potential member of the class in that class action, although the circumstances of her utilization of the mikvah differ from Plaintiff Jane Doe 1's in several material respects.  (*E.g.*, Plaintiff Jane Doe utilized the mikvah for academic purposes only, relating to the fact that she was a student of Freundel's at Georgetown University Law School. In contrast, Plaintiff Jane Doe 2 utilized the mikvah for spiritual purposes during her conversion to Judaism.)   At the time of the filing of the December 2, 2014 class action complaint, Plaintiff Jane Doe 2 was already represented by undersigned counsel.  Plaintiff Jane Doe 2 had been considering filing her own class action complaint.

3.   On December 2, 2014, shortly after the filing of the original class action complaint, counsel for the two Plaintiffs had a lengthy telephone conversation to discuss how to proceed with respect to Plaintiff Jane Doe 2's claim.   Counsel for Plaintiff Jane Doe 2 initially expressed the intention to file a separate class action.  However, all counsel discussed having Plaintiff Jane Doe 2 join the instant class action as an additional class representative.  (Part of the rationale for this agreement was the belief that Plaintiff Jane Doe 2, as a convert, may be more "typical" of a greater portion of the putative class than the original Plaintiff Jane Doe.)

4.   All counsel also discussed Plaintiff Jane Doe 2's desire to protect her own anonymity, just as the original Plaintiff Jane Doe sought and obtained leave to proceed anonymously when she filed the class action complaint.  *See Plaintiff Jane Doe's Motion for Leave to Proceed Under Pseudonym and Memo. of Pts. and Auths. in Support Thereof*, filed December 2, 2014.  Jane Doe 2's counsel discussed the need to file a similar motion on behalf of Plaintiff Jane Doe 2, with counsel for Plaintiff Jane Doe 1.

5.   On December 4, 2014, counsel for the original Plaintiff Jane Doe assisted

Jane Doe 2's counsel in preparing Plaintiff Jane Doe 2's Motion for Leave to Proceed Under Pseudonym, by e-mailing to counsel a "Word" document containing Plaintiff Jane Doe's original Motion for Leave to Proceed Under Pseudonym.  Thus, counsel for the original Plaintiff Jane Doe provided Jane Doe 2's counsel a template to use in preparing Plaintiff Jane Doe 2's Motion for Leave to Proceed Under Pseudonym.

6.   When counsel attempted to file Plaintiff Jane Doe 2's Motion for Leave to Proceed Under Pseudonym, counsel was informed by the Clerk of the Court that Plaintiff Jane Doe 2 could not file a Motion for Leave to Proceed Under Pseudonym under a case number different from the case number in this action, without *also* filing her own new class action complaint.  However, doing so would have been contrary to the tentative agreement that undersigned counsel reached with counsel for Plaintiff Jane Doe.  The law clerk of the Honorable Herbert Dixon confirmed that the Motion should be filed in this case.  Therefore, counsel, in accordance with the instructions from the clerks recited above, promptly filed Plaintiff Jane Doe 2's Motion for Leave to Proceed Under Pseudonym, in this action, on December 10, 2014.[1]

7.   Given that the agreement for Plaintiff Jane Doe 2 to join in this class action as an additional class representative was tentative, Plaintiff Jane Doe 2's Motion for Leave to Proceed Under Pseudonym expressly stated the alternative that Plaintiff Jane Doe 2 would proceed with her own, independent class action.  Specifically, the introductory paragraph stated that Plaintiff Jane Doe 2:

---

[1] The fact that Plaintiff Jane Doe 2 did not file her own class action complaint at that time, as she could have easily done, evidences the tentative agreement that counsel had reached with counsel for Plaintiff Jane Doe.  This, in addition to the fact that counsel for Plaintiff Jane Doe, Steven Silverman, forwarded the Motion in a "Word" format for counsel to use to expedite filing, clearly demonstrates that at least as of December 4, 2014, all counsel were in agreement as to how to proceed.

3

is either newly joining this suit [the original class action] as a class action
representative, **or** will file a class action in her own right.

(Emphasis added.)

8.   On December 15, 2014, this Court granted Plaintiff Jane Doe 2's Motion for Leave
to Proceed Under Pseudonym.  Unfortunately, the draft Order submitted by Plaintiff, did not
accurately track the request in the Motion, which was to permit Plaintiff Jane Doe 2 to proceed
under a pseudonym, whether by "joining this suit as a class representative, or [filing] a class
action in her own right."  Accordingly, Plaintiff Jane Doe 2 seeks a clarification of the original
order, establishing that her right to proceed under a pseudonym has been granted, be it in this
class action or in a separate class action that she will file independently.

9.   The instant Motion is necessary and appropriate in the interests of judicial
economy, to permit the seamless filing of Plaintiff Jane Doe 2's independent class action, and
obviate the need to re-file her Motion for Leave to Proceed Under Pseudonym in that action.
This would fulfill Plaintiff Jane Doe 2's original intent in filing the Motion for Leave to
Proceed Under Pseudonym, and presumably the intent of the Court in granting it.

WHEREFORE, Plaintiff Jane Doe 2 respectfully requests that the Court issue an Order clarifying that the December 15, 2014 Order granting Plaintiff Jane Doe 2's Motion for Leave to Proceed Under a Pseudonym, applies whether Plaintiff Jane Doe 2 proceeds in this action, or files her own separate action.

Respectfully submitted,

**CHAIKIN, SHERMAN,**
 **CAMMARATA & SIEGEL, P.C.**

*/s/ Joseph Cammarata*
Joseph Cammarata
D.C. Bar No. 389254
Matthew W. Tievsky
D.C. Bar No. 1004955
1232 17th Street, N.W.
Washington, D.C. 20036
Tel: (202) 659-8600
Fax: (202) 659-8680
joe@dc-law.net
matthew@dc-law.net
Attorneys for Plaintiff Jane Doe 2

### MEMORANDUM OF POINTS AND AUTHORITIES

1. Super. Ct. Civ. Pro. R. 54(b); and,
2. The record herein.

*/s/ Joseph Cammarata*
Joseph Cammarata

### RULE 12-I CERTIFICATION

I certify that all the Defendants in this action are corporations and no attorney has entered an appearance on their behalf. The undersigned was therefore unable to confer with counsel pursuant to Rule 12-I.

*/s/ Joseph Cammarata*
Joseph Cammarata

5

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiff Jane Doe 2's Motion to Clarify December 15, 2014 Order Granting Plaintiff Jane Doe 2's Motions for Leave to Proceed Under Pseudonym and to Seal Exhibit A, and the proposed order will be served upon Defendants along with the Complaint initiating this action.

I further hereby certify that on this 16th day of December, 2014 a copy of the above papers were e-filed and served electronically on:

> Steven J. Kelly (D.C. Bar No. 1021534)
> Anne T. McKenna (D.C. Bar No. 450414)
> SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
> 201 N. Charles Street, Suite 2600
> Baltimore, Maryland 21201

and mailed first class, postage pre-paid, to:

> Steven D. Silverman (*Pro Hac Vice* Pending)
> Stephen G. Grygiel (*Pro Hac Vice* Pending)
> Sima G. Fried (*Pro Hac Vice* Pending)
> 201 North Charles Street, Suite 2600
> Baltimore, Maryland 21201

> */s/ Joseph Cammarata*
> Joseph Cammarata

6

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **Jane Doe 2, <u>et al</u>.** | * | |
| *Plaintiffs,* | * | |
| | | **Judge Herbert B. Dixon** |
| **v.** | * | **Case No. 2014 CA 007644 B** |
| **The Georgetown Synagogue --** | * | **Next Event: ISC 03/06/15** |
| **Kesher Israel Congregation, <u>et al</u>.** | | |
| | * | |
| *Defendants.* | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>ORDER</u>

Upon consideration of Plaintiff Jane Doe 2's Motion to Clarify December 15, 2014 Order Granting Plaintiff Jane Doe 2's Motions for Leave to Proceed Under Pseudonym and to Seal Exhibit A , finding good cause supporting the same, it is on this ___ day of December, 2014, hereby ORDERED that the Motion is GRANTED as follows:

The relief granted to Plaintiff Jane Doe 2 by the  Order dated December 15, 2014, allowing her to proceed under the pseudonym Jane Doe 2, shall apply whether Plaintiff Jane Doe 2 joins in the class action Complaint in the instant action, or she files her own, new, independent action arising out of the same events.

_____
Judge Herbert B. Dixon
Superior Court for the District of Columbia

*Cont'd*

CC:

Joseph Cammarata
Matthew W. Tievsky
CHAIKIN, SHERMAN,
  CAMMARATA & SIEGEL, P.C.
1232 17th Street, N.W.
Washington, D.C. 20036

Steven J. Kelly
Anne T. McKenna
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201

Steven D. Silverman
Stephen G. Grygiel
Sima G. Fried
201 North Charles Street, Suite 2600
Baltimore, Maryland 21201

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

**JANE DOE,**
c/o SILVERMAN, THOMPSON, SLUTKIN & WHITE, LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201

and

**EMMA SHULEVITZ,**
c/o SILVERMAN, THOMPSON, SLUTKIN & WHITE, LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201

and

**STEPHANIE SMITH,**
c/o SILVERMAN, THOMPSON, SLUTKIN & WHITE, LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201

*Plaintiffs,*

v.

**THE GEORGETOWN UNIVERSITY,**
37th & O Streets, NW
204 Healy Hall
Washington, D.C. 20057

**SERVE ON:**

Lisa Brown, Registered Agent
37th & O Streets, NW
202 Healy Hall
Washington, D.C. 20057

and

**THE GEORGETOWN SYNAGOGUE –
KESHER ISRAEL CONGREGATION,**
2801 N Street, NW
Washington, D.C. 20007

**SERVE ON:**

The Georgetown Synagogue – Kesher Israel Congregation
2801 N Street, NW
Washington, D.C. 20007

and



FILED
CIVIL ACTIONS BRANCH

DEC 1 8 2014

Superior Court
of the District of Columbia
Washington, D.C.

CASE No. 2014 CA 007644 B
Judge Herbert B. Dixon, Jr.
Next Event:   Initial Scheduling Conference
March  6, 2015 at 9:30 a.m.



Case: 2014 CA 007644 B
0005366387
Dkt: CIVAC



COMPLETED

1

| | |
|---|---|
| **THE NATIONAL CAPITAL MIKVAH, INC.,**<br>1308 28th Street, NW<br>Washington, D.C. 20007<br><br>**SERVE ON:**<br><br>    Sarah Barak, Registered Agent<br>    1559 33rd Street, NW<br>    Washington, D.C. 20007<br><br>and<br><br>**HISTADRUTH HORABONIM**<br>**DEAMERICA – RABBINICAL COUNCIL**<br>**OF AMERICA, INC.,**<br>305 Seventh Avenue, 12th Floor<br>New York, New York 10001<br><br>**SERVE ON:**<br><br>    Secretary of State<br>    New York Department of State<br>    One Commerce Plaza<br>    99 Washington Avenue<br>    Albany, New York 12231<br><br>    *Defendants.* | |

## AMENDED CLASS ACTION & INDIVIDUAL COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs Jane Doe ("Jane Doe"),[1] Emma Shulevitz ("Emma"), and Stephanie Smith

("Stephanie") (collectively, "Plaintiffs" or the "Named Plaintiffs") individually and on behalf of

the class of similarly situated individuals,[2] by and through their undersigned attorneys, hereby

sue Defendants The Georgetown University ("Georgetown"), The Georgetown Synagogue –

Kesher Israel Congregation ("Kesher Israel"), The National Capital Mikvah, Inc. ("NCM"), and

---

[1]    Pursuant to the D.C. Superior Court Rules of Civil Procedure, contemporaneous with the filing of the initial Complaint, Jane Doe filed a motion to proceed under a pseudonym (the "Pseudonym Motion") setting forth the precise legal and factual basis for her need to conduct this litigation in this manner. The Court granted the Pseudonym Motion on December 1, 2014 (*see* Docket Nos. 4 & 5). Pursuant to the Court's prior Orders and based on Plaintiffs' concern for their safety, Plaintiffs have used their attorneys' address as the address of record. Defendants will be furnished with Plaintiffs' full addresses at the appropriate time.

[2]    Plaintiffs assert class action claims against The Georgetown Synagogue – Kesher Israel Congregation, The National Capital Mikvah, Inc., and Histadruth Horabonim Deamerica – Rabbinical Council of America, Inc. only. The claims against The Georgetown University are brought solely in Jane Doe's individual capacity at this stage of the proceedings.

Histadruth Horabonim Deamerica – Rabbinical Council of America, Inc. (the "RCA") (collectively, the "Defendants"), and state as follows:

## I.    INTRODUCTION

1.    This case arises from an unfathomable breach of trust by a prominent religious leader and scholar and Defendants' utter failure to prevent and/or to stop it. Rabbi Bernard "Barry" Freundel, Ph.D. ("Freundel") lured his students, congregants, and other women into the sacred religious cleansing ritual of "mikvah" to sexually exploit the women without their knowledge or consent by capturing their naked images using concealed cameras and recording devices. For years, Defendants turned a blind eye to obvious signs of Freundel's increasingly bizarre and obviously improper behavior, ignoring the bright red flags that Freundel was acting inappropriately with women subjected to his authority. Defendants were derelict in their duties to their congregants, students, and those seeking to join or considering joining their ranks, thereby permitting Freundel's devastating sexual exploitation of Plaintiffs and other similarly situated women.

2.    Jane Doe is a third-year law student at Georgetown University Law Center ("Georgetown Law") who is devoted to her Jewish faith and who selected Georgetown Law because of its reputation for excellence and diversity.

3.    Jane Doe was excited to enroll in a "Jewish Law Seminar" course (the "Jewish Studies" class) co-taught by Freundel and Rabbi David Saperstein. Freundel suggested that she write the mandatory research paper on the mikvah ritual and, as part of her Jewish Studies class, Freundel required Jane Doe to participate in the immersion ritual at the mikvah built by Kesher Israel and owned and operated by NCM (the "NCM/Kesher Israel Mikvah"). Freundel also invited her to attend services at Kesher Israel on numerous occasions and to join his family and the Kesher Israel community at religious dinners at the Kesher Israel Rabbinical Residence,

3

including Friday night Sabbath dinner and Passover Seder. Jane Doe was thrilled to be part of a thriving and intellectual religious community and to be integrating her legal education with her Jewish faith. She was devastated when she learned that Freundel had used his positions with Georgetown Law, Kesher Israel, NCM, and the RCA to lure her to the NCM/Kesher Israel Mikvah to sexually exploit her. Freundel's breach of trust has cut Jane Doe to her core—shattering her trust in religious and educational institutions that have failed to live up to their reputations for excellence.

4.     Plaintiff Emma is a 27-year-old woman who converted to Judaism in August 2013. Born to a Jewish father and a non-Jewish mother,[3] in 2012 Emma sought Freundel's counseling, supervision, and sponsorship for her conversion to Judaism so that she could be married in accordance with the Jewish faith. Freundel led Emma through the conversion process based on this authority as an agent of RCA and Kesher Israel.

5.     For over a year,[4] Emma followed all the requirements prescribed by Freundel, including: participating in often awkward one-on-one meetings with Freundel, attending lectures, and visiting Israel. Emma was particularly disturbed by Freundel's request that she do a "practice dunk" in the NCM/Kesher Israel Mikvah that "wouldn't count" for her conversion. Emma was so uncomfortable with Freundel she eventually abandoned the conversion process with him and completed the process with another rabbi.

6.     Emma, who is now eight months pregnant with her first child, was devastated to learn that Freundel used his authority under the RCA and his position with Kesher Israel and NCM to lure her to the NCM/Kesher Israel Mikvah to sexually exploit her.

---

[3]   Judaism is matrilineal, meaning the religion passes through the mother. Accordingly, although Emma's father was Jewish, because her mother was not, Emma was not considered to be Jewish in the Orthodox community until she converted in August 2013.

[4]   Emma ultimately completed her conversion with a different sponsoring rabbi out of New York .

7.      Stephanie is a rising senior at Towson University ("Towson"), where Freundel was a tenured professor. In the fall semester of 2013, she took Freundel's Faith Perspectives in Medical Ethics course. Stephanie is not Jewish and she told Freundel she had no interest in converting to Judaism. Nonetheless, Freundel repeatedly invited her and other select students to the NCM/Kesher Israel Mikvah. In February 2014, Stephanie participated in an unconventional immersion at NCM/Kesher Israel Mikvah.

8.      Like her fellow Plaintiffs, Stephanie was shocked and horrified to learn that Freundel had used his positions as a religious leader with NCM, Kesher Israel and the RCA to sexually exploit her.

9.      Plaintiffs assert the causes of action detailed herein against Kesher Israel, NCM, and the RCA individually and on behalf of the entire class of women who were sexually exploited by Freundel at the NCM/Kesher Israel Mikvah and at the Kesher Israel Rabbinical Residence based on Defendants' utter failure (i) to investigate Freundel prior to hiring him and placing him in a position of authority, and (ii) to take any meaningful action to prevent the obvious harm Freundel posed to congregants, female conversion candidates, and other women.

10.     Plaintiffs also assert the causes of action detailed herein against Kesher Israel, NCM, and the RCA individually and on behalf of the entire class of women who were sexually exploited at the NCM/Kesher Israel Mikvah and at the Kesher Israel Rabbinical Residence through the acts of these Defendants' employee, agent, and/or servant – Freundel.

11.     Plaintiff Jane Doe further asserts the causes of action detailed herein against Georgetown in her individual capacity.

## II.      PARTIES, JURISDICTION, & VENUE

12.     Plaintiff Jane Doe is a natural person who resides in the District of Columbia.

13.     Plaintiff Emma Shulevitz is a natural person who resides in Rockville, Maryland.

5

14.     Plaintiff Stephanie Smith is a natural person who resides in Towson, Maryland.

15.     Defendant Georgetown is a private educational institution organized and existing under the laws of the District of Columbia with its principal place of business at 37th & O Streets, NW, 204 Healy Hall, Washington, D.C. 20057. Georgetown Law is one of the many graduate schools within the Georgetown institution.

16.     Defendant Kesher Israel is a private religious institution organized and existing under the laws of the District of Columbia with its principal place of business at 2801 N Street, NW, Washington, D.C. 20007. Kesher Israel raised the money necessary to build the mikvah owned and operated by NCM.

17.     Defendant NCM owns and operates the NCM/Kesher Israel Mikvah and is organized and existing under the laws of the District of Columbia with its principal place of business at 1308 28th Street, NW, Washington, D.C. 20007.

18.     Defendant RCA is a professional organization for Orthodox rabbis in the United States organized and existing under the laws of the state of New York with its principal place of business at 305 Seventh Avenue, 12th Floor, New York, New York 10001. The RCA organized and currently oversees the regional rabbinical "courts" (the "Beth Din") that are tasked with supervising, authorizing, and approving conversions to Judaism.

19.     This Court has subject matter jurisdiction over this action pursuant to D.C. Code Ann. § 11–921(a) because this action is being brought in the District of Columbia.

20.     This Court has personal jurisdiction over Defendants Georgetown, Kesher Israel, and NCM pursuant to D.C. Code Ann. § 13–422 because each of these Defendants is organized under the laws of the District of Columbia and maintains its principal place of business in the District of Columbia.

21.     In addition and in the alternative, this Court has personal jurisdiction over Defendants Georgetown, Kesher Israel, and NCM pursuant to D.C. Code Ann. § 13–423(a)(1) and (3) because each Defendant transacts business in the District of Columbia and caused tortious injury to Plaintiffs in the District of Columbia by an act or omission in the District of Columbia.  Further, this Court has personal jurisdiction over Defendant RCA pursuant to D.C. Code Ann. § 13–423(a)(1) and (3) because the RCA directly, and/or through its agent Freundel, transacts business in the District of Columbia and caused tortious injury to Plaintiffs in the District of Columbia by an act or omission in the District of Columbia.

22.     Venue in this Court is proper because each of the above-mentioned Defendants' acts and omissions described in this Amended Complaint occurred within the District of Columbia.

### III.     FACTS COMMON TO ALL COUNTS

23.     At all relevant times, Freundel served as the Rabbi at Kesher Israel. Freundel did so as an actual and/or apparent agent, servant, and/or employee of Kesher Israel.

24.     At all relevant times, Freundel also served as the supervising Rabbi of the NCM/Kesher Israel Mikvah. Freundel did so at all times as an actual and/or apparent agent, servant, and/or employee of NCM.

25.     At all relevant times, Freundel also was a member of the RCA and served in various roles within the RCA including, but not limited to, Chairman of the Geirus Policies and Standards Committee and, upon information and belief, vice president of the RCA. Freundel did so at all times as an actual and/or apparent agent, servant, and or employee of the RCA.

26.     At all relevant times, Freundel also served on the Washington Beth Din organized and overseen by the RCA. Freundel did so at all times as an actual and/or apparent agent, servant, and or employee of the RCA.

7

27.     At all relevant times, Freundel was an Adjunct Professor at Georgetown, where he taught Georgetown Law school students, including Plaintiff Doe, educational courses including, but not limited to, the Jewish Studies class. Freundel did so at all times as an actual and/or apparent agent, servant, and/or employee of Georgetown.

A.     **FREUNDEL CREATES FOR HIMSELF A POWERFUL LEADERSHIP POSITION IN THE WASHINGTON METROPOLITAN JEWISH COMMUNITY**

28.     Kesher Israel selected Freundel to be its leader in 1987. According to Kesher Israel's website, "with his exceptional intellectual mind, Rabbi Freundel helped Kesher Israel become a beacon of modern orthodoxy and a shul that sees traditional Judaism as essential, while also understanding the value of modern society." Kesher Israel's website also indicates: "During Rabbi Freundel's tenure, Kesher Israel experienced growth in membership and the expansion of the congregant demographic to include college and graduate students, young professionals, interns . . . ."

29.     At all relevant times, Freundel resided at 2801 N Street, NW, Washington, D.C. 20007, in a dwelling that was owned, operated and managed by Kesher Israel and that was used by Freundel in connection with his official Kesher Israel functions (the "Rabbinical Residence").

30.     In addition to leading the Kesher Israel congregation, Freundel also maintained a leadership role in the broader Orthodox community.

31.     Most notably, Freundel was a leader within the RCA, a national non-profit organization whose mission is "to advance the cause and voice of the Torah and the rabbinic tradition by promoting the welfare, interests, and professionalism of Orthodox rabbis all around the world."

32.     In particular, Freundel was the architect of the RCA's Geirus Policies and Standards ("GPS") system, and served as the long-time chair of that committee within the RCA.

33.     The GPS's primary mission is to provide a centralized system of standards Orthodox rabbis must follow for "converts" and/or individuals not recognized by the RCA as "Jewish" who wish to convert to Judaism. Conversion is critical to certain individuals because in the Orthodox community it serves as a prerequisite to a Jewish marriage, can determine whether an individual's offspring are considered to be "Jewish," is a prerequisite to Israeli citizenship, and it can affect an individual's right to purchase real property in Israel.

34.     Freundel devised a system of regional Beth Din that function under the direction and leadership of local rabbis and that are sanctioned by the RCA's GPS program, which Freundel headed.

35.     Freundel sat on the Washington Beth Din and, because of his leadership positions in the broader Orthodox community, served as the ultimate arbiter for any person seeking to convert to Judaism in the metropolitan Washington area and, with the full knowledge and support of Kesher Israel, NCM, and the RCA, Freundel placed himself in an excellent position to sexually and otherwise exploit converts, over whom he exercised great power and control.

36.     Freundel also served as the head of the Rabbinical Council of Greater Washington, the Orthodox body that supervises kosher dietary laws in the greater Washington area.

**B.      FREUNDEL OPENS A MIKVAH AS A SEXUAL EXPLOITATION DEVICE**

37.     A "mikvah" is a pool of water in which members of the Jewish faith completely immerse themselves (the immersion is of the entire body including one's hair) while they are completely naked and stripped of all "barriers," including jewelry, makeup, and any other beauty products on the hair or skin. The purpose of the immersion ritual is to cleanse the soul and purify the participant. In recent years, survivors of sexual assault have participated in the mikvah ritual to help them heal emotionally and spiritually from the pain associated with sexual assault. The

9

pool of water at the NCM/Kesher Israel Mikvah resembles a large bathtub and is adjacent to a bathroom (the "Changing Room") that participants use to shower and prepare for the immersion ritual.

38.     Converts to Judaism are required to immerse in a mikvah as the final step in the conversion process. Although a mikvah is traditionally used only by Jewish persons and those persons about to convert to Judaism, Freundel often urged individuals traditionally not welcome in a mikvah, including non-Jews and unmarried women, to use the NCM/Kesher Israel Mikvah.

39.     Despite serious concerns within Kesher Israel and in the greater Jewish Orthodox community concerning Freundel's behavior toward converts, Kesher Israel permitted Freundel to establish a mikvah that would essentially be controlled by Freundel under the auspices of Kesher Israel. Upon information and belief, Freundel wanted to set up a mikvah that would be completely under his control, that no other Orthodox rabbi would be permitted to use, and that would be open to conversion students and converts to Judaism.

40.     Upon information and belief, Freundel used Kesher Israel's assets to plan and fund the proposed mikvah and, with Kesher Israel's knowledge and consent, he began diverting donations made to Kesher Israel to his effort to found and construct what ultimately became the NCM/Kesher Israel Mikvah.

41.     According to public filings with the Department of Consumer and Regulatory Affairs for the District of Columbia ("DCRA"), NCM incorporated in 2000 for the sole purpose of operating the mikvah.

42.     DCRA filings indicate that NCM's "business address" is the same as the address used by Kesher Israel: 2801 N. Street, NW, Washington, D.C. 20007.

43.   Further, DCRA filings reveal that NCM's Director and Resident Agent is Sarah Barak. Upon information and belief, Sarah Barak is the wife of David Barak, who sat on Kesher Israel's Board of Directors, is a former President of the NCM/Kesher Israel Mikvah, and who has maintained a leadership role in the Kesher Israel congregation.

44.   Upon information and belief, Defendants Kesher Israel and NCM opened the NCM/Kesher Israel Mikvah in 2005 in the basement of the building adjacent to Kesher Israel.

45.   At all relevant times, Freundel was in charge of performing and overseeing the sacred religious immersion rituals at the NCM/Kesher Israel Mikvah.[5]

46.   Defendants Kesher Israel and NCM operated the NCM/Kesher Israel Mikvah with the assistance of their agent/employee Freundel and Freundel oversaw and performed the immersion rituals on the property of NCM and/or Kesher Israel. Freundel did so as an actual and/or apparent agent, servant, and/or employee of Kesher Israel, NCM, and/or the RCA.

C.   **FREUNDEL USES HIS POSITION AT GEORGETOWN LAW TO LURE JANE DOE TO THE NCM/KESHER ISRAEL MIKVAH**

47.   In 2014, Jane Doe was enrolled in Freundel's Jewish Studies class at Georgetown Law, which is co-taught by Rabbi David Saperstein, President Obama's recent nominee to serve as Ambassador-at-Large for International Religious Freedom. The Jewish Studies class requires, among other things, that each student write a 25-page research paper on an approved topic that is related to Jewish law.

48.   On or about January 22, 2014, and prior to the start of that evening's class, Jane Doe approached Freundel seeking assistance in selecting a topic for her research paper. While acting in his capacity as a Georgetown adjunct professor, Freundel immediately, and without

---

[5]   Pursuant to the law associated with mikvah, Freundel was not present in the mikvah bathing area during the immersion. Instead, a female attendant was present throughout the ritual and Freudel remained in a waiting area antechamber.

11

hesitation, urged Jane Doe to write her research paper about the mikvah ritual. Freundel advised

Jane Doe that one of his former Georgetown Law students previously wrote a research paper

about mikvah, that the paper was "very successful," and that the former student "got an A."

Freundel insisted that Jane Doe write about mikvah, going so far as to, on the spot, provide Jane

Doewith an outline of the various issues to be addressed in her research paper. After that

evening's class, Freundel approached Jane Doe and invited her to immerse at the NCM/Kesher

Israel Mikvah. Freundel urged Jane Doe, as research for her paper, to call him to set up a time to

attend the NCM/Kesher Israel Mikvah.

49.    Because Jane Doe sought Freundel's assistance in selecting a topic for her

research paper, she became one of a handful of students assigned to be mentored by Freundel in

the Jewish Studies class.

50.    JaneDoe visited the NCM/Kesher Israel Mikvah and immersed two separate times

as part of the research for her Georgetown Law-required research paper.

51.    In February 2014, Freundel and Jane Doe communicated via e-mail regarding

scheduling her first visit to the NCM/Kesher Israel Mikvah.

52.    On or about March 2, 2014, Jane Doe went to the NCM/Kesher Israel Mikvah.

Before the immersion rituals began, Freundel entered the Changing Room to prepare it for the

participants in the mikvah ritual. Thereafter, Freundel accompanied Plaintiff Jane Doe into the

Changing Room and specifically directed her where she should place her clothing when she

undressed, where and how to shower, and what bath products to use. Once Freundel exited the

Changing Room area, Jane Doe undressed, showered, entered the mikvah's ritual bath area, and

immersed herself while fully nude in the NCM/Kesher Israel Mikvah in accordance with

Freundel's instructions. Following her immersion, Freundel invited Jane Doe to Passover

12

services at Kesher Israel and to a Passover Seder being held at the Kesher Israel Rabbinical Residence.

53.     In or around March 2014, Freundel approached Jane Doe and inquired about her experience immersing in the NCM/Kesher Israel Mikvah. After discussing Jane Doe's first mikvah experience, Freundel urged her to participate in a second immersion at the NCM/Kehser Israel Mikvah where just she and Freundel would be present. Jane Doe did not follow up on Freundel's invitation.

54.     On or about March 31, 2014, and without request or prior inquiry from Jane Doe, Freundel e-mailed  her and asked her to return to the NCM/Kesher Israel Mikvah on the following Thursday to participate in a second immersion.

55.     On or about April 2, 2014, Freundel called Jane Doe to confirm she would attend the NCM/Kesher Israel Mikvah on April 3, 2014 because Freundel wanted to make sure he was present during her second visit.

56.     On or about April 3, 2014, Jane Doe returned to the NCM/Kesher Israel Mikvah. As he had before, Freundel entered the Changing Room to organize it for Jane Doe's pre-immersion preparations. Freundel once again accompanied Jane Doe into the Changing Room and, again, specifically directed her where she should place her clothing when she undressed, where and how to shower, and what bath products to use. As before, once Freundel had exited the Changing Room, Jane Doe undressed, showered, went into the mikvah's ritual bath area, and immersed herself while fully nude in the NCM/Kesher Israel Mikvah in accordance with Freundel's instructions.

57.     Following her second immersion in the NCM/Kesher Israel Mikvah, Freundel reiterated his prior invitation to attend Passover services at Kesher Israel and, after the services,

to attend a Passover Seder with his family and others at the Kesher Israel Rabbinical Residence. On several occasions, Freundel had also invited Jane Doe to attend Shabbat services at Kesher Israel and, following those services, to attend Shabbat dinners with his family and others at the Kesher Israel Rabbinical Residence.

58.     In or around May 2014, Jane Doe submitted her research paper to Georgetown Law as her official final examination in the Jewish Studies class. Jane Doe's research paper was entitled: "The *Mikveh*: Expanding the Ritual for Jewish Women" (the "Paper").

59.     In her Paper, Jane Doe explicitly states she immersed in the NCM/Kesher Israel Mikvah "as a research tool for this paper."

60.     Indeed, the Paper details how Jane Doe twice immersed herself in the NCM/Kesher Israel Mikvah at the request of her Georgetown Law professor. Jane Doe notes that her second immersion was to "continue my research for this paper" and "to connect to Judaism on a deeper level." Jane Doe further observes that with the facilitation of her trusted Georgetown Law professor, "I transformed the meanings of those waters and made it my own. I reinterpreted the ritual to purify my soul."

61.     Freundel and Saperstein gave Jane Doe's Paper an "A" and conferred on her an award for achieving the highest grade of all final research papers submitted in the Jewish Studies class. Georgetown Law also posted Jane Doe's Paper to an electronic database permitting other students to view the Paper as a "model examination."

**D.     FREUNDEL USES HIS POSITIONS WITHIN KESHER ISRAEL, NCM, AND THE RCA TO LURE CONVERSION CANDIDATES—LIKE EMMA—TO THE NCM/KESHER ISRAEL MIKVAH**

62.     Emma decided in 2012 she wanted to formally convert to Judaism with an Orthodox rabbi. Another community leader, a well-respected Orthodox rabbi, told Emma to

contact Freundel to inquire about conversion because of Freundel's ability to "approve" Orthodox conversions in his various capacities with the RCA and Kesher Israel.

63.     On or about June 21, 2012, Emma called Freundel at Kesher Israel. They spoke briefly by telephone and Freundel told her to come to Kesher Israel the next morning.

64.     Emma met Freundel at Kesher Israel the next day, on June 22, 2012. The weekday morning prayer session had just ended so the only people present were Freundel, a bunch of older retired men, Emma, and another young woman who was seeking Freundel's approval to get married in Israel. The other young woman spoke with Freundel first about her desire to get married in Israel. At the end of their conversation, Emma overhead Freundel tell the young woman "You don't have to pay me. Just smile."

65.     Throughout the fourteen months Emma sought to convert to Judaism with Freundel, Freundel and Emma had multiple one-on-one meetings, including meetings on or about June 22, July 20, July 27, September 12, and October 18, 2012, and February 25, March 1, and August 25, 2013. The meetings were awkward and uncomfortable for Emma because Freundel made repeated references to Emma's "looks" and did not seem interested in discussing her spiritual development. In addition, while Freundel often bragged about his prominence within the RCA and touted his relationship with the Chief Rabbi in Israel, Emma found his prescriptions for conversion to be arbitrary and disconnected from any recognized religious teachings.

66.     For instance, Freundel required Emma to attend multiple lectures organized by Freundel on various topics related to Jewish history and Jewish religious studies. Freundel gave Emma an open invitation to attend all services at Kesher Israel and she did, in fact, attend multiple Shabbat services, holiday services, and holiday celebrations at Kesher Israel.

15

67.     On or about September 26, 2012, while at Kesher Israel for Yom Kippur services, Emma told Freundel that her father had passed away four years prior and told him this was a motivating factor to seek Freundel's counseling and supervision for her conversion. A few weeks later, during a one-on-one meeting with Freundel, Emma told him that her father's yahrtzeit[6] was coming up the following week.

68.     The following week, without request or inquiry from Emma, Freundel called Emma and invited her to do a "practice dunk" at the NCM/Kesher Israel Mikvah the very next day on October 24, 2012. Freundel told Emma the "practice dunk" "does not count" and that she would be required to immerse again prior to completion of her conversion. Emma found that statement both odd and inconsistent with her understanding of Jewish law.

69.     On or about October 24, 2012, Emma went to the NCM/Kesher Israel Mikvah. Three other women she did not know and never saw again were also present. Emma was the last of the four women to do a "practice dunk." Freundel accompanied Emma into the Changing Room. When Emma started to place a water bottle on the counter of the sink in front of the clock-radio, Freundel sternly warned her not to disturb the clock-radio. Freundel then specifically directed Emma where she should place her clothing when she undressed. Once Freundel had exited the Changing Room area, Plaintiff Shulevitz disrobed, showered, entered the mikvah's ritual bath area, and immersed herself while fully nude in the mikvah. Following her "practice dunk," Freundel invited Emma to come back to the NCM/Kesher Israel Mikvah as frequently and often as she wished.

70.     That was the only time Emma visited the NCM/Kesher Israel Mikvah.

---

[6]   "Yahrzeit" is the anniversary of someone's death – especially that of a parent – and is remembered and commemorated by lighting a yahrzeit candle the night before the anniversary and allowing the candle to burn down and extinguish itself.

71.     On or about August 25, 2013, more than a year after Emma commenced the conversion process under Freundel, Emma and Freundel had another one-on-one meeting. While in Freundel's office at the Rabbinical Residence, Emma demanded that Freundel authorize her conversion immediately or she would go with a different rabbi. Freundel responded, "Fine, but it won't be accepted in Israel."

72.     On or around August 28, 2013, Emma traveled to New York City and converted with a different sponsoring rabbi in a mikvah located in Manhattan's Lower East Side.

73.     On or around December 6, 2013, Emma moved to Rockville, Maryland to attend a different Orthodox synagogue and escape Freundel and Kesher Israel.

74.     Emma's shock and horror to learn of Freundel's acts is compounded by the fact that her own Orthodox synagogue in Rockville, Maryland, refused to support her following the community's discovery of Freundel's betrayal and, instead, shunned her for speaking out about her experience with Freundel.

### E.     FREUNDEL BRINGS NON-JEWISH COLLEGE STUDENTS – LIKE STEPHANIE – ON "FIELD TRIPS" TO THE NCM/KESHER ISRAEL MIKVAH

75.     Stephanie is a rising senior at Towson University ("Towson") who is studying in Towson's Child Life program—a program that provides a multi-disciplinary approach to working with hospitalized children and their families.

76.     Stephanie took Freundel's Faith Perspectives in Medical Ethics course (the "Medical Ethics" course) as part of her Child Life focus in the fall semester of 2013.

77.     Stephanie was an active student in the Medical Ethics course and was impressed with Freundel's broad knowledge of the Jewish faith and of his leadership positions within the RCA, Kesher Israel, and NCM.

78.     On several occasions, Stephanie informed Freundel that she is not Jewish, that she

has no desire to convert to Judaism, and that she does not associate with any religious group.

79.     Nonetheless, Freundel encouraged Stephanie, and other young, female Towson

students, both Jewish and non-Jewish, to go on "field trips" to Kesher Israel and the

NCM/Kesher Israel Mikvah and to participate in the immersion ritual at the NCM/Kesher Israel

Mikvah.

80.     On November 10, 2013, Stephanie went on such a "field trip" with several other

young women who were also Towson students. While several of the young women from Towson

participated in the immersion ritual at the NCM/Kesher Israel Mikvah, Stephanie did not feel

comfortable doing so, so she declined.

81.     At the next Medical Ethics class, Freundel expressed his disappointment and

surprise that Stephanie had chosen  not to participate in the immersion ritual and he encouraged

her to return on a future "field trip" to try an immersion.

82.     On February 16, 2014, in another "field trip" of young, female Towson students

selected by Freundel, Stephanie went back to the NCM/Kesher Israel Mikvah and, this time,

participated in the immersion ritual. Freundel showed Stephanie and the other young women

from Towson the Changing Room and directed them regarding the pre-immersion preparation

procedures to follow.

83.     No one questioned Stephanie about not being Jewish or a conversion candidate

and it was Stephanie's understanding that the majority of the Towson students participating in

the immersion ritual on both of her "field trips" to Kesher Israel and the NCM/Kesher Israel

Mikvah were neither Jewish and nor conversion candidates.

18

84.   Freundel continued to stay in touch with Stephanie after her second visit to the NCM/Kesher Israel Mikvah.

85.   Freundel routinely called Stephanie late at night and after business hours from a cellular telephone that was not listed in his name. Freundel also repeatedly invited Stephanie to attend weekend retreats, which she declined to do.

### F.   FREUNDEL'S CRIMINAL WRONGDOING COMES TO LIGHT

86.   On or about September 28, 2014, a woman in charge of maintaining the NCM/Kesher Israel Mikvah's Changing Room who, upon information and belief, is or was an employee of Kesher Israel and/or NCM, noticed Freundel place a "Dream Machine" clock-radio in the Changing Room adjacent to the shower. The woman advised Freundel that there was already a clock on the wall of the Changing Room, to which Freundel responded "this clock will help with the ventilation in the shower."

87.   On or about October 12, 2014, the same Kesher Israel/NCM employee removed the "Dream Machine" clock-radio she had seen Freundel place in the Changing Room, examined it, and discovered that it contained hidden electronic recording devices including, but not limited to, a hidden camera and memory card.

88.   On or about October 14, 2014, officers of the District of Columbia Metropolitan Police Department ("MPD") arrested Freundel and criminally charged him with, among other charges, voyeurism. MPD's investigation is ongoing.

89.   Also on or about October 14, 2014, MPD officers executed search warrants on both Kesher Israel and the Rabbinical Residence.

90.   To date, police searches of the Rabbinical Residence, Kesher Israel, and other offices maintained by Freundel have revealed, among other things, the following: several laptop computers, desktop computers, external computer hard drives, digital cameras, memory cards,

19

flash drives, electronically deleted files labeled with women's names, a second clock with a hidden camera and memory card, a tissue box containing a hidden camera, a fan containing a hidden camera, a computer charger containing a hidden camera, and nude photographs of women.

91. MPD and several other area law enforcement agencies are conducting investigations into Freundel's criminal sexual exploitation.

G. **FREUNDEL'S ILLICIT SURVEILLANCE AND SEXUAL EXPLOITATION OF PLAINTIFFS AND THE MEMBERS OF THE CLASS**

92. Upon information and belief, on each of Plaintiffs' and Class Members' visits to the NCM/Kesher Israel Mikvah, Freundel intentionally placed in the Changing Room a clock-radio containing an electronic recording device capable of capturing video, audio, and/or still images. Freundel did so for the purpose of surreptitiously observing, electronically recording, and intentionally capturing video, audio, and still images of Plaintiffs' and the Class Members' private areas while Plaintiffs and the Class Members were using the Changing Room, were disrobing and showering, and were totally or partially undressed in both the Changing Room and the ritual bath area of the mikvah. Freundel further willfully and intentionally intercepted, or in the alternative, willfully endeavored to intercept, through the means of an electronic recording device, Plaintiffs' and the Class Members' oral communications while they were using the Changing Room and the mikvah. Freundel committed all of these acts without notice to Plaintiffs and the Class Members and without their knowledge or consent.

93. Upon information and belief, on each of Plaintiffs' and Class Members' visits to the NCM/Kesher Israel Mikvah, Freundel had installed cameras and/or other electronic surveillance and recording devices in the ritual bath area of the NCM/Kesher Israel Mikvah and, without Plaintiffs' and the Class Members' knowledge or consent, Freundel captured images

and/or recorded video and audio of Plaintiffs and the Class Members while they were completely naked for the express purpose of sexually exploiting them.

94.     Upon information and belief, Freundel willfully and intentionally captured, possessed, and/or distributed images, audio-recordings, and/or video depicting Plaintiffs and the Class Members while they were in a state of undress and without their knowledge or consent.

95.     Upon information and belief, Freundel used equipment owned by Kesher Israel to capture Plaintiffs' and the Class Members' images, oral communications, and/or video and, upon information and belief, Freundel stored the video, audio-recordings, and/or photographs depicting Plaintiffs and the Class Members in or on devices and/or equipment owned by Kesher Israel in his Kesher Israel office and/or at the Rabbinical Residence.

**H.     RED FLAGS IGNORED BY KESHER ISRAEL, NCM, AND THE RCA, AND THEIR WILLFUL BLINDNESS TOWARD THE PLAIN WARNING SIGNS**

96.     Based upon Freundel's planning and urging, Defendants Kesher Israel and NCM opened the NCM/Kesher Israel Mikvah in 2005 under the name "National Capital Mikvah."

97.     The manner in which the NCM/Kesher Israel Mikvah was operated and Freundel's use and management of it raised serious concern both within Kesher Israel and NCM and in the greater Washington D.C. community at large.

98.     Fundamentally, although Freundel purported to be an Orthodox rabbi, he used the NCM/Kesher Israel Mikvah in ways that were directly at odds with Kesher Israel's Orthodox Jewish foundations, including (without limitation):

  a.    Freundel opened the NCM/Kesher Israel Mikvah to non-Jews and unmarried women, who ordinarily are not welcomed at an Orthodox mikvah.

  b.    The unmarried women and conversion candidates Freundel encouraged to attend the NCM/Kesher Israel Mikvah were predominately young women and it was

common knowledge and openly remarked upon at Kesher Israel and NCM that all of Freundel's "converts" were described by some as "attractive young women."

c.  Freundel developed an entirely new exercise, which he called "practice dunks," to encourage conversion candidates to come to the NCM/Kesher Israel Mikvah more than once, and which Freundel *required* all conversion candidates to do prior to the conversion immersion – a practice completely at odds with Orthodox Judaism and the conversion process – as emergence from the mikvah completes an individual's conversion from non-Jew to Jew.

d.  Since Freundel's arrest, the RCA has publicly rebuked the concept of "practice dunking," confirming the practice has no basis in Judaism.

e.  Freundel also sometimes required recently converted women to perform "re-dunks," claiming that there was a Jewish legal problem with the conversion immersion, however, the "re-dunks" did not occur with the three rabbi "witnesses" as is required for conversion, but rather with only Freundel present.

f.  Freundel brought so many young women through the NCM/Kesher Israel Mikvah, a member of Kesher Israel's own staff stated that Freundel "treated that mikvah like a car wash. Every Sunday, six students at a time."

99.   Kesher Israel congregants had also launched numerous complaints regarding Freundel's "constant" comments praising female congregant's appearance, remarking on their dating life, and discouraging them from dressing "so modestly."

100.   Freundel generally behaved in an inappropriate manner with young female converts and congregants and he was commonly described by female members of the Kesher

Israel and NCM communities as "creepy" due to his regular "borderline sexual" comments to female conversion candidates and congregants, especially converts.

101.    Defendants were, or should have been, aware of public accusations of impropriety by Freundel.

102.    Upon information and belief, Kesher Israel received numerous complaints that Freundel was using the NCM/Kesher Israel Mikvah in an inappropriate manner and was otherwise acting not in accordance with Orthodox Jewish tenets, including (without limitation):

    a.    As early as 2006, Kesher Israel congregants, other rabbis, and Orthodox religious leaders were made aware of accusations that Freundel was intimidating, extorting, and otherwise mistreating his conversion students, who were mostly young women.

    b.    Reports were made that Freundel had brought his young female conversion students to his home, where they were alone with him, and forced them to perform various clerical and other duties at the Kesher Israel Rabbinical Residence.

    c.    Freundel's exercise of "practice dunks" was also brought to the attention of Kesher Israel, other rabbis, and other Orthodox religious leaders.

    d.    Media reports indicate that, as early as 2009, the former Vice President of Kesher Israel's Board of Directors was aware of inappropriate conduct by Freundel against his conversion students.

    e.    Kesher Israel congregants complained that Freundel routinely made inappropriate comments to young women, treated "attractive" young women preferentially, and "manipulated and controlled" conversion students in his care.

23

103.   According to media reports, approximately ten to fifteen years ago, around the same time Freundel was leading the charge to construct the NCM/Kesher Israel Mikvah, Kesher Israel responded to persistent complaints, concerns, and criticism of Freundel from members of its congregation by issuing a statement to the congregation, essentially a religious "gag" order, ordering congregants "to cease to participate in any Lashon Hara,[7] to stop listening to insinuations and attacks, to disassociate ourselves from them, and finally to respond forcefully in opposition to Lashon Hara" against Freundel. From that point on, Kesher Israel congregants were forbidden from complaining about or criticizing Freundel and were further required to affirmatively support Freundel if they overheard any such complaints.

104.   In addition, Kesher Israel was made aware of at least two formal complaints launched against Freundel with the RCA. Although the full details of the complaints are not known, it is clear that Freundel was accused of abusing converts and of potential sexual impropriety with at least one convert or conversion student. The RCA's investigations into the complaints involving one of its own leaders were handled by two prominent attorneys who now head major Jewish organizations: Allen Fagin of the Orthodox Union and Eric Goldstein of UJA-Federation of New York. The RCA's investigations and the subsequent slaps on the wrist it administered to Freundel were described by one critic as "totally incompetent."

105.   Kesher Israel was specifically aware of the complaints to the RCA and it was further advised of the RCA's failure to take any meaningful action.

106.   MPD's investigation has revealed that the "Dream Machine" clock-radio that ultimately led to Freundel's downfall was observed in the NCM/Kesher Israel Mikvah Changing Room at least two years before any action was taken to investigate the out-of-place item, but

---

[7]   "Lashon Hara" means slanderous, negative talk, which is considered sinful in Judaism.

certain media reports indicate the clock-radio may have been present in the NCM/Kesher Israel Mikvah's Changing Room as far back as 2010.

107.   Kesher Israel and/or NCM negligently and/or recklessly permitted Freundel to place the "Dream Machine" clock-radio and/or other electronic recording devices in the Changing Room and the ritual bath area of the NCM/Kesher Israel Mikvah. Kesher Israel and/or NCM, with negligent and/or reckless disregard for the safety, privacy, and well-being of the Kesher Israel congregants, female conversion candidates, and other women using the NCM/Kesher Israel Mikvah, including, but not limited to, Plaintiffs and others, failed to inquire, inspect, or investigate why Freundel was placing electronic devices in the Changing Room and the ritual bath area of the mikvah.

108.   The RCA also negligently or recklessly ignored the obvious signs that Freundel was acting inappropriately with Kesher Israel congregants, female conversion candidates, and other women using the NCM/Kesher Israel Mikvah, including, but not limited to, Plaintiffs and others, and failed to appropriately inquire into or investigate Freundel's unacceptable and bizarre behavior.

109.   Additionally, Kesher Israel and the RCA affirmatively silenced anyone who questioned Freundel, spoke out against him, or tried to bring any new issues out into the open. After the news broke about the discovery of the "Dream Machine" clock-radio, Emma spoke with various media outlets about her experience, publicly speaking out against Freundel. Instead of hearing compassion and concern from these Defendants, Emma was silenced and shunned by her now former congregation in Rockville, Maryland. The Rabbi himself chastised Emma and her husband for publicly discussing the Freundel allegations. This is merely one small example

of how Kesher Israel and the RCA have tried to sweep Freundel's unacceptable behavior under the rug and intentionally ignored the warning signs.

## I.  GEORGETOWN'S WILLFUL BLINDNESS TOWARD THE PLAIN WARNING SIGNS

110.   Georgetown has a long association with Freundel, who has taught classes and has been involved in Jewish life in various capacities at both Georgetown's main campus and at Georgetown Law.

111.   Kesher Israel is located in the same community as Georgetown's main campus, where members of Washington's elite reside and socialize.

112.   Upon information and belief, members of the Georgetown faculty were congregants at Kesher Israel and were active in the congregation throughout Freundel's tenure as Kesher Israel's Rabbi.

113.   Freundel generally behaved in an inappropriate manner with young female students and congregants and, like the female members of the Kesher Israel and NCM communities, the female members of the Georgetown community commonly described Freundel as "creepy."

114.   Upon information and belief, Freundel had lured other Georgetown Law students before Plaintiff to the NCM/Kesher Israel Mikvah using his position at Georgetown Law to sexually exploit these young women.

115.   Upon information and belief, despite Freundel's widespread reputation for abusing his young female students and conversion candidates and for engaging in other inappropriate behaviors, Georgetown undertook no investigation into Freundel's background prior to hiring him as an adjunct professor at Georgetown Law.

116.   Furthermore, upon information and belief, Georgetown undertook no investigation prior to allowing Freundel to invite Georgetown Law students to participate in the

immersion ritual at the NCM/Kesher Israel Mikvah, despite widespread public controversy concerning the NCM/Kesher Israel Mikvah and Freundel's practices and policies with regard to the same.

117.   Upon information and belief, Georgetown undertook no efforts to warn its students and/or members of its community about widespread public concerns surrounding Freundel and/or the NCM/Kesher Israel Mikvah.

## IV.   CLASS ALLEGATIONS AGAINST KESHER ISRAEL, NCM, AND THE RCA

### A.   MAINTAINABILITY OF CLASS ACTION

118.   Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

119.   The "Class" consists of all women who participated in an immersion ritual at the NCM/Kesher Israel Mikvah (the "immersion"): (i) while Freundel was an actual and/or apparent agent, servant, and/or employee of Kesher Israel, NCM, and/or the RCA, (ii) where Freundel initiated, arranged, participated in or was otherwise involved in the immersion, and (iii) who, through cameras, surveillance equipment, recording devices, or other surreptitious means positioned or contrived by Freundel individually or at his request or direction, were involuntarily and secretly photographed or recorded by any means or otherwise subjected to invasions of their privacy in connection with the immersion. The Class is maintainable under D.C. Super. Ct. Civ. P. Rule 23(a) for the reasons that follow. All three Named Plaintiffs are representatives of the Class.

120.   The identity of the members of the Class will be readily ascertainable through the records of Defendants Kesher Israel, NCM, and/or the RCA in conjunction with records and documents obtained by the MPD and other law enforcement organizations.

121. The members of the Class are likely to exceed 100 or more individuals and, therefore, are so numerous that joinder of all members is impracticable. According to media reports, police detectives believe there could be upwards of 200 victims and some of them could be as far away as Israel.

122. The questions of law and fact in this action are common to the Class and predominate over any question affecting only individual Class members. These common questions include (without limitation):

    a. Whether Freundel was an actual and/or apparent agent, servant, and/or employee of Kesher Israel, NCM, and/or the RCA at any or all relevant times;

    b. Whether Freundel obtained consent to take videos and/or photographs of the Class members;

    c. Whether Freundel acted within the scope of his employment and/or agency when he captured videos and/or photographs of the Class members while they were participating in the immersion ritual and the "practice dunks" that Freundel supervised and oversaw at the NCM/Kesher Israel Mikvah;

    d. Whether Kesher Israel, NCM, and/or the RCA's actions and/or failures to act, including (without limitation) their failure to properly investigate, qualify, select, monitor, and/or supervise Freundel, resulted in foreseeable injuries or damages to the Class members;

    e. Whether Kesher Israel, NCM, and/or the RCA had actual knowledge of or were on notice of Freundel's illicit behavior;

    f. Whether sufficient indicia of Freundel's wrongdoing existed to put Kesher Israel, NCM, and/or the RCA on notice of Freundel's wrongdoing;

28

g. Whether Kesher Israel, NCM, and/or the RCA are directly liable to Plaintiff and the Class members for failing to prevent Freundel's wrongdoing that harmed Plaintiff and the members of the Class;

h. Whether Kesher Israel, NCM, and/or the RCA are vicariously liable for failing to prevent the wrongdoing of their agent, employee, and servant; and

i. Whether Freundel's wrongdoing took place within the scope and performance of his duties as an employee, agent and servant of Kesher Israel, NCM, and/or the RCA.

123. The claims of the Named Plaintiffs, who are representatives of the other members of the Class, are typical of the claims of the Class members and the defenses applicable to the Named Plaintiffs' claims are typical of the defenses likely to be asserted as to the claims asserted by members of the Class.

124. Because the Named Plaintiffs share legal interests identical to those of the Class members, the Named Plaintiffs will fairly and adequately protect the interests of the Class.

**B.    DESIRABILITY OF CLASS ACTION**

125. This action should proceed as a class action as to Kesher Israel, NCM, and the RCA under D.C. Super. R. Civ. P. 23(b)(1) because separate actions by individual members of the Class would create a risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

126. Alternatively, this action should proceed as a class action as to Kesher Israel, NCM, and the RCA under D.C. Super. R. Civ. P. 23(b)(1) because questions of law or fact common to the Class predominate over any questions affecting individual plaintiffs and class

29

action treatment is superior to other available methods for the fair and efficient adjudication of this controversy between the Class and Defendants Kesher Israel, NCM, and the RCA.

127.    No member of the Class has a substantial interest in individually controlling the prosecution of a separate action but if she does, she may exclude herself from the Class upon the receipt of notice under D.C. Super. R. Civ. P. 23(c).

128.    This class action can be managed without undue difficulty because the Class representatives will vigorously pursue the interests of the Class by virtue of, and as evidenced by, their actions in initiating this proceeding.

129.    Furthermore, Plaintiff's counsel is experienced in class actions and in complex civil litigation. For example, Plaintiff's counsel includes a Co-Lead Counsel in two national Internet privacy rights putative class actions: *In re: Facebook, Inc. Internet Tracking Litigation*, Case No. 5:12-md-02314-EJD (N.D. Cal.) and *In re: Google, Inc. Cookie Placement Consumer Privacy Litigation*, Case No. 12-MD-2358 (SLR) (D. Del.). Plaintiff's counsel recently has served as counsel in a similar class action based on an institutional actor's privacy invasions and is currently litigating as Co-Lead Counsel two national putative class actions against the National Hockey League and the National Football League. Plaintiff's counsel will adequately represent the interests of the Class.

## V.    CAUSES OF ACTION

### COUNT I
### NEGLIGENT HIRING, TRAINING, RETENTION AND SUPERVISION

130.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

131.    Plaintiffs assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the entire Class.

30

132. Plaintiffs also assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

133. Jane Doe further asserts this claim against Defendant Georgetown in her individual capacity.

134. At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted him to remain as such for all relevant periods.

135. At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi, professor, and/or advisor and, thereby, to render spiritual and educational services to their students, congregants, and/or community members, including Plaintiff.

136. At all relevant times, Defendants acted by and through Freundel – their agent, servant, and/or employee – acting within the scope and course of his agency and/or employment.

137. At all relevant times, Defendants owed a continuing duty to: reasonably, carefully, and conscientiously secure the services of qualified and well-trained agents, servants, and/or employees; to properly investigate, credential, qualify, select, monitor, and supervise their agents, servants, and/or employees; to promulgate and enforce proper and effective standards, procedures, protocols, systems, and rules to ensure quality care, safety, and privacy of Plaintiffs and members of the Class; and to otherwise assure and maintain the safety and privacy of Plaintiffs and members of the Class.

138. Defendants negligently breached the above-mentioned duties by hiring, retaining, failing to properly train, and failing to properly supervise Freundel, despite his reputation for improper, unlawful, inappropriate, lewd, and unprofessional conduct.

139.    Defendants knew or should have known that Freundel engaged in improper, unlawful, inappropriate, lewd, and unprofessional conduct, including, but not limited to, photographing and/or videotaping Plaintiffs and other Class Members while naked and without consent or authorization, and distributing and/or publishing those images and/or videos without consent or authorization.

140.    As a direct and proximate result of Defendants' negligent hiring, training, retention, and supervision of Freundel, Plaintiffs and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

## COUNT II
### NEGLIGENT ENTRUSTMENT

141.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

142.    Plaintiffs assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the entire Class.

143.    Plaintiffs also assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

144.    Jane Doe further asserts this claim against Defendant Georgetown in her individual capacity.

145.   At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted him to remain as such for all relevant periods.

146.   At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi, professor, and/or advisor and, thereby, to render spiritual and educational services to their students and/or congregants, including Plaintiffs.

147.   At all relevant times, Defendant Georgetown owed a continuing duty to Plaintiff Doe to use reasonable care to ensure Freundel was trustworthy, competent, and fit to safely and appropriately utilize the facilities, devices, equipment, machines, and/or supplies entrusted to him for spiritual and/or educational purposes.

148.   At all relevant times, Defendants Kesher Israel, NCM, and the RCA owed a continuing duty to Plaintiffs and the Class to use reasonable care to ensure Freundel was trustworthy, competent, and fit to safely and appropriately utilize the facilities, devices, equipment, machines, and/or supplies entrusted to him for spiritual and/or educational purposes.

149.   At all relevant times, Defendants Kesher Israel, NCM, and the RCA owed a continuing duty to  use reasonable care to ensure Freundel was trustworthy, competent, and fit to safely and appropriately utilize the facilities, devices, equipment, machines, and/or supplies entrusted to him for the purposes of mentoring and sponsoring their conversions to Judaism.

150.   At all relevant times, Defendants knew or should have known, and/or had actual knowledge, constructive knowledge, and/or reasonable suspicion that Freundel was using the Defendants' facilities, devices, equipment, machines, and/or supplies to engage in unprofessional, unlawful, and outrageous conduct by photographing and/or video-recording his

33

(and Defendants') students, congregants, and/or community members, including Plaintiffs and,

for Kesher Israel, NCM, and the RCA, members of the Class, without authorization or consent.

151.    Defendants breached these duties by entrusting Freundel with the facilities,

devices, equipment, machines, and/or supplies that he used to perform the tortious and illegal

acts alleged herein, and Defendants knew or should have known Freundel would use the

facilities, devices, equipment, machines, and/or supplies entrusted to him to harm his (and

Defendants') students, congregants, and/or community members.

152.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the

Class have suffered, and will continue to suffer, permanent economic and non-economic

damages including (without limitation): great indignity, humiliation, shame, embarrassment,

mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe

emotional anguish, mental anguish, and psychological distress; the past, present and future cost

of medical care including (without limitation) therapy and psychological counseling; lost

earnings and diminished capacity; and other pecuniary losses to be established at trial.

**COUNT III**
**VICARIOUS LIABILITY – *RESPONDEAT SUPERIOR* NEGLIGENCE &**
**NEGLIGENCE *PER SE***

153.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as

if fully set forth herein.

154.    Plaintiffs assert this claim against Defendants Kesher Israel, NCM, and the RCA

individually and on behalf of the Class.

155.    Plaintiffs also assert this claim against Defendants Kesher Israel, NCM, and the

RCA individually and on behalf of the Class.

34

156.    Jane Doe further asserts this claim against Defendant Georgetown in her individual capacity.

157.    At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Freundel to remain as such for all relevant periods.

158.    At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi, professor, and/or advisor and, thereby, to render spiritual and educational services to their students, congregants, and/or community members, including Plaintiffs.

159.    At all relevant times, Freundel owed a continuing duty to assure and maintain the safety and privacy of his Georgetown Law students, Kesher Israel congregants, participants in the immersion ritual at the NCM/Kesher Israel Mikvah, and various other members of the public.

160.    Freundel breached this duty by, among other things, photographing, videotaping, and/or otherwise sexually exploiting Plaintiff Doe when she participated in the immersion ritual at the NCM/Kesher Israel Mikvah in furtherance of her research paper for the Jewish Studies class she was enrolled in at Georgetown Law.

161.    Freundel breached this duty by, among other things, photographing, videotaping, and/or otherwise sexually exploiting Plaintiff Shulevitz when she participated in a "practice dunk" at the NCM/Kesher Israel Mikvah at Freundel's suggestion and invitation, and in furtherance of her conversion to Judaism with Freundel as the sponsoring rabbi before the RCA-created Washington Beth Din.

162.    Freundel breached this duty by, among other things, photographing, videotaping, and/or otherwise sexually exploiting members of the Class while they participated in the

immersion ritual and/or "practice dunks" at the mikvah owned and/or controlled by Kesher Israel and/or NCM.

163.    In addition and in the alternative, Defendants owed Plaintiffs and the Class duties grounded in criminal statutes designed to protect Plaintiffs and members of the Class from sexual exploitation including, without limitation: D.C. Code Ann. §§ 22–3531(b), (c), (d), and, upon information and belief, (f)(2).

164.    Defendants breached these duties by virtue of Freundel's violation of these statutes while he was Defendants' agent, employee, and/or servant. Freundel's violation of those statutes constitutes negligence per se as a matter of the law of the District of Columbia.

165.    As a direct, proximate, immediate, and foreseeable result of the foregoing breaches of Defendants' duties, Plaintiffs and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

166.    As the principals, masters, and/or employers of Freundel, Defendants are liable for all of the injuries and damages caused by the negligent acts committed by Freundel within the scope of his employment and/or agency, and/or for his negligence per se in violating wiretapping and criminal voyeurism statutes while acting as Defendants' agent, employee, and/or servant.

36

## COUNT IV

## DIRECT NEGLIGENCE

167. Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

168. Plaintiffs assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

169. Plaintiffs also assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

170. Plaintiff Jane Doe further asserts this claim against Defendant Georgetown in her individual capacity.

171. At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Freundel to remain as such for all relevant periods.

172. At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi, professor, and/or advisor and, thereby, to render spiritual and educational services to their students, congregants, and/or community members, including Plaintiffs.

173. At all relevant times, Defendants owed a continuing duty to assure and maintain the safety and privacy of their students, congregants, and participants in the immersion ritual at the NCM/Kesher Israel Mikvah.

174. In addition and in the alternative, Defendants owed Plaintiffs and the Class a duty to exercise reasonable care under all of the circumstances to protect persons lawfully on their premises from dangers of which they were or should have been aware and over which they had the ability to exercise control. As discussed above, Defendants had actual and/or constructive

knowledge and/or notice of the danger posed by Freundel and had the ability to exercise control over him.

175.    In addition and in the alternative, Defendants Kesher Israel, NCM, and the RCA owed Plaintiffs and the Class special legal duties to preserve and protect the sanctity of religious exercise.

176.    In addition and in the alternative, Georgetown owed Plaintiff Doe a special duty of care by virtue of Plaintiff's relationship as a student enrolled at Georgetown Law.

177.    Defendants breached these duties by failing to take any meaningful action to prevent Freundel from sexually exploiting Plaintiffs and members of the Class, despite clear warning signs and numerous red flags.

178.    As a direct, proximate, immediate, and foreseeable result of Defendants' conduct, Plaintiffs and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

## COUNT V
### VICARIOUS LIABILITY – *RESPONDEAT SUPERIOR*
### INVASION OF PRIVACY—INTRUSION UPON SECLUSION

179.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

180.    Plaintiffs assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the entire Class.

181.    Plaintiffs also assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

182.    Plaintiff Jane Doe further asserts this claim against Defendant Georgetown in her individual capacity.

183.    At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Freundel to remain as such for all relevant periods.

184.    At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi, professor, and or advisor and, thereby, to render spiritual and educational services to their students, congregants, and/or community members, including Plaintiffs.

185.    Freundel invaded the privacy of Plaintiff Jane Doe by, among other things, photographing, videotaping, and/or otherwise sexually exploiting Jane Doe when she was in the Changing Room and participated in the immersion ritual at the NCM/Kesher Israel Mikvah in furtherance of her research paper for the Jewish Studies class she was enrolled in at Georgetown Law.

186.    Freundel invaded the privacy of Plaintiff Emma by, among other things, photographing, videotaping, and/or otherwise sexually exploiting Emma while she was in the Changing Room and participated in a "practice dunk" at the mikvah owned and/or controlled by Kesher Israel and/or NCM in furtherance of her conversion to Judaism with Freundel as the sponsoring rabbi before the RCA-created Washington Beth Din.

187.   Freundel invaded the privacy of Plaintiff Stephanie by, among other things, photographing, videotaping, and/or otherwise sexually exploiting Stephanie while she was in the Changing Room and participated in the immersion ritual at the mikvah owned and/or controlled by Kesher Israel and/or NCM in conjunction with the "field trip" Freundel organized for select female Towson students.

188.   Freundel invaded the privacy of members of the Class other than the Named Plaintiffs by, among other things, photographing, videotaping, and/or otherwise sexually exploiting them while they were in the Changing Room and participated in the immersion ritual and/or "practice dunks" at the mikvah owned and/or controlled by Kesher Israel and/or NCM.

189.   The Changing Room and the mikvah's ritual bath areas are objectively and subjectively private, secure, and intimate places and Plaintiffs and the Class reasonably expected that they would have privacy in the NCM/Kesher Isreal Mikvah's Changing Room and ritual bath area because, among other things, the individual participating disrobes, showers naked, and participates naked in the mikvah ritual. In addition, only one person at a time is permitted to participate in the mikvah ritual, so the participant reasonably assumes she is alone in a private, secure, and intimate setting.

190.   Freundel's conduct is and would be highly offensive to an ordinary, reasonable person.

191.   As a direct, proximate, immediate, and foreseeable result of Freundel's conduct, Plaintiffs and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past,

40

present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

192.    As the principals, masters, and/or employers of Freundel, Defendants are liable for all of the injuries and damages caused by the intentional acts committed by Freundel within the scope of his employment.

### COUNT VI

**VICARIOUS LIABILITY –** *RESPONDEAT SUPERIOR*
**VIOLATION OF D.C. CODE ANN. § 23–542(a)—WIRETAPPING**

193.    Plaintiffs adopt by reference all allegations contained in the paragraphs above as if fully set forth herein.

194.    Plaintiffs assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the entire Class.

195.    Plaintiffs also assert this claim against Defendants Kesher Israel, NCM, and the RCA individually and on behalf of the Class.

196.    Plaintiff Jane Doe further asserts this claim against Defendant Georgetown in her individual capacity.

197.    This Count is brought pursuant to D.C. Code Ann. § 23-554(a).

198.    At all relevant times, Defendants appointed, engaged, employed, and/or contracted with Freundel to act as their actual and/or apparent, duly authorized agent, servant, and/or employee and permitted Freundel to remain as such for all relevant periods.

199.    At all relevant times, Defendants granted privileges to Freundel to practice as a rabbi, professor, and/or advisor and, thereby, to render spiritual and educational services to their students, congregants, and/or community members, including Plaintiffs.

41

200.   Upon information and belief, Freundel willfully intercepted and/or willfully endeavored to intercept Jane Doe's's oral communications by means of one or more audio electronic recording devices while she participated in the immersion ritual at the NCM/Kesher Israel Mikvah in furtherance of her research paper for the Jewish Studies class she was enrolled in at Georgetown Law.

201.   Upon information and belief, Freundel willfully intercepted and/or willfully endeavored to intercept Plaintiff Emma's oral communications by means of one or more audio electronic recording devices while she participated in a "practice dunk" at the NCM/Kesher Israel Mikvah in furtherance of her conversion to Judaism with Freundel as the sponsoring rabbi before the RCA-created Washington Beth Din.

202.   Upon information and belief, Freundel willfully intercepted and/or willfully endeavored to intercept Plaintiff Stephanie's oral communications by means of one or more audio electronic recording devices while she participated in the immersion ritual at the NCM/Kesher Israel Mikvah in conjunction with the "field trip" Freundel organized for select female Towson students.

203.   Upon information and belief Freundel willfully intercepted and/or willfully endeavored to intercept the oral communications of the members of the Class other than the Named Plaintiffs by means of one or more audio electronic recording devices while they were in the Changing Room and participated in the immersion ritual and/or "practice dunks" at the mikvah owned and/or controlled by Kesher Israel and/or NCM.The Changing Room and the mikvah's ritual bath areas are objectively and subjectively private, secure, and intimate places and Plaintiffs and the Class reasonably expected that they would have privacy in the NCM/Kesher Israel Mikvah's Changing Room and ritual bath area because, among other things,

42

the individual participating disrobes, showers naked, and participates naked in the mikvah ritual. In addition, only one person at a time is permitted to participate in the mikvah ritual, so the participant reasonably assumes she is alone in a private, secure, and intimate setting.

204.   All these acts were committed within the scope of Freundel's agency for and/or employment with Defendants.

205.   As a direct, proximate, immediate, and foreseeable result of Freundel's conduct, Plaintiffs and the Class have suffered, and will continue to suffer, permanent economic and non-economic damages including (without limitation): great indignity, humiliation, shame, embarrassment, mortification, and other injuries to their physical, mental, emotional, and nervous systems; severe emotional anguish, mental anguish, and psychological distress; the past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial.

206.   As the principals, masters, and/or employers of Freundel, Defendants are liable for all of the injuries and damages caused by the intentional acts committed by Freundel within the scope of his employment.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

a.      Awarding Plaintiff Jane Doe compensatory damages against Defendant Georgetown in excess of the jurisdictional minimum in an amount to be proven at trial;

b.      Awarding Plaintiffs and the Class compensatory damages against Defendants Kesher Israel, NCM, and the RCA in excess of the jurisdictional minimum in an amount to be proven at trial;

c.      Awarding Plaintiffs and the Class such other relief as may be appropriate; and

43

      d.      Granting Plaintiffs and the Class their prejudgment interest, costs, and reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiffs demand that this case be tried by a jury on all counts.

Dated: December 18, 2014

Respectfully submitted,

Steven J. Kelly (D.C. Bar No. 1021534)
Geoffrey Hengerer (D.C. Bar No. 495994)
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel:  (410) 385-2225
Fax:  (410) 547-2432
skelly@mdattorney.com
ghengerer@mdattorney.com

*Counsel for Plaintiffs*

Steven D. Silverman (*Pro Hac Vice* Pending)
Stephen G. Grygiel (*Pro Hac Vice* Pending)
Sima G. Fried (*Pro Hac Vice* Pending)
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel:  (410) 385-2225
Fax:  (410) 547-2432
ssilverman@mdattorney.com
sgrygiel@mdattorney.com
sfried@mdattorney.com

*Counsel for Plaintiffs*



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

JANE DOE et al
    Vs.                                 C.A. No.     2014 CA 007644 B
THE GEORGETOWN UNIVERSITY et al

## INITIAL ORDER AND ADDENDUM

    Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

    (1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

    (2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

    (3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

    (4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

    (5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

    (6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                               Chief Judge Lee F. Satterfield

Case Assigned to: Judge HERBERT B DIXON JR
Date: December 18, 2014
Initial Conference: 9:30 am, Friday, March 06, 2015
Location:  Courtroom 415
             500 Indiana Avenue N.W.
             WASHINGTON, DC 20001

                                                                             Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**Jane Doe 2, <u>et</u> <u>al</u>.**                                    *

 *Plaintiffs,*                                                   *

             **Judge Herbert B. Dixon**

  **v.**                                                    * **Case No. 2014 CA 007644 B**

**The Georgetown Synagogue --**                                      * **Next Event: ISC 03/06/15**
**Kesher Israel Congregation, <u>et</u> <u>al</u>.**
              *

 *Defendants.*                                                   *

* * * * * * * * * * * * *

### <u>PRAECIPE</u>

  On December 18, 2014, in the Superior Court of the District of Columbia, Plaintiff Jane Doe 2 filed her own, independent class action complaint arising out of the events that are the subject of the instant action.  Upon filing that new complaint, the Clerk of the Court accepted the Order that the Court issued in this action on December 15, 2014; and the Clerk allowed Plaintiff Jane Doe 2 to proceed under a pseudonym in her own class action.  Accordingly, there is no need to clarify the Court's December 15, 2014 Order, and Plaintiff Jane Doe 2's Motion to Clarify December 15, 2014 Order Granting Plaintiff Jane Doe 2's Motions for Leave to Proceed Under Pseudonym and to Seal Exhibit A, which is pending in this action, is now MOOT.

Respectfully submitted,

**CHAIKIN, SHERMAN,**
   **CAMMARATA & SIEGEL, P.C.**


*/s/ Matthew W. Tievsky*
Joseph Cammarata
D.C. Bar No. 389254
Matthew W. Tievsky
D.C. Bar No. 1004955
1232 17th Street, N.W.
Washington, D.C. 20036
Tel: (202) 659-8600
Fax: (202) 659-8680
joe@dc-law.net
matthew@dc-law.net
Attorneys for Plaintiff Jane Doe 2


## CERTIFICATE OF SERVICE

I hereby certify that on this 18th Day of December, 2014, a copy of the foregoing

Praecipe was e-filed and e-served electronically on:

Steven J. Kelly (D.C. Bar No. 1021534)
Anne T. McKenna (D.C. Bar No. 450414)
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201


*/s/ Matthew W. Tievsky*
Matthew W. Tievsky

2

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **JANE DOE,** *et al.*<br><br>                    *Plaintiffs*,<br><br>v.<br><br>**THE GEORGETOWN UNIVERSITY,** *et al.*<br><br>                    *Defendants*. | CASE NO. 2014 CA 007644 B<br>Judge Herbert B. Dixon, Jr.<br>Next Event: Initial Scheduling Conference<br>                    March 6, 2015 |

**PRAECIPE**

Please take notice that Geoffrey G. Hengerer of the law firm of Silverman, Thompson, Slutkin & White, LLC, 201 N. Charles Street, Suite 2600, Baltimore, Maryland 21201, hereby enters his appearance in the above captioned case as counsel for Plaintiff Jane Doe.  Mr. Hengerer is already counsel of record for Plaintiff Emma Shulevitz and Plaintiff Stephanie Smith, who were added in the Amended Complaint filed on December 18, 2014.  Mr. Hengerer, however, is not currently identified as counsel of record for Plaintiff Doe, who was the only plaintiff in the original Complaint filed on December 2, 2014.

Dated: December 23, 2014                    Respectfully submitted,


                                        */s/ Geoffrey G. Hengerer*
                                        Steven J. Kelly (D.C. Bar No. 1021534)
                                        Geoffrey Hengerer (D.C. Bar No. 495994)
                                        SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
                                        201 N. Charles Street, Suite 2600
                                        Baltimore, Maryland 21201
                                        Tel:  (410) 385-2225
                                        Fax:  (410) 547-2432
                                        skelly@mdattorney.com
                                        ghengerer@mdattorney.com

                                        *Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 23rd day of December 2014, a copy of the foregoing Praecipe was electronically filed via CaseFileExpress and will be served upon all Defendants along with the Amended Complaint.


_____/s/_____
Geoffrey G. Hengerer, Esq.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **JANE DOE,** *et al.*<br><br>               *Plaintiffs*,<br><br>v.<br><br>**THE GEORGETOWN UNIVERSITY,** *et al.*<br><br>               *Defendants*. | CASE NO. 2014 CA 007644 B<br>Judge Herbert B. Dixon, Jr.<br>Next Event: Initial Scheduling Conference,<br>               March 6, 2015 |

**NOTICE OF ISSUE OF SUBPOENA *DUCES TECUM***

Plaintiffs Jane Doe, Emma Shulevitz, and Stephanie Smith, by and through their attorneys, Steven J. Kelly, Geoffrey G. Hengerer, and Silverman, Thompson, Slutkin & White, LLC, will issue and serve a subpoena *duces tecum* on the following non-party requesting production of documents, electronically stored information, and tangible things specified in the attachment annexed hereto, in its possession, custody and control, with such materials to be produced at the law office of Silverman, Thompson, Slutkin & White, LLC, Attn: Steven J. Kelly, Esq., c/o Price Benowitz, LLP, 409 7th Street, NW, Suite 200, Washington, D.C. 20004,on or before the 26th day of January, 2015, at 10:00 a.m.:

**Custodian of Records**
**Metropolitan Police Department**
**300 Indiana Avenue, NW**
**Washington, D.C. 20001**

1

Dated: December 24, 2014                    Respectfully submitted,

_____

Steven J. Kelly (D.C. Bar No. 1021534)
Geoffrey Hengerer (D.C. Bar No. 495994)
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel:  (410) 385-2225
Fax:  (410) 547-2432
skelly@mdattorney.com
ghengerer@mdattorney.com

*Counsel for Plaintiffs*

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **JANE DOE,** *et al.* <br><br>             *Plaintiffs*, <br><br> v. <br><br> **THE GEORGETOWN UNIVERSITY,** *et al.* <br><br>             *Defendants*. | CASE NO. 2014 CA 007644 B <br> Judge Herbert B. Dixon, Jr. <br> Next Event: Initial Scheduling  Conference, March 6, 2015. |

### NOTICE OF SUBPOENA *DUCES TECUM*

Plaintiffs Jane  Doe,  Emma  Shulevitz,  and  Stephanie Smith,  by  and  through  their

attorneys, Steven J. Kelly, Geoffrey G. Hengerer, and Silverman, Thompson, Slutkin & White,

LLC, pursuant to Super. Ct. Civ. R. 30 and 45, hereby give notice to Deponent that it is required to

appear personally and to produce at or before the date and time listed below a copy of **any and all**

**documents listed on Schedule A attached hereto**:

NAME:         Custodian of Records
                      Metropolitan Police Department
                      300 Indiana Avenue, NW
                      Washington, D.C. 20001

DATE:           January 26, 2015

TIME:            2:00 p.m.

PLACE:         SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
                      Attn: Steven J. Kelly, Esq.
                      c/o Price Benowitz, LLP
                      409 7th Street, NW, Suite 200
                      Washington, D.C.  20004.

**NOTE: If the documents are produced prior to this date, personal attendance is not required.**

Dated: December 24, 2014

Steven J. Kelly (D.C. Bar No. 1021534)
Geoffrey Hengerer (D.C. Bar No. 495994)
Sɪʟᴠᴇʀᴍᴀɴ|Tʜᴏᴍᴘsᴏɴ|Sʟᴜᴛᴋɪɴ|Wʜɪᴛᴇ|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel:  (410) 385-2225
Fax:  (410) 547-2432
skelly@mdattorney.com
ghengerer@mdattorney.com

*Counsel for Plaintiffs*

## SCHEDULE A OF THE SUBPOENA TO
## THE METROPOLITAN POLICE DEPARTMENT

### DEFINITIONS AND INSTRUCTIONS

1.     The term "you", "your", and "MPD" mean the Metropolitan Police Department, including all of its divisions, offices, and branches and all of its agents and employees.

2.     The terms "document" and "documents" includes but is not limited to: correspondence, letters, memoranda, notes, reports, papers, files, books, records, contracts, agreements, telegrams, electronic mail, other communications sent or received; printouts, diary entries and calendars; drafts, tables, compilation tabulations, charts, graphs, recommendations, accounts, worksheets, logs, and work papers; minutes, notes, summaries, and other written records or recordings of or relating to any conference, meeting, visit, interview, or telephone conversation; bills, statements, invoices, and other records of any obligation or expenditure; cancelled checks, vouchers, receipts, and other records of payment; financial and statistical data, analyses, surveys and schedules; audiotapes and videotapes and cassettes and transcripts thereof; affidavits, transcripts of testimony, statements, interviews, and conversations; printed matter (including published articles, speeches, newspaper clippings, press releases, and photographs); microfilm and microfiche; disks, computer files, electronically stored data, film, tapes, and other sources from which information can be obtained, including materials used in electronic data processing. Every draft or non-identical copy of a document is a separate document as defined herein. A non-identical copy is a document originally identical in all relevant respects to another document, but no longer identical by virtue of any notation, modification, or attachment of any kind. A document is deemed to be in your control if you have the right to secure the document or a copy thereof from another person or public or private entity having actual physical possession thereof.

NOTICE OF SUBPOENA *DUCES TECUM*

3.       The phrase "possession, custody, or control" applies to:

    i.   A document in your physical custody;

    ii.   A document that you own in whole or in part;

    iii.   A document that you have a right by contract, statute, or otherwise to use, inspect, examine, or copy on any terms;

    iv.   A document for which you have an understanding (express or implied) that you may use, inspect, examine, or copy on any terms; or

    v.   A document that you have, as a practical matter, the ability to use, inspect, examine, or copy.

4.       The term "communication" means the transmittal of information in the form of facts, ideas, inquiries or otherwise, in writing, orally, electronically (*e.g.*, including but not limited to, electronic mail or text message) or otherwise.

5.       The term "Investigation" means any investigation conducted pursuant to a complaint made on or about October 6, 2014, by an employee of The Georgetown Synagogue—Kesher Israel Congregation and/or The National Captial Mikvah, Inc., alleging that Rabbi Bernard "Barry" Freundel placed hidden cameras inside of The National Capital Mikvah, Inc.'s, changing/shower room or was acting inappropriately, including but not limited to any ongoing Investigation relating to Bernard Freundel.

6.       The term "Prosecution" means any prosecution, regardless of whether it was abandoned or whether a grand jury declined to issue an indictment, concerning the Investigation.

7.       The term "evidence" means anything collected in the course of the Investigation and Prosecution.

8.      The terms, "any" and "all" shall each be considered to mean "any and all" as necessary to make these requests inclusive, rather than exclusive.

9.      The term "concerning" shall mean referring to, relating to, discussing, describing, mentioning, noting, studying, reflecting, evaluating, analyzing, summarizing, evidencing, memorializing or being relevant in any way.

10.     The term "including" shall mean "including but not limited to", or "including without limitation."

11.     The use of the singular form of any word includes the plural and vice versa.

12.     The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all other tenses, moods, or voices, as necessary to bring within the scope of the Document Request all responses that might otherwise be construed to be outside of its scope.

13.     "And" as well as "or" shall be construed disjunctively as well as conjunctively as necessary to bring within the scope of the request documents which might otherwise be construed to be outside its scope.

14.     "Person" refers to a natural person, firm, association, joint venture, partnership, corporation, limited liability company, and all other forms of legal relationships, unless the context indicates otherwise, and shall be deemed to mean the plural as well as the singular. To "identify" a person, state with respect to each person:

      a.  The full name and, in the case of entities other than natural persons, the nature of the entity (*e.g.*, corporation, partnership, etc.);

      b.  The last known residence address, residence phone number, business address, and business phone number;

      c.  The company or business affiliation at the date of the matter referred to;

      d.  The title and duties in the company or business with which the person was affiliated; and

NOTICE OF SUBPOENA *DUCES TECUM*

     e.   The person's current company or business affiliation.

15.    In responding to the requests, you are required to furnish all information, documents, and/or things that are available to you or subject to your reasonable inquiry, including information and things in the possession, custody, or control of any of your representatives, including without limitation your attorneys, accountants, advisors, agents, or anyone else otherwise subject to your control.

16.    To "identify" or "describe" a document means to state:

    a.   The name, address, telephone number, occupation, job title, and employer of the present or last known custodian of the document; and

    b.   The circumstances of the creation of the document, including the identification of each person creating or receiving the document, the date of creation, and the type of document.

17.    Should you seek to assert any privilege in objecting to the production of any record covered by this request, please (a) identify the nature of the privilege (including work product) that you are claiming, and (b) identify (i) the record type, e.g. letter or memorandum; (ii) the general subject matter of the record; (iii) the date of the record; and (iv) such information as is sufficient to describe the record, including its author and recipients.

18.    No part of a request should be left unanswered merely because an objection is interposed to another part of a request.

19.    If you deem any information, document, and/or things sought by these requests to be privileged or otherwise protected from discovery, you must nevertheless provide the following information:

    a.   The nature of the privilege asserted;

    b.   The person asserting the privilege;

    c.   A description and identification of the requested information, documents, and/or things sufficient to frame an appropriate demand for the

information or thing and a motion to compel disclosure, setting forth at least the following:

    i.      In the case of documents:

        (1) the author and/or signatory of the document;

        (2) the date of the document;

        (3) the identity of the addressee, all others who have received or read the document, and those who have knowledge of the matters contained in the document;

        (4) whether the requested documents have any other documents appended to, included with, attached to, incorporated by, or referred to in them;

        (5) whether such other documents have been produced in response to any of these requests; and

        (6) the general subject matter of the document.

    ii.     If a communication:

        (1)     identify the participants in the communication;

        (2)     the date of the communication;

        (3)     the identity of all others to whom the subject matter of the communication has been disclosed, in whole or in part; and

        (4)     the general subject matter of the document.

20.     Responsive documents and things shall be produced as kept in the ordinary course of business or shall be produced in a manner organized and labeled to correspond with the categories in these requests for production. If there are no documents or things responsive to a particular request, state so in writing.

21.     If you are unable to produce a document or property requested, state in writing why you cannot produce the document or the property and, if your inability to produce the document is because it is not in your possession or the possession of a person from whom you

NOTICE OF SUBPOENA *DUCES TECUM*

could obtain it, state the name, address, and telephone number of any person you believe may have the original or a copy of any such document.

22.     "Plaintiffs" shall refer to the Plaintiffs Jane Doe, Emma Shulevitz, and Stephanie Smith, as named in this litigation, as well as any employees, agents, and, unless privileged, attorneys.

23.     The term "Individual Defendants" shall refer to Defendants The Georgetown University, The Georgetown Synagogue—Kesher Israel Congregation, The National Capital Mikvah, Inc., and Histadruth Horabonim Deamerica—Rabbinical Council of America, Inc., as named in this litigation, as well as any employees, agents, and, unless privileged, attorneys.

24.     "Freundel" shall refer to Rabbi Bernard "Barry" Freundel.

25.     The term "Rabbinical Residence" is used herein as defined in the Complaint.

26.     To "explain" a contention or allegation means to fully state the factual and legal basis for that contention or allegation.

27.     The "Complaint" refers to the initial Complaint and all subsequent amendments filed in the above-captioned action, as well as any and all exhibits attached thereto.

28.     The "Class" is used herein as defined in the Complaint.

## ITEMS TO BE PRODUCED

Please produce the following to Law Offices of Silverman, Thompson, Slutkin & White, LLC, Attn: Steven J. Kelly, Esq., c/o Price Benowitz, LLP, 409 7th Street, NW, Suite 200, Washington, D.C.  20004., on or before the 26th day of January, 2015, at 2:00 p.m.:

1.      All documents, evidence, and communications in your possession, custody or control concerning the Investigation and Prosecution. This includes, but is not limited to:

a. Each and every document and communication comprising the MPD file or case jacket relating to the Investigation and Prosecution.

b. All handwritten or typewritten notes employees of the MPD generated pursuant to the Investigation and Prosecution.

c. All MPD reports and memoranda concerning the Investigation and Prosecution, in unredacted form, including but not limited to:; Incident and Investigation Reports (and supplements); running resumes; evidence collection reports; and chain of custody reports.

d. All audio and video recordings collected pursuant to this Investigation and Prosecution, including but not limited to any security camera footage collected from The National Mikvah, Inc., The Georgetown Synagogue— Kesher Israel, Congregation, The Georgetown University, Towson University, and/or the Rabbincial Residence.

e. All audio and video recordings created pursuant to this Investigation and Prosecution.

f. All records, including recordings, memoranda, transcripts, or notes, concerning any and all interviews conducted pursuant to the Investigation and Prosecution, including but not limited to the following persons: (i) the Complainants; (ii) anyone with whom the Complainants communicated about the alleged misconduct; and (iii) anyone with whom the Complainant had contact up to and until the conclusion of the Investigation, irrespective of whether the Complainants communicated with such person(s) about the alleged misconduct.

g.  All records and reports of any forensic or other scientific testing conducted on any evidence collected in the course of the Investigation and Prosecution.

h.  The transcribed grand jury testimony of any and all witnesses that appeared before the grand jury concerning the Investigation and Prosecution.

i.  All communications between any witnesses contacted or questioned in the course of the Investigation and Prosecution and any agent or employee of the MPD.

j.  All communications among MPD agents and employees concerning the Investigation and Prosecution.

k.  All communications between MPD agents and employees and any other government agency concerning the Investigation and Prosecution, including but not limited to the United States Attorney's Office for the District of Columbia.

l.  All interview logs concerning the Investigation and Prosecution.

m.  All Plan-of-Action logs associated with the Investigation and Prosecution.

n.  The names and contact information of any agent and employees of the MPD who worked on the Investigation and Prosecution.

2.  All documents concerning or identifying all individuals and entities with a financial interest in the individual Defendants and any of its parent companies, subsidiaries, affiliates, predecessors, successors, divisions, offices, or branches.

3.  Any and all documents relating to any insurance policy or declaration page from any insurance policy that is or may be available to satisfy all or part of any judgment that

might be entered in this action or to indemnify or reimburse for payments made to satisfy such judgment.

4.    Any and all documents pertaining to Plaintiffs and the Individual Defendants.

5.    All documents relating to any communication between Freundel and any third party concerning the Investigation.

6.    All documents and communications relating to any grievance, complaint, allegation, or claim made against Freundel and/or the Individual Defendants asserting that the Individual Defendants had knowledge of any potential misconduct by Freundel towards students, converts to Judaism, and other members of the Class.

7.    All documents and communications concerning any grievance, complaint, allegation, or claim made against Freundel asserting that Freundel encouraged members of the Class to take "practice dunks."

8.    Any police reports, reports of investigation, evidence, or other documents produced or maintained by any law enforcement agency relating to Freundel.

9.    All documents relating to any reprimands, suspensions, fines, or adverse actions of any kind taken against Freundel by any governmental or regulatory authority.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 24th day of December, 2014, the foregoing was served

by First Class U.S. Mail, postage prepaid, upon the following:

William D. Nussbaum, Esq.
Saul Ewing, LLP
1919 Pennsylvania Avenue, N.W., Suite 550
Washington, D.C. 20006-3434

*Attorneys for Defendant The Georgetown
University*

The Georgetown Synagogue – Kesher Israel
   Congregation
2801 N Street, NW
Washington, D.C. 20007

*Defendant*

Sarah Barak, Registered Agent
1559 33rd Street, NW
Washington, D.C. 20007

*Registered Agent of Defendant The National
Capital Mikvah, Inc.*

Histadruth Horabonim Deamerica—Rabbinical
   Council of America, Inc.
305 Seventh Avenue, 12th Floor
New York, New York 10001

*Defendant*

_____
Geoffrey G. Hengerer

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **JANE DOE,** *et al.*<br><br>　　　　　*Plaintiffs*,<br><br>v.<br><br>**THE GEORGETOWN UNIVERSITY,** *et al.*<br><br>　　　　　*Defendants*. | CASE NO. 2014 CA 007644 B<br>Judge Herbert B. Dixon, Jr.<br>Next Event: Initial Scheduling Conference,<br>　　　　　March 6, 2015 |

<u>**NOTICE OF ISSUE OF SUBPOENA *DUCES TECUM***</u>

Plaintiffs Jane Doe, Emma Shulevitz, and Stephanie Smith, by and through their attorneys, Steven J. Kelly, Geoffrey G. Hengerer, and Silverman, Thompson, Slutkin & White, LLC, will issue and serve a subpoena *duces tecum* on the following non-party requesting production of documents, electronically stored information, and tangible things specified in the attachment annexed hereto, in its possession, custody and control, with such materials to be produced at the law office of Silverman, Thompson, Slutkin & White, LLC, Attn: Steven J. Kelly, Esq., c/o Price Benowitz, LLP, 409 7th Street, NW, Suite 200, Washington, D.C. 20004,on or before the 26th day of January, 2015, at 10:00 a.m.:

**Hon Ronald C. Machen, Jr.**
**United States Attorney's Office for the District of Columbia**
**555 4th Street, NW**
**Washington, D.C. 20530**

1

Dated: December 24, 2014                  Respectfully submitted,

_____

Steven J. Kelly (D.C. Bar No. 1021534)
Geoffrey Hengerer (D.C. Bar No. 495994)
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel:  (410) 385-2225
Fax:  (410) 547-2432
skelly@mdattorney.com
ghengerer@mdattorney.com

*Counsel for Plaintiffs*

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **JANE DOE,** *et al.* | |
| *Plaintiffs*, | |
| v. | CASE NO. 2014 CA 007644 B<br>Judge Herbert B. Dixon, Jr.<br>Next Event: Initial Scheduling Conference,<br>March 6, 2015. |
| **THE GEORGETOWN UNIVERSITY,** *et al.* | |
| *Defendants*. | |

### NOTICE OF SUBPOENA *DUCES TECUM*

Plaintiffs Jane Doe, Emma Shulevitz, and Stephanie Smith, by and through their attorneys, Steven J. Kelly, Geoffrey G. Hengerer, and Silverman, Thompson, Slutkin & White, LLC, pursuant to Super. Ct. Civ. R. 30 and 45, hereby give notice to Deponent that it is required to appear personally and to produce at or before the date and time listed below a copy of **any and all documents listed on Schedule A attached hereto**:

NAME:       Hon. Ronald C. Machen, Jr.
              United States Attorney's Office for the District of Columbia
              555 4th Street, NW
              Washington, D.C. 20530

DATE:       January 26, 2015

TIME:       10:00 a.m.

PLACE:      SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
              Attn: Steven J. Kelly, Esq.
              c/o Price Benowitz, LLP
              409 7th Street, NW, Suite 200
              Washington, D.C.  20004.

**NOTE: If the documents are produced prior to this date, personal attendance is not required.**

Dated: December 24, 2014

_____
Steven J. Kelly (D.C. Bar No. 1021534)
Geoffrey Hengerer (D.C. Bar No. 495994)
SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel:  (410) 385-2225
Fax:  (410) 547-2432
skelly@mdattorney.com
ghengerer@mdattorney.com

*Counsel for Plaintiffs*

**SCHEDULE A OF THE SUBPOENA TO**
**THE METROPOLITAN POLICE DEPARTMENT**

**DEFINITIONS AND INSTRUCTIONS**

1.      The term "you", "your", and "United States Attorney's Office" mean the United States Attorney's Office for the District of Columbia, including all of its divisions, offices, and branches and all of its agents and employees.

2.      The terms "document" and "documents" includes but is not limited to: correspondence, letters, memoranda, notes, reports, papers, files, books, records, contracts, agreements, telegrams, electronic mail, other communications sent or received; printouts, diary entries and calendars; drafts, tables, compilation tabulations, charts, graphs, recommendations, accounts, worksheets, logs, and work papers; minutes, notes, summaries, and other written records or recordings of or relating to any conference, meeting, visit, interview, or telephone conversation; bills, statements, invoices, and other records of any obligation or expenditure; cancelled checks, vouchers, receipts, and other records of payment; financial and statistical data, analyses, surveys and schedules; audiotapes and videotapes and cassettes and transcripts thereof; affidavits, transcripts of testimony, statements, interviews, and conversations; printed matter (including published articles, speeches, newspaper clippings, press releases, and photographs); microfilm and microfiche; disks, computer files, electronically stored data, film, tapes, and other sources from which information can be obtained, including materials used in electronic data processing. Every draft or non-identical copy of a document is a separate document as defined herein. A non-identical copy is a document originally identical in all relevant respects to another document, but no longer identical by virtue of any notation, modification, or attachment of any kind. A document is deemed to be in your control if you have the right to secure the document or

a copy thereof from another person or public or private entity having actual physical possession thereof.

      3.     The phrase "possession, custody, or control" applies to:

       i.  A document in your physical custody;

      ii.  A document that you own in whole or in part;

      iii.  A document that you have a right by contract, statute, or otherwise to use, inspect, examine, or copy on any terms;

      iv.  A document for which you have an understanding (express or implied) that you may use, inspect, examine, or copy on any terms; or

      v.  A document that you have, as a practical matter, the ability to use, inspect, examine, or copy.

      4.     The term "communication" means the transmittal of information in the form of facts, ideas, inquiries or otherwise, in writing, orally, electronically (*e.g.*, including but not limited to, electronic mail or text message) or otherwise.

      5.     The term "Investigation" means any investigation conducted pursuant to a complaint made on or about October 6, 2014, by an employee of The Georgetown Synagogue—Kesher Israel Congregation and/or The National Captial Mikvah, Inc., alleging that Rabbi Bernard "Barry" Freundel placed hidden cameras inside of The National Capital Mikvah, Inc.'s, changing/shower room or was acting inappropriately, including but not limited to any ongoing Investigation relating to Bernard Freundel.

      6.     The term "Prosecution" means any prosecution, regardless of whether it was abandoned or whether a grand jury declined to issue an indictment, concerning the Investigation.

7.     The term "evidence" means anything collected in the course of the Investigation and Prosecution.

8.     The terms, "any" and "all" shall each be considered to mean "any and all" as necessary to make these requests inclusive, rather than exclusive.

9.     The term "concerning" shall mean referring to, relating to, discussing, describing, mentioning, noting, studying, reflecting, evaluating, analyzing, summarizing, evidencing, memorializing or being relevant in any way.

10.    The term "including" shall mean "including but not limited to", or "including without limitation."

11.    The use of the singular form of any word includes the plural and vice versa.

12.    The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all other tenses, moods, or voices, as necessary to bring within the scope of the Document Request all responses that might otherwise be construed to be outside of its scope.

13.    "And" as well as "or" shall be construed disjunctively as well as conjunctively as necessary to bring within the scope of the request documents which might otherwise be construed to be outside its scope.

14.    "Person" refers to a natural person, firm, association, joint venture, partnership, corporation, limited liability company, and all other forms of legal relationships, unless the context indicates otherwise, and shall be deemed to mean the plural as well as the singular. To "identify" a person, state with respect to each person:

> a.   The full name and, in the case of entities other than natural persons, the nature of the entity (*e.g.*, corporation, partnership, etc.);
>
> b.   The last known residence address, residence phone number, business address, and business phone number;

    c.   The company or business affiliation at the date of the matter referred to;

    d.   The title and duties in the company or business with which the person was affiliated; and

    e.   The person's current company or business affiliation.

15.    In responding to the requests, you are required to furnish all information, documents, and/or things that are available to you or subject to your reasonable inquiry, including information and things in the possession, custody, or control of any of your representatives, including without limitation your attorneys, accountants, advisors, agents, or anyone else otherwise subject to your control.

16.    To "identify" or "describe" a document means to state:

    a.   The name, address, telephone number, occupation, job title, and employer of the present or last known custodian of the document; and

    b.   The circumstances of the creation of the document, including the identification of each person creating or receiving the document, the date of creation, and the type of document.

17.    Should you seek to assert any privilege in objecting to the production of any record covered by this request, please (a) identify the nature of the privilege (including work product) that you are claiming, and (b) identify (i) the record type, e.g. letter or memorandum; (ii) the general subject matter of the record; (iii) the date of the record; and (iv) such information as is sufficient to describe the record, including its author and recipients.

18.    No part of a request should be left unanswered merely because an objection is interposed to another part of a request.

19.    If you deem any information, document, and/or things sought by these requests to be privileged or otherwise protected from discovery, you must nevertheless provide the following information:

    a.   The nature of the privilege asserted;

b. The person asserting the privilege;

c. A description and identification of the requested information, documents, and/or things sufficient to frame an appropriate demand for the information or thing and a motion to compel disclosure, setting forth at least the following:

   i. In the case of documents:

      (1) the author and/or signatory of the document;

      (2) the date of the document;

      (3) the identity of the addressee, all others who have received or read the document, and those who have knowledge of the matters contained in the document;

      (4) whether the requested documents have any other documents appended to, included with, attached to, incorporated by, or referred to in them;

      (5) whether such other documents have been produced in response to any of these requests; and

      (6) the general subject matter of the document.

   ii. If a communication:

      (1) identify the participants in the communication;

      (2) the date of the communication;

      (3) the identity of all others to whom the subject matter of the communication has been disclosed, in whole or in part; and

      (4) the general subject matter of the document.

20. Responsive documents and things shall be produced as kept in the ordinary course of business or shall be produced in a manner organized and labeled to correspond with the categories in these requests for production. If there are no documents or things responsive to a particular request, state so in writing.

21. If you are unable to produce a document or property requested, state in writing why you cannot produce the document or the property and, if your inability to produce the

document is because it is not in your possession or the possession of a person from whom you could obtain it, state the name, address, and telephone number of any person you believe may have the original or a copy of any such document.

22.     "Plaintiffs" shall refer to the Plaintiff Jane Doe, Emma Shulevitz, and Stephanie Smith, as named in this litigation, as well as any employees, agents, and, unless privileged, attorneys.

23.     The term "Individual Defendants" shall refer to Defendants The Georgetown University, The Georgetown Synagogue—Kesher Israel Congregation, The National Capital Mikvah, Inc., and Histadruth Horabonim Deamerica—Rabbinical Council of America, Inc., as named in this litigation, as well as any employees, agents, and, unless privileged, attorneys.

24.     "Freundel" shall refer to Rabbi Bernard "Barry" Freundel.

25.     The term "Rabbinical Residence" is used herein as defined in the Complaint.

26.     To "explain" a contention or allegation means to fully state the factual and legal basis for that contention or allegation.

27.     The "Complaint" refers to the initial Complaint and all subsequent amendments filed in the above-captioned action, as well as any and all exhibits attached thereto.

28.     The "Class" is used herein as defined in the Complaint.

### ITEMS TO BE PRODUCED

Please produce the following to Law Offices of Silverman, Thompson, Slutkin & White, LLC, Attn: Steven J. Kelly, Esq., c/o Price Benowitz, LLP, 409 7th Street, NW, Suite 200, Washington, D.C.  20004., on or before the 26th day of January, 2015, at 10:00 a.m.:

NOTICE OF SUBPOENA *DUCES TECUM*

1.    All documents, evidence, and communications in your possession, custody or control concerning the Investigation and Prosecution. This includes, but is not limited to:

    a.   Each and every document and communication comprising the United States Attorney's Office file or case jacket relating to the Investigation and Prosecution.

    b.   All handwritten or typewritten notes employees of the United States Attorney's Office generated pursuant to the Investigation and Prosecution.

    c.   All United States Attorney's Office reports and memoranda concerning the Investigation and Prosecution, in unredacted form, including but not limited to:; Incident and Investigation Reports (and supplements); running resumes; evidence collection reports; and chain of custody reports.

    d.   All audio and video recordings collected pursuant to this Investigation and Prosecution, including but not limited to any security camera footage collected from The National Mikvah, Inc., The Georgetown Synagogue— Kesher Israel, Congregation, The Georgetown University, Towson University, and/or the Rabbincial Residence.

    e.   All audio and video recordings created pursuant to this Investigation and Prosecution.

    f.   All records, including recordings, memoranda, transcripts, or notes, concerning any and all interviews conducted pursuant to the Investigation and Prosecution, including but not limited to the following persons: (i) the Complainants; (ii) anyone with whom the Complainants communicated about

the alleged misconduct; and (iii) anyone with whom the Complainants had contact up to and until the conclusion of the Investigation, irrespective of whether the Complainants communicated with such person(s) about the alleged misconduct.

g.  All records and reports of any forensic or other scientific testing conducted on any evidence collected in the course of the Investigation and Prosecution.

h.  The transcribed grand jury testimony of any and all witnesses that appeared before the grand jury concerning the Investigation and Prosecution.

i.  All communications between any witnesses contacted or questioned in the course of the Investigation and Prosecution and any agent or employee of the United States Attorney's Office.

j.  All communications among United States Attorney's Office agents and employees concerning the Investigation and Prosecution.

k.  All communications between United States Attorney's Office agents and employees and any other government agency concerning the Investigation and Prosecution, including but not limited to the District of Columbia Metropolitan Police Department.

l.  All interview logs concerning the Investigation and Prosecution.

m.  All Plan-of-Action logs associated with the Investigation and Prosecution.

n.  The names and contact information of any agent and employees of the United States Attorney's Office who worked on the Investigation and Prosecution.

2.     All documents concerning or identifying all individuals and entities with a financial interest in the individual Defendants and any of its parent companies, subsidiaries, affiliates, predecessors, successors, divisions, offices, or branches.

3.     Any and all documents relating to any insurance policy or declaration page from any insurance policy that is or may be available to satisfy all or part of any judgment that might be entered in this action or to indemnify or reimburse for payments made to satisfy such judgment.

4.     Any and all documents pertaining to Plaintiffs and the Individual Defendants.

5.     All documents relating to any communication between Freundel and any third party concerning the Investigation.

6.     All documents and communications relating to any grievance, complaint, allegation, or claim made against Freundel and/or the Individual Defendants asserting that the Individual Defendants had knowledge of any potential misconduct by Freundel towards students, converts to Judaism, and other members of the Class.

7.     All documents and communications concerning any grievance, complaint, allegation, or claim made against Freundel asserting that Freundel encouraged members of the Class to take "practice dunks."

8.     Any police reports, reports of investigation, evidence, or other documents produced or maintained by any law enforcement agency relating to Freundel.

9.     All documents relating to any reprimands, suspensions, fines, or adverse actions of any kind taken against Freundel by any governmental or regulatory authority.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 24th day of December, 2014, the foregoing was served

by First Class U.S. Mail, postage prepaid, upon the following:

| | |
|---|---|
| William D. Nussbaum, Esq.<br>Saul Ewing, LLP<br>1919 Pennsylvania Avenue, N.W., Suite 550<br>Washington, D.C. 20006-3434 | The Georgetown Synagogue – Kesher Israel<br>    Congregation<br>2801 N Street, NW<br>Washington, D.C. 20007 |
| *Attorneys for Defendant The Georgetown University* | *Defendant* |
| Sarah Barak, Registered Agent<br>1559 33rd Street, NW<br>Washington, D.C. 20007 | Histadruth Horabonim Deamerica—Rabbinical<br>    Council of America, Inc.<br>305 Seventh Avenue, 12th Floor<br>New York, New York 10001 |
| *Registered Agent of Defendant The National Capital Mikvah, Inc.* | *Defendant* |

_____

Geoffrey G. Hengerer

# Superior Court of the District of Columbia
## CIVIL DIVISION
### 500 Indiana Avenue, N.W.
### Washington, D.C. 20001    Telephone (202) 879-1133

| | |
|---|---|
| Jane Doe, et al | **SUBPOENA IN A CIVIL CASE** |
| **Plaintiff** | |
| v. | |
| The Georgetown University, et al | **CASE NUMBER:** 2014 CA 007644 B |
| **Defendant** | |

To: Custodian of Records, Metropolitan Police Department
300 Indiana Avenue, NW
Washington, D.C. 20001

☐ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify in the above case.

| COURTROOM | DATE | TIME |
|---|---|---|
| | | |

☐ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE | TIME |
|---|---|---|
| | | |

☑ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below *(list documents or objects):*

| DOCUMENTS OR OBJECTS | | |
|---|---|---|
| See Notice of Subpoena Duces Tecum and "Schedule A" attached hereto. | | |

| PLACE OF PRODUCTION | Silverman, Thompson, Slutkin & White, LLC c/o Price Benowitz, LLP 409 7th Street, NW, Suite 200, Washington, DC 20004 | DATE January 26, 2015 | TIME 2 P.M. |
|---|---|---|---|

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE | TIME |
|---|---|---|
| | | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. SCR-CIV 30(b)(6).

| ISSUING PERSON'S SIGNATURE AND TITLE (indicate if attorney for plaintiff or defendant) | DATE |
|---|---|
| , Attorneys for Plaintiffs | December 24, 2014 |

| ISSUING PERSON'S NAME, ADDRESS AND PHONE NUMBER |
|---|
| Geoffrey G. Hengerer, Esq., Silverman Thompson Slutkin & White, LLC, 201 N. Charles Street Suite 2600, Baltimore, MD 21201, 410-385-2225 |

**(SEE RULE 45, SUPERIOR COURT RULES OF CIVIL PROCEDURE ON REVERSE)**

**WHITE—ORIGINAL    YELLOW—FOR RETURN SERVICE    PINK—OFFICE COPY**

Authorization as required by D.C. Code §14-307 and Brown v U.S., 567 A. 2d 426 (D.C. 1989), is hereby given for issuance of a subpoena for medical records concerning a person who has not consented to disclosure of the records and has not waived the privilege relating to such records.

Judge Herbert B. Dixon, Jr.

Judge To Whom Case Is Assigned

## PROOF OF SERVICE

|  | DATE | TIME | PLACE |
|---|---|---|---|
| SERVED |  |  |  |

SERVED ON (PRINT NAME)   MANNER OF SERVICE

(attach return receipt if service was made by registered or certified mail)

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
|  |  |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the District of Columbia that I am at least 18 years of age and not a party to the above entitled cause and that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

RULE 45, SUPERIOR COURT RULES OF CIVIL PROCEDURE, Sections C & D:

#### (c) Protection of Persons Subject to Subpoenas.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The Court shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this Rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the Court. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the Court shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 25 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(b)(iii) of this Rule, such a person may in order to attend trial be commanded to travel from any such place to the place of trial, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies  or,

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurances in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 25 miles to attend trial, the Court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the Court may order appearance or production only upon specified conditions.

#### (d) Duties in Responding to Subpoena.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

SUBPOENA

# Superior Court of the District of Columbia
## CIVIL DIVISION
### 500 Indiana Avenue, N.W.
#### Washington, D.C. 20001    Telephone (202) 879-1133

Jane Doe, et al.

_____
Plaintiff

**SUBPOENA IN A CIVIL CASE**

v.

The Georgetown University, et al.

_____
Defendant

**CASE NUMBER:** 2014 CA 007644 B

Hon. Ronald C. Machen, Jr.

To: United States Attorney's Office for the District of Columbia
555 4th Street, NW
Washington, D.C. 20530

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in the above case.

| COURTROOM | DATE | TIME |
|---|---|---|
|  |  |  |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE | TIME |
|---|---|---|
|  |  |  |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below *(list documents or objects)*:

| DOCUMENTS OR OBJECTS | | |
|---|---|---|
| See Notice of Subpoena Duces Tecum and "Schedule A" attached hereto. | | |
| **PLACE OF PRODUCTION** Silverman, Thompson, Slutkin & White, LLC c/o Price Benowitz, LLP 409 7th Street, NW, Suite 200, Washington, DC 20004 | **DATE** January 26, 2015 | **TIME** 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE | TIME |
|---|---|---|
|  |  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. SCR-CIV 30(b)(6).

| ISSUING PERSON'S SIGNATURE AND TITLE (indicate if attorney for plaintiff or defendant) | DATE |
|---|---|
| , Attorney for Plaintiffs | December 24, 2014 |
| **ISSUING PERSON'S NAME, ADDRESS AND PHONE NUMBER** Geoffrey G. Hengerer, Esq., Silverman Thompson Slutkin & White, LLC, 201 N. Charles Street 26th Floor, Baltimore, MD 21201, 410-385-2225 | |

**(SEE RULE 45, SUPERIOR COURT RULES OF CIVIL PROCEDURE ON REVERSE)**

WHITE—ORIGINAL    YELLOW—FOR RETURN SERVICE    PINK—OFFICE COPY

Form CV(6)-433/May 94

4-1855 wd-392

Authorization as required by D.C. Code §14-307 and Brown v U.S., 567 A. 2d 426 (D.C. 1989), is hereby given for issuance of a subpoena for medical records concerning a person who has not consented to disclosure of the records and has not waived the privilege relating to such records.

Judge Herbert B. Dixon, Jr.

Judge To Whom Case Is Assigned

### PROOF OF SERVICE

| SERVED | DATE | TIME | PLACE |
|---|---|---|---|
| | | | |

SERVED ON (PRINT NAME)   MANNER OF SERVICE
(attach return receipt if service was made by registered or certified mail)

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the District of Columbia that I am at least 18 years of age and not a party to the above entitled cause and that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

RULE 45, SUPERIOR COURT RULES OF CIVIL PROCEDURE, Sections C & D:

(c) Protection of Persons Subject to Subpoenas.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The Court shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this Rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the Court. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the Court shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance.
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 25 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(b)(iii) of this Rule, such a person may in order to attend trial be commanded to travel from any such place to the place of trial, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurances in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 25 miles to attend trial, the Court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the Court may order appearance or production only upon specified conditions.

(d) Duties in Responding to Subpoena.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.