**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:15-cv-00026 (CRC) |
| | ) |
| THE GEORGETOWN UNIVERSITY, THE | ) Oral Argument Requested |
| GEORGETOWN SYNAGOGUE – KESHER | ) |
| ISRAEL CONGREGATION, THE | ) [Exhibit A, Exhibit B, Declarations of Elanit |
| NATIONAL CAPITAL MIKVAH, INC., and | ) Jakabovics, Adela Renna, and Rabbi |
| RABBINICAL COUNCIL OF AMERICA | ) Micheol Zylberman, and Proposed Order |
| | ) filed concurrently herewith] |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR REMAND OR, IN THE ALTERNATIVE, FOR**
**LIMITED JURISDICTIONAL DISCOVERY**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ........................................................................................................... 5

III. LEGAL STANDARD ................................................................................................... 6

IV. ARGUMENT ............................................................................................................... 10

    A.    The Amount in Controversy Clearly Exceeds $5 Million, Giving the Court Original Jurisdiction ........................................................................................... 10

    B.    Because Plaintiffs Offer No Reasonable Basis for Inferring Class Members' Citizenship, They Have Failed to Show That Any CAFA Exception Applies. ... 14

        1.    Plaintiffs' Speculations as to Class Citizenship Are Unsound. ............... 16

        2.    The Evidence Suggests That Far Less Than One-Third of the Proposed Class Are D.C. Citizens ...................................................................... 24

    C.    Plaintiffs' Arguments as to the "Interests of Justice," "Local Controversy," and "Home State" CAFA Exceptions Fail as a Matter of Law, and Jurisdiction Is Mandatory. ......................................................................................................... 25

    D.    Class Discovery Is Not Warranted .................................................................... 28

V. CONCLUSION ............................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Civil Liberties Union of Nevada v. City of Las Vegas*,
  13 F. Supp. 2d 1064 (D. Nev. 1998)...................................................................... 15

*Anderson v. Watts*,
  138 U.S. 694 (1891) ............................................................................................. 18

*Anthony v. Small Tube Mfg. Corp.*,
  535 F. Supp. 2d 506 (E.D. Pa. 2007)................................................................... 29

*Bell v. Hershey Co.,*
  557 F.3d 953 (8th Cir. 2009) ............................................................................... 11

*Bhagwanani v. Howard Univ.*,
  355 F. Supp. 2d 294 (D.D.C. 2005)....................................................................... 7

*Breuer v. Jim's Concrete of Brevard, Inc.*,
  538 U.S. 691 (2003) ............................................................................................... 9

*Carazani v. Zegarra*,
  972 F. Supp. 2d 1 (D.D.C. 2013) ........................................................................ 13

*Caruso v. Allstate Insurance Co.*,
  469 F. Supp. 2d 364 (E.D. La. 2007)................................................................... 22

*Catron v. Colt Energy, Inc.*,
  2013 U.S. Dist. LEXIS 161567 (D. Kan. Nov. 13, 2013) .................................... 30

*Dammarell v. Islamic Republic of Iran*,
  2006 U.S. Dist. LEXIS 99679 (D.D.C. Aug. 17, 2006) ....................................... 18

\* *Dart Cherokee Basin Operating Co., et al., v. Owens*,
  135 S. Ct. 547 (2014)................................................................................ 7, 10, 11

*Dixon v. Coburg Dairy, Inc.*,
  369 F.3d 811 (4th Cir. 2004) ................................................................................. 7

*Doe v. Howard*,
  No. 1:11-cv-1105, 2012 WL 3834867 (E.D. Va. Sept. 4, 2012)........................... 13

*Frazier v. Pioneer Americas LLC*,
  455 F.3d 542 (5th Cir. 2006) ................................................................................. 9

*Frederick v. Hartford Underwriters Ins. Co.*,
  683 F.3d 1242 (10th Cir. 2012) ..................................................................... 11, 13

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*,
603 F.3d 23 (2d Cir. 2010) .................................................................... 9

*GTE New Media Servs. Inc. v. Bellsouth Corp.*,
199 F.3d 1343 (D.C. Cir. 2000) ........................................................... 28

*Guglielmino v. McKee Foods Corp.*,
506 F.3d 696 (9th Cir. 2007) ............................................................... 14

*Harding-Wright v. District of Columbia Water & Sewer Auth.*,
350 F. Supp. 2d 102 (D.D.C. 2005) ....................................................... 7

*Hollinger v. Home State Mut. Ins. Co.*,
654 F.3d 564 (5th Cir. 2011) ............................................................... 22

*Int'l Union of Bricklayers & Allied Craftworkers v. Ins. Co. of the W.*,
366 F. Supp. 2d 33 (D.D.C. 2005) ......................................................... 7

*Johnson by Johnson v. Thompson*,
971 F.2d 1487 (10th Cir. 1992) ........................................................... 31

*Johnson-Brown v. 2200 m Street, LLC*,
257 F. Supp. 2d 175 (D.D.C. 2003) ....................................................... 7

*Julien v. CCA of Tenn., Inc.*,
268 F. Supp. 2d 19 (D.D.C. 2003) ......................................................... 7

*Krasnov v. Dinan*,
465 F.2d 1298 (3d Cir 1972) ............................................................... 14

*Lowdermilk v. U.S. Bank Nat'l Ass'n*,
479 F.3d 994 (9th Cir. 2007) ............................................................... 14

*Lowery v. Alabama Power Co.*,
483 F.3d 1184 (11th Cir. 2007) ........................................................... 29

*LSSi Data Corp. v. Time Warner Cable, Inc.*,
892 F. Supp. 2d 489 (S.D.N.Y. 2012) ................................................... 15

*Lucker v. Bayside Cemetery*,
262 F.R.D. 185 (E.D.N.Y. 2009) .......................................................... 22

*McMorris v. TJX Companies, Inc.*,
493 F. Supp. 2d 158 (D. Mass. 2007) ................................................... 14

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Mondragon v. Capital One Auto Finance*,
    736 F.3d 880 (9th Cir. 2013) ................................................................. 8

*Morgan v. Gay*,
    471 F.3d 469 (3d Cir. 2006) ................................................................. 11

*Musgrave v. Aluminum Co. of America, Inc.*,
    No. 3:06-cv-29, 2006 WL 1994840 (S.D. Ind. July 14, 2006).................. 15

*Rhodes v. United States*,
    967 F. Supp. 2d 246 (D.D.C. 2013), *appeal dismissed*, No. 13-5339, 2014
    WL 1378277 (D.C. Cir. Mar. 31, 2014).................................................. 13

*Rivet v. Regions Bank of La.*,
    522 U.S. 470 (1998) ............................................................................. 7

*Samuel-Bassett v. KIA Motors Am., Inc.*,
    357 F.3d 392 (3d Cir. 2004) ................................................................. 11

*Schwartz v. Comcast Corp.*,
    No. 05-2340, 2006 WL 487915 (E.D. Pa. Feb. 28, 2006)....................... 14

*Serrano v. 180 Connect, Inc.*,
    478 F.3d 1018, 1022 (9th Cir. 2007) ..................................................... 8

*St. Paul Mercury Indem. Co. v. Red Cab Co.*,
    303 U.S. 283 (1983) ............................................................................. 7

\* *Standard Fire Ins. Co. v. Knowles*,
    133 S. Ct. 1345 (2013).................................................................. 6, 10, 14

*Stein v. Am. Exp. Travel Related Servs.*,
    813 F. Supp. 2d 69 (D.D.C. 2011)......................................................... 7

*Swicegood ex rel. Swicegood v. Med. Protective Co.*,
    No. CIV.A.3:95-CV-0335-D, 2003 WL 22234928 (N.D. Tex. Sept. 19, 2003)...... 13

*United States v. DiLeo*,
    No. 12-CR-260 ENV, 2014 WL 5841083 (E.D.N.Y. Nov. 4, 2014) ................ 13

*Westerfield v. Indep. Processing, LLC*,
    621 F.3d 819 (8th Cir. 2010) ................................................................. 9

*Woods v. Standard Ins. Co.*,
    771 F.3d 1257 (10th Cir. 2014) ............................................................. 9

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Yun Ja Chung v. Chrysler Corp.*,
  903 F. Supp. 160 (D.D.C. 1995) ........................................................................... 19

**Statutes**

28 U.S.C. § 1332(d) .................................................................................... passim

28 U.S.C. § 1446(c)(2)(A) ........................................................................... 10

D.C. Code § 23-554(a)(2)(C) ...................................................................... 14

**Treatises**

13E Charles Alan Wright & Arthur R. Miller,
  Federal Practice and Procedure § 3612 (3d ed. 2013) .............................. 18

**Other Authorities**

\* S. Rep. No. 109-14 (Feb. 28, 2005) .......................................................... 6

Defendants The Georgetown Synagogue – Kesher Israel Congregation ("Kesher"), the National Capital Mikvah (the "NCM"), and the Rabbinical Council of America (the "RCA") (collectively, "Defendants") respectfully submit this Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Remand or, in the Alternative, for Limited Jurisdictional Discovery (the "Remand Motion"), ECF No. 21.

## I.  INTRODUCTION

The Defendants removed this case to this Court pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), on the grounds that the putative class numbered more than 100 members, that the amount in controversy exceeded $5 million, and that there was sufficient diversity between the parties.  Plaintiffs have now moved to remand the case to the D.C. Superior Court, arguing (1) that the Defendants have not sufficiently established that the amount in controversy is greater than $5 million, and (2) that the Court should exercise its discretion to remand the case under the so-called "interests of justice" exception because, they claim, more than one-third of the class were citizens of the District of Columbia ("D.C." or the "District") at the time the complaint was filed and the relevant considerations favor remand.  Alternatively, Plaintiffs seek jurisdictional discovery to better establish the citizenry of the putative class. Remand Mot. at 1–2.  Plaintiffs are wrong both on the facts and law and have insufficiently established a basis for any jurisdictional discovery.

Indeed, neither proposition that allegedly supports remand sits well coming from Plaintiffs.  First, Plaintiffs seek to profit from the fact that they have not alleged a dollar amount of damages in either the initial or Amended Complaint.  But Plaintiffs have not been silent on the injuries that they and the members of the putative class have allegedly sustained as a result of Freundel's criminal conduct.  According to the Amended Complaint, Plaintiffs and the class members "have suffered, and will continue to suffer, permanent economic and non-economic

damages," including "severe emotional anguish," "psychological distress," "the past, present and future cost of medical care," not to mention "lost earnings and diminished capacity . . ." Amended Complaint ("Am. Compl.") ¶¶ 140, 152, 165, 178, 191, 205.  Should this case ever proceed to trial, it is inconceivable that Plaintiffs will not offer evidence that the aggregate damages purportedly sustained by themselves and by the putative class of 150 to 200 or more members far exceeds the $5 million threshold for CAFA removal.  (Whether Plaintiffs will prevail is another matter entirely.)  As Defendants pointed out in their Notice of Removal, recoveries in single-plaintiff cases with similar claims have ranged from six to seven figures. *See* ECF No. 1 at ¶ 16, n.5.

Second, on the face of Plaintiffs' Amended Complaint, the pertinent exceptions to the continued exercise by this Court of its jurisdiction under CAFA simply do not apply.  At best, only one of the three named Plaintiffs is a citizen of D.C., thus failing to satisfy the threshold requirement that "greater than one-third" of the members of the proposed class are citizens of the District.  Indeed, the named plaintiff in a companion case filed the same day as the Amended Complaint, *Jane Doe v. The Georgetown Synagogue – Kesher Israel Congregation, et al.*, No. 1:15-cv-28 (D.D.C.) ("Jane Doe 2"), is also not a D.C. citizen, making three out of the four named plaintiffs in these related actions citizens of jurisdictions other than D.C.

Moreover, although they have the burden on this issue, Plaintiffs have offered nothing but speculation that more than one-third of the unnamed class members reside in the District. Plaintiffs' Remand Motion is not accompanied by any declaration or other evidence that even suggests, let alone establishes, that more than one-third of the members of the putative class are D.C. citizens.  Further, recent proceedings in the criminal case against Freundel have wholly undermined the central premise of Plaintiffs' speculation that most of the class members are

married Orthodox Jewish women who regularly used the mikvah at NCM for ritual purification. Plaintiffs' proposed class is defined to include "all women" whose use of the NCM mikvah was "initiated, arranged" by Freundel or where Freundel "participated in or was involved" in that use. Am. Compl. ¶ 119.  Freundel was in no way involved in the use of the NCM mikvah by the Orthodox Jewish women who were regular users.  As Freundel had no knowledge as to when those women would use the mikvah, for those women to have been videoed or otherwise recorded, the recording device would have had to be a permanent fixture at the NCM mikvah. However, the factual proffer submitted by the U.S. Attorney's office in support of Freundel's guilty plea to multiple counts of criminal voyeurism makes it plain that recording devices were not constantly present in the mikvah, but that Freundel "periodically installed and removed the recording device."  *See* Exhibit A at 8.[1]

Furthermore, Plaintiffs' speculative premise is logically flawed and fatally so.  They erroneously assert that the proposed class members must be D.C. citizens because Orthodox Jews cannot drive or use public transportation on the Sabbath and thus must live within walking distance of their synagogue.  Therefore, Plaintiffs argue, the NCM mikvah must have primarily serviced D.C. citizens.  What Plaintiffs ignore is that the use of the NCM mikvah was not limited to married women of the Kesher synagogue or other Orthodox-area synagogues, but the mikvah was also used by women who were converted to Judaism by Freundel and by some of Freundel's female university students, including students from Towson University in Maryland.  Plaintiffs offer absolutely no evidence to show that substantial numbers of these groups of women, who make up the vast majority, if not the exclusive number, of putative class members, are D.C. citizens.  And, as Defendants demonstrate, the NCM mikvah, which is open seven days a week

---

[1]  Exhibit A is a true and correct copy of Freundel's signed plea agreement, including a factual proffer in support of the guilty plea, and is available at http://www.justice.gov/usao/dc/programs/vw/bernard_freundel.html.

and not only on the Sabbath, is not limited to female members of Kesher,[2] and is available to all married Jewish women who want to perform the religious purification rite.  Women from all over the metropolitan area and, indeed, the world have availed themselves of the NCM's facilities since it opened in 2005.

And although they do not bear the burden of proof, Defendants nonetheless bring to the Court's attention certain facts that strongly indicate that less than one-third of the proposed class is comprised of D.C. citizens.  For example, this controversy is not limited to the geographical boundaries of the District of Columbia.  Freundel lured his students at Towson University, which is located in Maryland, *see* Am. Compl. ¶¶ 75–81, to travel to the NCM mikvah so that he might record them in various states of undress.  Indeed, Plaintiffs acknowledge that the crime has international ramifications by alleging that Freundel's victims "could be [from] as far away as Israel." Am. Compl. ¶ 121.  And with respect to converts, Defendants have presented evidence that shows that those individuals were more likely to be Maryland residents (31 converts) than District residents (22 converts).

Finally, Plaintiffs' request for jurisdictional discovery is not warranted.  The putative class more likely than not consists of less than a one-third of D.C. citizens and Plaintiffs have failed to show a "strong likelihood" that discovery would produce evidence to the contrary.

For the reasons set forth herein, the Court should deny Plaintiffs' Remand Motion in its entirety.

---

[2]   In any event, the married female members of Kesher currently number 100 and Plaintiffs have offered no proof to support the notion that these 100 women are the same women that Freundel is alleged to have recorded, nor even that all 100 have ever used the NCM mikvah.

## II. BACKGROUND

On December 2, 2014, Plaintiffs initiated this putative class action in the Superior Court of the District of Columbia against Kesher, the NCM, and the RCA[3] on behalf of a proposed class of what Plaintiffs estimate could be upwards of 200 individuals who used the NCM mikvah at Freundel's initiative or arrangement, and who were secretly photographed or recorded in connection with their naked immersion in the mikvah. *See* Compl. ¶¶ 85, 87; *see also* Am. Compl. ¶ 121.[4] The Plaintiffs seek to hold Defendants vicariously and/or directly liable for Freundel's personal use of hidden cameras in the NCM to surreptitiously "record[] video and audio of Plaintiffs and the Class Members while they were completely naked for the express purpose of sexually exploiting them." *See* Am. Compl. ¶ 93.[5] Those are the actions that formed the basis for Freundel's arrest and subsequent plea to multiple counts of criminal voyeurism.[6]

Freundel was the rabbi at Kesher from 1987 until October 14, 2014, the day he was arrested and Kesher suspended his rabbinic duties. He was also the supervising rabbi at the NCM mikvah since it opened in 2005.

Plaintiffs' initial complaint was filed sixteen days before another putative class action was initiated in D.C. Superior Court by another Jane Doe ("Jane Doe 2") on behalf of a broader class of all women who used the mikvah at the NCM at any time from its opening in 2005 to Freundel's arrest, whether or not they had been videoed or otherwise recorded by Freundel in a state of undress. *See* Jane Doe 2 Compl., Case No. 1:15-cv-28 (D.D.C.), ¶¶ 8, 11, 25–26. The

---

[3]   Plaintiffs also sued Georgetown University; however, as the claims against the University were brought only by Jane Doe in her individual capacity and were not class claims, they were severed and remanded to D.C. Superior Court on February 18, 2015. *See* ECF No. 22.

[4]   Plaintiffs' Complaint is Exhibit A to Defendants' removal papers. ECF No. 1-2 at 4–37.

[5]   Plaintiffs' Amended Complaint is Exhibit B to Defendants' removal papers. ECF No. 1-2 at 39–82.

[6]   On February 19, 2015, Freundel pleaded guilty to 52 counts of voyeurism. He will be sentenced on May 15, 2015. *See* http://www.justice.gov/usao/dc/programs/vw/bernard_freundel.html.

Plaintiffs in this case filed their Amended Complaint on December 18, 2014 (ECF No. 1-2 at 39–92), the same day that complaint was filed in the related Jane Doe 2 case (No. 1:15-cv-28).

Defendants Kesher and the NCM timely removed this case and the related Jane Doe 2 case to this Court on January 8, 2015 under CAFA, 28 U.S.C. § 1332(d).  ECF No. 1.  That same day, Kesher and the NCM moved to consolidate both cases and to stay all proceedings pending the appointment of interim class counsel and the filing of a consolidated complaint.  ECF No. 3.[7]

Plaintiffs now move to remand the case to D.C. Superior Court on the grounds that the Defendants have not satisfied the $5 million jurisdictional amount in controversy, and that the so-called "interests of justice" exception to CAFA jurisdiction warrants the remand.  In the alternative, the Plaintiffs also seek jurisdictional discovery in order to establish the citizenship of the class under all of the CAFA exceptions.

### III.  LEGAL STANDARD

CAFA "provides the federal district courts with 'original jurisdiction' to hear a 'class action' if the class has more than 100 members, the parties are minimally diverse, and the 'matter in controversy exceeds the sum or value of $5,000,000.'"  *Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345, 1348 (2013) (citing 28 U.S.C. §§ 1332(d)(2), 1332(d)(5)(B)).  Congress intended CAFA to be interpreted expansively to curb perceived abuses of class actions, making clear that "new section 1332(d) is intended to *expand* substantially federal court jurisdiction over class actions. Its provisions should be read broadly, with a *strong preference* that interstate class actions should be heard in a federal court if properly removed by any defendant."  S. Rep. No. 109-14, at 43 (Feb. 28, 2005) (emphases added).

Contrary to what Plaintiffs maintain, there is no presumption against removal under CAFA.  The cases Plaintiffs cite to support their argument that a presumption favors remand are

---

[7]  Defendant RCA has since joined in the motion to consolidate.  ECF No. 19.

all cases that either pre-date CAFA or that do not address diversity jurisdiction of a class action

under CAFA.  Seven of those cases were decided *before* CAFA even took effect on February 18,

2005,[8] and the two cases that post-date CAFA's enactment are inapposite.  Thus, *Int'l Union of*

*Bricklayers & Allied Craftworkers v. Ins. Co. of the W.*, 366 F. Supp. 2d 33 (D.D.C. 2005),

addresses federal question jurisdiction and not jurisdiction over a class action under CAFA,

while *Stein v. Am. Express Travel Related Servs.*, 813 F. Supp. 2d 69 (D.D.C. 2011), also dealt

with federal question jurisdiction and was not a class action.

Most important, the Supreme Court has squarely rejected Plaintiffs' argument that a

presumption against CAFA jurisdiction exists.  As the Court made plain less than three months

ago, "*no antiremoval presumption attends cases invoking CAFA*, which Congress enacted to

*facilitate* adjudication of certain class actions in federal court."  *Dart Cherokee Basin Operating*

*Co., et al. v. Owens*, 135 S. Ct. 547, 554 (2014) (emphases added) (citations omitted).

Where, as here, the removing Defendants' assertion of the amount in controversy is

challenged, "both sides submit proof and the court decides, by a preponderance of the evidence,

whether the amount-in-controversy requirement has been satisfied."  *Id.* at 554 (citation omitted).

Although Defendants have the burden of establishing each of the three criteria for removal, if "a

federal court is uncertain about whether 'all matters in controversy' in a purported class action

'do not in the aggregate exceed the sum or value of $5,000,000,' the court should err in favor of

exercising jurisdiction over the case."  S. Rep. No. 109-14, at 42.

---

[8] These seven cases are: (1) *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283 (1983); (2) *Rivet v. Regions Bank of La.*, 522 U.S. 470 (1998); (3) *Bhagwanani v. Howard Univ.*, 355 F. Supp. 2d 294 (D.D.C. 2005); (4) *Harding-Wright v. D.C. Water & Sewer Auth.*, 350 F. Supp. 2d 102 (D.D.C. 2005); (5) *Julien v. CCA of Tenn., Inc.*, 268 F. Supp. 2d 19 (D.D.C. 2003); (6) *Johnson-Brown v. 2200 M Street, LLC*, 257 F. Supp. 2d 175 (D.D.C. 2003); and (7) *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811 (4th Cir. 2004) (*en banc*).  In their discussion, Plaintiffs inexplicably quote *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475 (1998), a case involving *federal question* jurisdiction to assert that federal jurisdiction exists only when a federal question is presented on the face of plaintiff's complaint.  Remand Mot. at 6.  But CAFA is a special form of ***diversity*** jurisdiction, which Plaintiff acknowledges in the second sentence of its discussion on legal standards.  *Id.* at 5.

Even though a court may have "original" jurisdiction under CAFA when the threshold criteria are met, there are statutory exceptions where a court may or must decline to exercise that jurisdiction. *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1022 (9th Cir. 2007). The CAFA exceptions are not limits upon subject-matter jurisdiction, but are akin to abstention doctrines. *Id.* ("Implicit in both subsections (d)(3) and (d)(4) is that the court has jurisdiction, but the court either may or must decline to exercise such jurisdiction.").

CAFA has three exceptions to continued federal court jurisdiction, all of which are premised on a certain proportion of class members' being citizens of the forum state. *See* 28 U.S.C. §§ 1332(d)(3), (d)(4)(A), (d)(4)(B). The first, known as the "interests of justice" exception, and the only one Plaintiffs invoke, *permits* a district court to decline jurisdiction, "in the interests of justice and looking at the totality of circumstances," if—but only if—the "primary defendants" and "*greater than one-third* but less than two-thirds" of the proposed class members are citizens of the forum state. 28 U.S.C. § 1332(d)(3) (emphasis added). The second, known as the "local controversy" exception, *requires* a district court to decline jurisdiction over a class action in which "*greater than two-thirds*" of the members of the class are citizens of the forum state, taking into consideration certain additional factors.[9] 28 U.S.C. § 1332(d)(4)(A) (emphasis added). The third, known as the "home-state" exception, *requires* that a district court decline jurisdiction where "*two-thirds or more* of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(B) (emphasis added).

---

[9] When a court analyzes the citizenship of the putative class members, "there must ordinarily be at least some facts in evidence from which the district court may make findings regarding class members' citizenship for purposes of CAFA's local controversy exception." *Mondragon v. Capital One Auto Fin.*, 736 F.3d 880, 884 (9th Cir. 2013). Plaintiffs have provided no such evidence to justify the consideration of this exception.

Because each of CAFA's exceptions is premised on either greater than one-third or two-thirds of putative class members' being citizens of the forum state, if one-third or fewer of class members are citizens of the forum state, none of the exceptions apply, and the district court *must* retain jurisdiction. *See* 28 U.S.C. § 1332(d)(3)–(d)(4); S. Rep. No. 109-14, at 28 ("[C]lass actions filed in the home state of the primary defendant would automatically be subject to federal jurisdiction (assuming the other prerequisites are met) if less than one-third of the proposed class members are citizens of that state.").

Once a defendant has established federal jurisdiction under CAFA, the burden shifts to the objecting party to establish the applicability of one of the exceptions. *See, e.g.*, *Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1262 (10th Cir. 2014) ("[O]nce a defendant establishes removal is proper, a party seeking remand to the state court bears the burden of showing jurisdiction in federal court is improper under one of CAFA's exclusionary provisions."); *Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 26 (2d Cir. 2010) (same); *Serrano*, 478 F.3d at 1024 (same) (citing *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691, 698 (2003) ("Since 1948, therefore, there has been no question that whenever the subject matter of an action qualifies it for removal [under 28 U.S.C. § 1441(a)], the burden is on a plaintiff to find an express exception.")); *Frazier v. Pioneer Americas LLC*, 455 F.3d 542, 546 (5th Cir. 2006) (same); *Westerfield v. Indep. Processing, LLC*, 621 F.3d 819, 822–23 (8th Cir. 2010) (same); S. Rep. No. 109-14 at 44) ("It is the Committee's intention with regard to each of these exceptions that the party opposing federal jurisdiction shall have the burden of demonstrating the applicability of an exemption.").  Accordingly, Plaintiffs have the burden to establish as a matter of fact and law that a statutory exception applies.

## IV.  ARGUMENT

**A.   The Amount in Controversy Clearly Exceeds $5 Million, Giving the Court Original Jurisdiction.**

Plaintiffs' sole ground for claiming that the amount in controversy does not meet the $5 million CAFA threshold is that Defendants' removal papers were not accompanied by evidence that demonstrated that the $5 million threshold was met.  Remand Mot. at 7.  Plaintiffs, however, never actually claim that the jurisdictional amount is not met.  Instead, they rely solely on the absence of any allegation as to the amount in damages for the class in the Amended Complaint.

As an initial matter, the fact that the Amended Complaint does not allege a dollar amount of alleged damages does not mean that the aggregate amount in controversy for the putative class is less than $5 million.  Plaintiffs cannot avoid CAFA jurisdiction by limiting their damages to under $5 million and any attempt to do so, even by implication, must be rejected.  *See Standard Fire Ins. Co.*, 133 S. Ct. at 1348–49 (rejecting plaintiffs' attempt to avoid jurisdiction by artificially reducing damages sought, because, prior to class certification, plaintiffs could not bind unnamed class members).

Where, as here, the complaint does not allege the amount in controversy, Defendants may do so in the notice of removal.  28 U.S.C. § 1446(c)(2)(A).  As the Supreme Court held in *Dart Cherokee*, defendants' notice of removal need not be accompanied by an evidentiary submission, and defendants' assertion that the jurisdictional amount is met "should be accepted when not contested by the plaintiff or questioned by the court."  135 S. Ct. at 553.  Accordingly, defendants' notice of removal does not fail to properly invoke federal court jurisdiction simply because it does not include "evidence" that the amount in controversy exceeds $5 million.

Where defendants' assertion of the amount in controversy is challenged, "*both* sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-

controversy requirement has been satisfied." *Id.* at 554 (emphasis added). It is not at all surprising, however, that the Plaintiffs' Remand Motion does not even suggest, let alone provide any evidence, that the aggregate amount in controversy for the putative class here is less than $5 million. Given the description of the injuries allegedly sustained by the named Plaintiffs and the proposed class, as including "permanent economic and non-economic damages," Am. Compl. ¶ 140, 152, 165, 178, 191, 205, Plaintiffs would undermine their own damages case if they did so. Consequently, they only point to Defendants' purported failure to establish the amount in controversy by evidence in their Notice of Removal. In that regard, Plaintiffs do not even mention the Supreme Court's holding in *Dart Cherokee* that the Notice of Removal need not include evidence of the amount in controversy. 135 S. Ct. at 554.

To meet their burden on the amount in controversy issue, Defendants are not required to show "to a legal certainty that the amount in controversy exceeds the statutory minimum." *Morgan v. Gay*, 471 F.3d 469, 474 (3d Cir. 2006) (quoting *Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 398 (3d Cir. 2004). "Under the preponderance standard, '[t]he jurisdictional fact . . . is not whether the damages *are* greater than the requisite amount, but whether a fact finder *might* legally conclude that they are . . . .'" *Bell v. Hershey Co.,* 557 F.3d 953, 959 (8th Cir. 2009) (alteration in original) (citation omitted). "The amount in controversy … is not the amount 'the plaintiff will recover,' but rather 'an estimate of the amount that will be put at issue in the course of the litigation.'" *Frederick v. Hartford Underwriters Ins. Co.*, 683 F.3d 1242, 1245 (10th Cir. 2012) (citations omitted). And, as noted above, when there is uncertainty "about whether 'all matters in controversy' in a purported class action" fail to reach the $5 million CAFA jurisdictional threshold, "the court should err in favor of exercising jurisdiction over the case." S. Rep. No. 109-14 at 42.

Plaintiffs' Remand Motion attempts to broaden the class set out in the Amended Complaint, claiming that the class includes not just those women who were actually videotaped by Freundel, but also "all women who used the NCM/Kesher Israel Mikvah." Remand Mot. at 12. If the putative class includes "all" the women who used the mikvah, the number of class members is expanded perhaps exponentially from upwards of 200 to perhaps the thousands claimed by plaintiff Jane Doe 2 in the related case. Jane Doe 2 Compl. ¶ 26. Assuming that the putative class consists of two thousand women, as is consistent with the Jane Doe 2 complaint alleging "thousands" of class members, the arithmetic as to the amount in controversy becomes simple: $5,000,000 divided by 2000 members equals an average of $2,500. And it is inconceivable that Plaintiffs will ever maintain that the putative class members were on average damaged less than $2,500.

But even if the Court looks only to the narrower class Plaintiffs set forth in the Amended Complaint, *i.e.*, women who were actually videotaped, the amount in controversy nonetheless still exceeds $5 million. Plaintiffs concede in their Amended Complaint that there are at least 100 members of the class, and possibly upwards of 200. Am. Compl. ¶ 121. And indeed, Freundel himself admitted in his February 18, 2015 plea proffer that he recorded at least 152 women. Exhibit A at 8–9. Thus, in order to reach the $5 million threshold, Defendants only need point out that a fact finder might reasonably conclude that each victim may have sustained about $33,000 (precisely $32,894) in damages (based on the 152 victims confirmed by Freundel).

Although the Amended Complaint does not provide a dollar amount that Plaintiffs seek for themselves and the class, it is not silent on the extent of the injuries allegedly caused by Freundel's criminal conduct. Plaintiffs maintain that they have suffered "permanent economic

and non-economic damages" and that they seek "past, present and future cost of medical care including (without limitation) therapy and psychological counseling; lost earnings and diminished capacity; and other pecuniary losses to be established at trial."  Am. Compl. ¶¶ 140, 152, 165, 178, 191, 205.  Indeed, their claims for a lifetime of unlimited therapy and counseling costs alone are more likely than not to total more than $33,000 per class member,[10] and when "lost earnings and diminished capacity" are added, the total damages being sought is certainly much higher.[11]

Just as "courts also look to other awards in similar cases 'to ensure that the award is within a reasonable range,'" *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 24 (D.D.C. 2013) (quoting *Doe v. Howard*, No. 1:11-cv-1105, 2012 WL 3834867, at *2 (E.D. Va. Sept. 4, 2012), so should this Court also look to awards in similar cases to determine if it is likely than the amount in controversy here exceeds $5 million.  Accordingly, the chart in Appendix A shows that in other voyeurism cases the recoveries for a single plaintiff have exceeded $33,000, ranging in the six to seven figures.  *See* Appendix A, *infra* at 33-34; *see also* Exhibit B.

Moreover, in aggregating the sums in controversy, the Court must include Plaintiffs' demand for attorneys' fees.  Am. Compl. at 82 ¶ d.  This demand is apparently based on

---

[10]  Cases awarding damages for therapy due to emotional distress also exemplify amounts in controversy well over $33,000 per plaintiff.  *See, e.g.*, *United States v. DiLeo*, No. 12-CR-260 ENV, 2014 WL 5841083, at *3, *5 (E.D.N.Y. Nov. 4, 2014) (stating that evidence proved that a victim of child pornography would need  $113,600 in future psychological counseling); *Swicegood ex rel. Swicegood v. Med. Protective Co.*, No. CIV.A.3:95-CV-0335-D, 2003 WL 22234928, at *2 n.4 (N.D. Tex. Sept. 19, 2003) (noting, without objection, a jury award of $40,525 for past and future psychological counseling to a woman who became depressed after a relationship with her physician).  Indeed, just three and a half years of weekly therapy sessions would cost more than $33,000 per plaintiff, according to an estimate recently approved by a court in this district. *Rhodes v. United States*, 967 F. Supp. 2d 246, 256, 315-16 (D.D.C. 2013), *appeal dismissed*, No. 13-5339, 2014 WL 1378277 (D.C. Cir. Mar. 31, 2014) (approving a professional nurse's calculation of the cost of "weekly counseling sessions with a psychologist or social worker" as $175 per week as well as an economist's application of a 3.75 or 4 percent "escalation rate" to that estimate to reflect the increase in costs over the time in which the plaintiff would need future care).

[11]  Defendants, of course, do not concede that Plaintiffs are entitled to these amounts, but for purposes of CAFA jurisdiction, "the amount in controversy is an estimate of the amount that will be put at issue in the course of litigation"—and Plaintiffs have clearly put much more than $5 million at issue.  *Frederick*, 683 F.3d at 1245 (citations omitted).

Plaintiffs' claim for violation of the District of Columbia wiretapping statute, D.C. Code § 23-554, which provides for recovery of reasonable attorneys' fees, D.C. Code § 23-554(a)(2)(C). Although Defendants have shown that the putative amount in controversy, not including attorneys' fees, surpasses the jurisdictional threshold, this Court should nevertheless include the potential attorneys' fees in evaluating the amount in controversy. *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 700 (9th Cir. 2007).[12]  Plaintiffs' demand for attorneys' fees reduces proportionally the average damages claim per putative class member needed to meet the $5 million threshold. *See id.*

    In short, Defendants have clearly met their burden of showing that the amount in controversy is more than $5 million, whether the class includes all women who used the mikvah or only those converts and students that were actually videotaped.

**B.    Because Plaintiffs Offer No Reasonable Basis for Inferring Class Members' Citizenship, They Have Failed to Show That Any CAFA Exception Applies.**

    Once Defendants have met the criteria for CAFA removal, it is Plaintiffs' burden to establish that one of the CAFA exceptions applies. *See Serrano*, 478 F.3d at 1024.  Their motion falls far short of meeting that burden. *See Schwartz v. Comcast Corp.*, No. 05-2340, 2006 WL 487915, at *3 (E.D. Pa. Feb. 28, 2006)  (citing *Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir 1972)) (holding that bare "allegations of residence are not sufficient for purposes of establishing residency); *McMorris v. TJX Companies, Inc.*, 493 F. Supp. 2d 158, 165-166 (D. Mass. 2007) (holding that the mere assertion that a putative class is composed of residents of a particular state without more is insufficient to meet the burden of proof required to invoke a CAFA exception);

---

[12]    Defendants deny that any such attorneys' fees are owed to Plaintiff or putative class members; however, for purposes of this jurisdictional analysis only, Defendants rely on Plaintiff's allegations that the attorneys' fees are owed. *Guglielmino*, 506 F.3d at 700; *Lowdermilk v. U.S. Bank Nat'l Ass'n*, 479 F.3d 994, 1000 (9th Cir. 2007), *overruled on other grounds by Standard Fire Ins. Co.*, 133 S. Ct. 1345.

*Musgrave v. Aluminum Co. of America, Inc.*, No. 3:06-cv-29, 2006 WL 1994840, at *2-*3 (S.D. Ind. July 14, 2006) (same).

Plaintiffs have offered absolutely no evidence that more than one-third of the members of the class are D.C. citizens, which is the threshold criterion for the application of the "interests of justice" exception.  Plaintiffs' Remand Motion is not supported by declarations, any documents of which the Court could take judicial notice, or, for that matter, any other evidence that would support their bare assertion that more than one-third of the members of the class are D.C. citizens.[13]

Instead, Plaintiffs base their arguments on unsupported assumptions that crucial matters of fact are purportedly self-evident or apparent on the face of the Amended Complaint.  They are not.  For example, Plaintiffs simply assert, without more, that:

- "Both requirements"—that the primary defendants are D.C. residents and one-third of class are D.C. citizens—"are easily satisfied on the face of the Amended Complaint."[14]  Remand Mot. at 10.

- "The second prong of the CAFA Discretionary Exception threshold is also satisfied here because the Amended Complaint establishes that at least one-third of the Proposed Class resides in the District of Columbia."  *Id.* at 11.

- "The Proposed Class will be comprised of at least one-third of D.C. residents…"  *Id.* at 14.

A complaint, however, is not evidence, *LSSi Data Corp. v. Time Warner Cable, Inc.*, 892 F. Supp. 2d 489, 501–02 (S.D.N.Y. 2012), and, in any event, those "critical" facts are not at all apparent from the Amended Complaint.

---

[13]  It would be improper for Plaintiffs to attempt to cure this defect with their Reply.  *See, e.g.*, *Am. Civil Liberties Union of Nev. v. City of Las Vegas*, 13 F. Supp. 2d 1064, 1071 (D. Nev. 1998).

[14]  Plaintiffs assert that Defendant RCA is not a "primary defendant."  Remand Mot. at 11.  While acknowledging, as they must, that Freundel's criminal conduct occurred at the NCM mikvah, Plaintiffs assert that Kesher is a primary defendant because the mikvah is "jointly owned and operated by NCM and Kesher Israel . . ."  *Id.* at 11.  Plaintiffs are mistaken.  NCM is an entirely separate corporation from Kesher, and Kesher has no ownership interest in NCM.  Kesher is the NCM's landlord: Kesher leases space in a building it owns at 1308 28th Street N.W. in Georgetown to the NCM.  The NCM operates the mikvah at that location.  Declaration of Adela Renna ¶ 16; Declaration of Elanit Jakabovics ¶ 7.

**1.  Plaintiffs' Speculations as to Class Citizenship Are Unsound.**

Although it is unclear how it aids their effort to obtain remand, Plaintiffs try to expand the proposed class to include "all women who used the NCM/Kesher Israel Mikvah," Remand Mot. at 12, despite the fact that the Amended Complaint clearly limits the class of women to those "where Freundel initiated, arranged, participated in or was otherwise involved in the immersion."  Am. Compl. ¶ 119.  This is no small alteration on Plaintiffs' part, because this redefinition of the class includes married women who regularly used the mikvah for ritual purification where Freundel did not initiate or arrange that use, and even when he was not present.  Declaration of Adela Renna ("Renna Decl.") ¶ 15.  And Plaintiffs make speculative assertions that this category of mikvah users overwhelmingly populates the putative class.

What Plaintiffs overlook, however, is that Freundel *had absolutely nothing to do* with arranging the use of the mikvah by married women for ritual purification.  *Id.*  Rather, the women whose mikvah use would have been initiated or arranged by Freundel, or where Freundel was present when they used the NCM mikvah, would almost entirely consist of converts to Judaism, university students or single women whom Freundel personally brought to the mikvah, just as he did all three named Plaintiffs.

Indeed, the specific allegations of the named Plaintiffs show the same pattern of conduct by Freundel.  Each Plaintiff alleges that Freundel was involved personally in initiating each of their immersions, and that he was present at each session.  Am. Compl. ¶¶ 51–56, 68–69, 79–82.  They do not allege that they used the NCM's publicly available appointments email address to set up their immersions, or otherwise made other arrangements through the NCM.  Yet, they allege they are typical of the putative class.

Moreover, because Freundel did not arrange, initiate, participate, nor even have the means to know when the NCM mikvah was being used by "married women members of Kesher

Israel and other area Orthodox and/or observant communities," Renna Decl. ¶ 15, for those

women to have been videoed or otherwise recorded, the recording device would have had to be

constantly present at the NCM mikvah.  It was not.  The factual proffer that supported Freundel's

guilty plea recited that Freundel "periodically installed and removed the recording device."

Exhibit A at 8.

Accordingly, once the class is viewed as defined in the Amended Complaint, it is almost

exclusively made up of converts, university students and perhaps unmarried women.  As to

converts, records of the RCA reveal that the women whose conversions were overseen by

Freundel hailed from a multitude of states other than D.C. at the times of their conversions.

Declaration of Rabbi Michoel Zylberman ("Zylberman Decl.") ¶ 5.  Specifically, the RCA's

records show:

- Of 96 women who converted to Judaism under Freundel's tutelage from 2008 to 2014
  for whom the RCA has residence information, 74, or *about 77%*, resided outside of
  Washington, D.C. at the time they converted.

- More women converts resided in Maryland (31 individuals, or 32%) than
  Washington, D.C. (22 individuals, or 23%) at the time of conversion.

- At least one convert resided as far away as Israel.

*Id.*[15]  As Plaintiffs' proposed class includes women who converted to Judaism through Freundel,

there is no reason to suppose that these individuals, the vast majority of whom resided elsewhere

at the time of their conversions, were D.C. citizens at the time the initial complaint was filed.

Plaintiffs have offered nothing that suggests that there has been a mass migration of these

women to the District.

The proposed class would also include students at the universities where Freundel

taught—a group that Plaintiffs almost totally ignore in their papers.  On various occasions,

---

[15]  The RCA does not have residency information (at the time of conversion) for 13 women converts.  Zylberman
Decl. ¶ 4.

Freundel brought students from Towson University on field trips to the mikvah.  Renna Decl.

¶ 5; *see also* Am. Compl. ¶¶ 80, 82.  On February 16, 2014, Plaintiff Smith, a non-Jewish student

of Freundel's at Towson University, came to the mikvah with Freundel and immersed in the

bath.  *Id.* at ¶¶ 78, 82.  The Amended Complaint states that Smith is a resident of Towson,

Maryland.  *Id*. at ¶ 14.  Given that Towson University offers a substantial discount (58%) on

tuition to in-state residents, *see* http://www.towson.edu/main/admissions/tuitionaid/tuition.asp

(estimating 2014–15 annual full-time tuition costs for Maryland residents to be $8,590 and for

out-of-state residents to be $20,268), it is more likely than not that many, if not all, of the

Towson University students who, like Plaintiff Smith, used the NCM mikvah on one of the field

trips organized by Freundel are also residents of Maryland.  Plaintiffs have offered nothing to the

contrary.

Nor is there any basis for presuming that Jane Doe is a D.C. citizen.  Although generally

residency is *prima facie* evidence of domicile and citizenship, *see Anderson v. Watts*, 138 U.S.

694, 706 (1891); 13E Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure

§ 3612 & n. 28 (3d ed. 2013), one well-established exception to this rule is for students, who do

not change domicile while attending a particular school absent an intention to remain in the state

where that school is located, *see id.* ("There are, however, certain classes of litigants who do not

reside where they are domiciled but nonetheless maintain their domiciles despite protracted

periods of residence elsewhere . . . out-of-state students . . . clearly fall into this category….

[O]ut-of-state students, as a class, are treated specially because of the presumed temporary

character of their residence at school solely for the purpose of receiving an education.");

*Dammarell v. Islamic Republic of Iran*, 2006 U.S. Dist. LEXIS 99679, *24 (D.D.C. Aug. 17,

2006) (finding plaintiff to be domiciled in California, "the last state in which he lived with any

sense of permanency," rather than in D.C., where "he was merely a student"); *Yun Ja Chung v. Chrysler Corp.*, 903 F. Supp. 160, 162 & n.1 (D.D.C. 1995) (treating three Gallaudet University students to be domiciled in states other than D.C., even though one student submitted an affidavit indicating that he "'reside[d],' at least temporarily, in the District of Columbia").[16]  While Plaintiff Jane Doe alleges that she currently resides in D.C., *see* Am. Compl. ¶ 12, she also alleges that she "is a third-year law student at Georgetown University Law Center … who selected Georgetown Law because of its reputation for excellence and diversity," *id.* ¶ 2.  She does not allege that she selected Georgetown Law because she hails from D.C. or because she intends to remain in the District.  *See generally* Am. Compl.  In short, Jane Doe has given the Court no basis from which to infer that she is domiciled in D.C. and should be treated as a D.C. citizen under CAFA.  Thus, while Plaintiffs Smith and Shulevitz are certainly not D.C. citizens, Doe's citizenship is simply a cipher.

In fact, Plaintiffs barely address the members of the class who were university students or conversion candidates at the time those women used the NCM mikvah, even though the named Plaintiffs are either university students (Jane Doe 1 and Plaintiff Smith), or converts (plaintiff Shulevitz).  Am. Compl. ¶¶ 47, 62, 75.  Instead, Plaintiffs focus almost exclusively on the

---

[16]   Defendants do not argue or imply that this Court should deem Towson students Maryland citizens merely by virtue of their residence in that state to attend that university.  Towson University requires a showing of more than temporary residence in Maryland before offering the substantial in-state tuition discount described above.  *See* http://www.towson.edu/main/admissions/documents/Residency%20Petition_01%2012%2011.pdf.  Any student wishing to claim Towson's in-state tuition discount must complete an application indicating whether the student is financially dependent on others who reside in Maryland and file Maryland state income tax returns, a ward of the state of Maryland, or financially independent (and in the latter case, *inter alia*, whether the student's permanent address is in state, whether the student's primary reason for residing in state is to attend the university, whether all or substantially all of the student's possessions are in Maryland, and whether the student has a Maryland driver's license, has registered a motor vehicle in Maryland, is registered to vote in state, and pays Maryland state income taxes).  *See* http://www.towson.edu/main/admissions/documents/ResidencySection11.pdf.

presumed likely residencies of married women using the mikvah—individuals who are not members of the putative class as defined in the Amended Complaint.[17]  Remand Mot. at 12–14.

But even if the putative class of women did include "all women who used the NCM/Kesher Israel Mikvah," it does not follow that these women would have necessarily been D.C. citizens at the time the initial Complaint was filed.  There is no reason to suppose, and Plaintiffs offer no evidence whatsoever for the proposition, that just because a married woman used the NCM mikvah at some point for ritual purification—even once, perhaps while temporarily in D.C.—that she was a citizen of D.C. when the complaint was filed.[18]

Nor do Plaintiffs support their assumption of the connection between use of the NCM mikvah and D.C. citizenship.  Their argument is largely that, because many Orthodox and/or observant Jews live near their respective synagogues, the majority of the users of the NCM mikvah therefore must live nearby and thus within D.C.  *See* Remand Mot. at 12–14.  Plaintiffs try to illustrate this point by trying to link the practice of married women immersing in the NCM mikvah on a monthly basis, with the requirement of walking to synagogue for Friday night and Saturday daytime Shabbat services.  *Id.* at 13.

However, Orthodox Jewish married women's monthly practice of immersing themselves in a mikvah does not necessarily mandate that they live nearby.  Nor does a claimed one-day-a-week travel prohibition for Orthodox Jews mean that the users of the NCM mikvah reside within walking distance, and no reason at all exists to suppose that mikvah use would occur

---

[17]  Plaintiffs devote but a single sentence to the women—university students and converts—who most likely comprise the overwhelming majority of class members:  "While the Proposed Class includes students from a number area [sic] universities and conversion candidates who may or may not have resided in the District of Columbia on the filing date of the Amended Complaint, NCM's self-described mission gives rise to the 'common sense presumption' that the Proposed Class will be comprised of at least one-third of D.C. residents and the second prong of the Discretionary Exception's threshold is therefore satisfied."  Remand Mot. at 14.  Plaintiffs fail to explain how the NCM's "self-described mission" gives rise to any common sense or other presumption as to the citizenship of the members of the putative class.

[18]  Citizenship under CAFA is determined as of the time the Complaint was filed.  28 U.S.C. § 1332(d)(7).

predominantly on the Sabbath, or any more on Saturdays than any other day of the week.  The NCM mikvah is open seven days a week, and Orthodox Jewish women who do not reside within walking distance use the mikvah the other six days.  Renna Decl. ¶ 14.

Plaintiffs indulge in yet another assumption—again with no evidentiary support—that because Orthodox mikvahs are allegedly "clustered around Orthodox communities throughout the Maryland and Virginia suburbs of the District of Columbia," the users of the NCM mikvah must be D.C. residents.  Remand Mot. at 13–14.  But Plaintiffs offer no reasonable basis for supposing that Orthodox Jewish women will necessarily choose to use the mikvah that corresponds with their legal domicile.  A mikvah is not like a Starbucks, and there is no reason at all to suppose that a member of the putative class would necessarily choose the situs of an intensely personal ritual strictly on the basis of geography.  *See* Renna Decl. ¶¶ 3–4.  Even assuming that Orthodox women would always choose the mikvah that is closest to their residence, Plaintiffs do not offer any reasonable basis for supposing that a mikvah that operates in some unspecified location "the Maryland and Virginia suburbs of the District of Columbia" is geographically the closest one for some or all class members who may reside in Maryland or Virginia (for example, women who live just across the Potomac River in Arlington or just across the D.C. border in Bethesda).

To circumvent their lack of evidence on this key threshold point, Plaintiffs maintain that the Court should draw all "reasonable inferences in Plaintiffs' favor," and that "a common sense presumption should be utilized in determining whether [the CAFA exception's] citizenship requirements have been met."  Remand Mot. at 11.  This statement is correct as far as it goes.  The problem for Plaintiffs is that their assertions are not based on "common sense" or "reasonable inferences," and putative class members' citizenship is not at all apparent from the

Amended Complaint.  The cases they cite are inapposite.  For example, in *Lucker v. Bayside Cemetery*, 262 F.R.D. 185 (E.D.N.Y. 2009), the court concluded that "the majority—and certainly one-third—of those buried, or desiring to be buried, in a Queens cemetery are New York residents." *Id.* at 189.  Certainly, the choice of burial location provides much more indication of the citizenship of that respective class than whether one immerses oneself in a mikvah in one of the most transient cities in the nation.

The basis for the court's inference in *Caruso v. Allstate Insurance Co.*, 469 F. Supp. 2d 364 (E.D. La. 2007), was even stronger: There, the court found that "the description of the proposed class [was] sufficient to establish that more than two-thirds of the proposed class [of Louisiana homeowners with Louisiana insurance policies] are Louisiana citizens" where "[t]he complaint aver[red] that each of the six named plaintiffs [were] Louisiana residents, that five of the six [were] Louisiana domiciliaries, and that these six plaintiffs [were] representative of all others similarly situated." *Id.* at 367.  And, the court in *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 573 (5th Cir. 2011), found an even stronger basis for establishing citizenship than in *Caruso*.  654 F.3d at 573–74.  In assessing the likely citizenship of class members who had purchased auto insurance in Texas, the *Hollinger* court discussed *Caruso* and noted that "[u]nlike owning a second home, a vehicle owner is more likely than not inclined to wait until actual relocation to register and insure a vehicle." *Id.*)

In stark contrast to the authorities they cite, which connect one's place of burial to one's domicile or one's purchasing of a home or auto insurance to one's domicile, Plaintiffs have attempted to make a connection between a woman's having engaged in a religious rite at the NCM mikvah—perhaps only once—and domicile in D.C.  There is absolutely no nexus in that regard.  Indeed, Plaintiff Smith visited the mikvah twice in November 2013 and February 2014,

only once participating in the immersion ritual.  *See* Am. Compl. ¶¶ 80, 82.  She currently

resides in Towson, Maryland.  *Id.* at ¶ 14.  Similarly, Plaintiff Shulevitz visited the mikvah once

in October 2012, and currently resides in Rockville, Maryland.  *Id.* at ¶ 13, 69.  But under their

logic, they would both be citizens of D.C.  In addition, although Plaintiff Jane Doe is alleged to

be a resident of D.C., she used the mikvah twice solely as part of a project for her class at

Georgetown Law School under Freundel, and she is not one of the regular users of the mikvah

that Plaintiffs' motion spends so much time discussing.  *Id.* at ¶¶ 47–60.  That Plaintiffs'

description of mikvah use by married women is so far different from their own use of the NCM

mikvah only serves to underscore the fallacy in their assumption that "married women members

of Kesher Israel and other area Orthodox and/or observant communities" who currently are D.C.

citizens constitute more than one-third of the putative class.  In fact, the number of married

women who are currently members of Kesher is 100, Declaration of Elanit Jakabovics

("Jakabovics Decl") ¶ 3(b), and thus at most only a small fraction of the women who used the

NCM mikvah since it started operations in 2005.  Remand Mot. at 12.

Accordingly, the only things apparent from the face of the Amended Complaint on the

subject of citizenship are: (1) that Plaintiffs Smith and Shulevitz are not citizens of D.C., and

(2) that observant women, including women seeking to convert to Judaism like Plaintiff

Shulevitz, traveled from outside of D.C. to use the mikvah at NCM.  Moreover, the named

plaintiff in the related Jane Doe 2 case is also not a D.C. citizen, but is instead a resident of

Florida.  Jane Doe 2 Compl. ¶ 2.  In all, at least three of the four named plaintiffs in the two

related cases are not D.C. citizens.  If any inference is to be drawn from the Amended Complaint

in this case and the Complaint in Jane Doe 2, it is that NCM mikvah users who are also putative

class members (as that class is defined in the Amended Complaint) are not likely to be current

D.C. citizens.

**2.      The Evidence Suggests That Far Less Than One-Third of the Proposed Class Are D.C. Citizens.**

Although Plaintiffs offer nothing more than speculation as to the likely citizenship of the

putative class members, Defendants—though they do not bear the burden of proof on these

issues—support their Opposition with facts that reveal the house of cards upon which Plaintiffs'

argument rests.   These facts indicate that it is highly unlikely that one-third of the proposed class

is comprised of D.C. citizens.   Indeed, it cannot be emphasized enough that the putative class is

limited to only those women "where Freundel initiated, arranged, participated in or was

otherwise involved in," their use of the mikvah and who were involuntarily secretly

photographed or recorded.   *See* Am. Compl. ¶ 119.   Those women are likely to be converts and

Freundel's university students.   With that key limitation in mind, the salient facts are as follows:

- Of 96 women who converted to Judaism under Freundel's tutelage from 2008 to 2014 for whom the RCA has residence information, 74, or ***about 77%***, resided outside of Washington, D.C. at the time they converted.   Zylberman Decl. ¶ 5

- More women converts resided in Maryland (31 individuals, or 32%) than Washington, D.C. (22 individuals, or 23%) at the time of conversion.   *Id.*

- One convert resided as far away as Israel.   *Id.*

- Women from all over the world use the mikvah at NCM today, as they have since 2005.   Renna Decl. ¶¶ 2–3.   Users of the mikvah come from many different synagogues in the D.C. metropolitan area, including Maryland and Virginia, as well as D.C. proper, certainly not just from Kesher.   *Id.*   Current married women members of Kesher number only approximately 100, almost none of whom (other than the handful who are converts) would have ever had Freundel involved in their immersion rituals.   Renna Decl. ¶ 15; *see also* Jakabovics Decl. ¶ 3(b).

- The Kesher congregation is a highly transient one, just as Washington, D.C. is a highly transient city.   Jakabovics Decl. ¶ 2.   Thus, former members of Kesher are unlikely to remain D.C. citizens.   *See id.*   Only 42% of Kesher members in 2005 remain active members today.   *Id.* at ¶ 3(d).   The 58% that are no longer members are not likely to be current D.C. citizens.   *See id.* at ¶ 2.

- Congregants of a number of other synagogues, including suburban communities outside of D.C., regularly use NCM for any number of reasons.  Renna Decl. ¶ 3.

- Orthodox Jewish women visiting the D.C. area make appointments to use the NCM mikvah.  Indeed, the mikvah has served visitors from all over the world.  *Id.*  One reason a woman visiting D.C. from out-of-town might use the NCM, rather than waiting to use her local mikvah after returning home, is that under Jewish Law, married women have only a limited period of time each month to immerse in the mikvah.  *Id.* at ¶ 4.

- The NCM website provides the general public with information as to how to make an appointment so that any woman can have access to its mikvah for ritual cleansing, no matter where she resides.  *Id.* at ¶ 10.  Freundel had nothing to do with arranging the regular use of the mikvah by married women for ritual cleansing (*taharat hamishpacha*), and was not present when those women used the NCM mikvah.  Renna Decl. ¶ 15.

- The NCM mikvah is open for use seven days a week, not just Saturdays.  *Id.* at ¶ 14.  Orthodox Jewish women do drive to the NCM on days other than the Sabbath.  *Id.*

In short, Plaintiffs have offered nothing but unadulterated speculation that more than one-third of class members are D.C. citizens, while Defendants have brought forth facts that suggests the precise opposite:  that the overwhelming majority of class members are not D.C. citizens.  These facts point the way to the inevitable conclusion that the members of the putative class who may be D.C. citizens will most assuredly fall well below the one-third threshold.

**C.    Plaintiffs' Arguments as to the "Interests of Justice," "Local Controversy," and "Home State" CAFA Exceptions Fail as a Matter of Law, and Jurisdiction Is Mandatory.**

Of the various statutory exceptions to the continued exercise of jurisdiction by this Court under CAFA, the Plaintiffs only invoke the so-called "interest-of-justice" exception (which they refer to as the "Discretionary Exception").  But, as Plaintiffs have wholly failed to establish the threshold for the applicability of the "interests of justice" exception—that more than one-third of the putative class are D.C. citizens—the Court need not even consider the statutory factors that would inform its discretion as to whether to remand the case to the D.C. Superior Court.  In any event, however, those factors would favor the Court's retaining jurisdiction.

In deciding whether to exercise its discretion to grant or deny a remand motion under the "interests of justice" exception, the Court considers whether: (1) the claims involve matters of "national or interstate interest"; (2) the claims will be governed by the laws of states other than the forum state; (3) the class action was "pleaded in a manner that seeks to avoid Federal jurisdiction"; (4) the action was filed "in a forum with a distinct nexus with the class members, the alleged harm, or the defendants"; (5) the class members residing in the forum state substantially predominate over residents of other states, and the citizenship of the other class members is dispersed among a substantial number of states; and (6) any class actions "asserting the same or similar claims" have been filed within the past three years.  28 U.S.C. § 1332(d)(3).

On balance, these factors support this Court's continued exercise of jurisdiction in this case.  At least two of the enumerated factors weigh in Defendants' favor, with a third either pointing in Defendants' favor or, at worst, neutral.  Under the first statutory factor, the claims here involve matters of "national or interstate interest" insofar as the litigation has "nationwide ramifications." S. Rep. No. 109-14, at 36.  If their residencies at the time of their respective conversions are reflective of their current citizenship, members of the proposed class who converted under Freundel's auspices could be located in at least ten different states, *see* Zylberman Decl. ¶ 5, and as far away as Israel.  Am. Compl. ¶ 121.  Proposed class members who used the NCM mikvah while visiting D.C. could reside in any number of places throughout the United States and, indeed, throughout the world.  *See* Renna Decl. ¶ 3.  And any harm following from Freundel's crimes will be felt by those class members in those locations where they currently reside.  *See id.*[19]

---

[19]   It is also worth noting that Plaintiffs' claims are predominantly common-law causes of action, rather than claims under state statutes that reflect specific policy choices, such as consumer-protection or labor laws that vary greatly from state to state.  Thus, the second factor is neutral at best.

Second, under the fifth factor, Plaintiffs have not shown that the number of class members who are citizens of D.C. "is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States."  28 U.S.C. § 1332(d)(3)(E).  The Senate Committee Report advises that "[t]his factor is intended to look at the geographic distribution of class members in an effort to gauge the forum state's interest in handling the litigation."  S. Rep. No. 109-14, at 37. The Senate Committee explained:

> If all of the other class members (that is, the class members who do not reside in the state where the action was filed) are widely dispersed among many other states (e.g., no other state accounted for more than five percent of the class members), that point would suggest that the interests of the forum state in litigating the controversy are preeminent (versus the interests of any other state).

*Id.* at 37–38.

Here, at least one other state, Maryland, has interests that at least rival, if not exceed, D.C.'s interests.  Maryland is home to two of the named Plaintiffs in this action and is likely home to more class members than is DC.  *See* Zylberman Decl. ¶ 5.   For those class members converted by Freundel between 2008 and 2014 and whose residency information is known, 31 were residents of Maryland at the time of conversion, while only 22 were D.C. residents at the time they converted.  *See id.*  And Maryland is home to Towson University, a school with strong connections to this litigation, as not only Plaintiff Smith but other Towson students are likely members of the proposed class, *see* Renna Decl. ¶ 5.  A second state, Virginia, may also account for far more than five percent of class members: at least 17% of women converted by Freundel lived in Virginia during that time.  *See* Zylberman Decl. ¶ 5.

Finally, the sixth factor favors Defendants because another related suit based on the same conduct is pending before this Court.  The purpose of the sixth factor is:

> [T]o determine whether a matter should be subject to federal jurisdiction so that it can be coordinated with other overlapping or parallel class actions. If other class actions on the same subject have been (or are likely to be) filed elsewhere, the Committee intends that this consideration would strongly favor the exercise of federal jurisdiction so that the claims of all proposed classes could be handled efficiently on a coordinated basis pursuant to the federal courts' multidistrict litigation process as established by 28 U.S.C. § 1407.

S. Rep. No. 109-14 at 38 (2005).  Retaining this case in this Court is consistent with the rationale that parallel actions be coordinated.  Accordingly, although the Jane Doe 2 case was filed sixteen days after this case, the Plaintiffs filed their Amended Complaint the same day as the Jane Doe 2 complaint was filed, essentially making them parallel actions filed concurrently and tipping this factor in favor of retaining federal jurisdiction.

**D.      Class Discovery Is Not Warranted.**

Plaintiffs also request that the Court "permit jurisdictional discovery on the applicability of all three statutory exceptions in CAFA," stating that "the residency of the Proposed Class members is critical to the Court's determination under CAFA."  Remand Mot. at 17.  Although it is undoubtedly true that the citizenship of proposed class members is critical to the application of the various exceptions to CAFA jurisdiction, it does not follow that such discovery is automatic or even favored.

And none of the authorities Plaintiffs cite would support ordering discovery where, as here, Plaintiffs' likelihood of establishing the thresholds for any CAFA exception is exceedingly low, if not nonexistent.  What is more, the cases Plaintiffs cite are completely inapposite and merely stand for the proposition that such discovery may be useful in some instances to determine jurisdiction.  For example, *GTE New Media Servs. Inc. v. Bellsouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000), decided before CAFA was even enacted, was an antitrust dispute between two companies and not a class action at all; accordingly, that case has nothing whatsoever to say

about the propriety of jurisdictional discovery in connection with a class action removed under CAFA or about any of the CAFA exceptions at issue here.

The court in *Anthony v. Small Tube Mfg. Corp.*, 535 F. Supp. 2d 506 (E.D. Pa. 2007), addressed jurisdictional discovery in passing, but did not analyze the issue or even order such discovery. *Id.* at 512. Moreover, in *Anthony*, the class was defined as the employees of a facility who had been exposed to certain products while working there for at least one month over a thirty-year period and did not turn on citizenship at all. *Id.* at 508–09. Indeed, the *Anthony* court actually denied remand and the application of the CAFA exceptions, finding that the "[p]laintiff relied entirely on the averments in the pleadings to support its motion . . . [and] submitted no other factual evidence. Thus, plaintiff has offered nothing more than bare assertions in its motion as to the citizenship of the putative class" and that such "bare assertions are wholly inadequate for the court to evaluate the citizenship of the class." *Id.* at 518.

Finally, in *Lowery v. Alabama Power Co.*, 483 F.3d 1184 (11th Cir. 2007), the court denied ordering jurisdictional discovery stating that such discovery "disrupts the careful assignment of burdens" and that the defendants' request for discovery in that case was "tantamount to an admission that the defendants do not have a factual basis for believing that jurisdiction exists." *Id.* at 1217–1218.

In short, neither *Anthony v. Small Tube Mfg.* nor *Lowery*, upon which Plaintiffs rely, addresses the propriety of jurisdictional discovery relating to the citizenship of the putative class members. Moreover, the *Lowery* case actually *supports* Defendants' position. In that case, the Eleventh Circuit observed that where the burdens have been established by the rules they ought not be disturbed by discovery, especially where, as here, Plaintiffs have no factual basis for their claim that over a third of the putative class members reside in the forum state.

Plaintiffs also fail to mention that despite the utility of discovery in certain instances, courts in CAFA cases routinely deny remand motions without allowing discovery where, as here, the plaintiffs failed to make a sufficient showing that the requested discovery is warranted. *See, e.g.*, *Catron v. Colt Energy, Inc.*, 2013 U.S. Dist. LEXIS 161567, at *7 (D. Kan. Nov. 13, 2013). Indeed, CAFA's legislative history indicates that "in most cases," discovery of precisely the type Plaintiffs request here would be "improper." S. Rep. No. 109-14, at 44. As the Senate Judiciary Committee Report explained:

> [I]n assessing the citizenship of the various members of a proposed class, it would in most cases be improper for the named plaintiffs to request that the defendant produce a list of all class members (or detailed information that would allow the construction of such a list), in many instances a massive, burdensome undertaking that will not be necessary unless a proposed class is certified.

*Id.*

Here, Plaintiffs have given the Court no reason to believe that it is likely that one-third of the proposed class members are D.C. citizens. Further, Defendants—though bearing no burden of proof on these issues—have gathered and presented evidence showing that it is highly unlikely that even one-third of the proposed class members are D.C. citizens.

Further, Plaintiffs also have not made the requisite showing that Kesher, the NCM or the RCA has "readily available" information as to the current citizenship of the women who Freundel recorded, much less the citizenship of all the women who used the NCM mikvah since 2005. Remand Mot. at 19. To the contrary, neither Kesher nor NCM has any records as to the women whom Freundel brought to the mikvah because they did not maintain records of the individual university students or converts that Freundel personally escorted to the NCM. Renna Decl. ¶¶ 7–8. Moreover, Kesher does not have any records as to use of the NCM mikvah in general. Jakabovics Decl. ¶ 6.

And the NCM does not have the sort of records Plaintiffs imagine.  In the interests of privacy, the NCM collects and maintains only the very limited information that is reasonably necessary to facilitate appointments for family purity rites at the mikvah—for example, typically identifying women by first name only, with no addresses or other personal identifying information.  Renna Decl. ¶¶ 9–12.  The limited information that the NCM possesses, moreover, is not even relevant to those women who are likely to make up much, if not all, of Plaintiffs' proposed class, as the NCM did not collect information as to the use of the mikvah in connection with conversions or Freundel's student tours.  *Id.* at ¶¶ 7–8.

In any event, because Plaintiffs have not made a sufficient showing that any CAFA exception applies, the Court need not resolve the thorny privacy issues that would inhere in compelling the NCM to turn over whatever information they have as to the women who have used the NCM mikvah.[20]  *Id.* at ¶ 10.

## V.  CONCLUSION

Because Defendants have provided evidence showing that the amount in controversy is at least $5 million and Plaintiffs have not met their burden of proving the applicability of *any* CAFA exceptions, Plaintiffs' Remand Motion and request for discovery should be denied.

Respectfully submitted,

Dated: March 5, 2015

*/s/Maura M. Logan*
Paul Blankenstein, D.C. Bar No. 304931
Maura M. Logan, D.C. Bar No. 1010924
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036

---

[20]  It is, of course, clear that constitutionally-based and common-law rights of privacy can be raised in response to discovery requests.  Federal courts deny requests for contact information of putative class members when plaintiffs' counsel fail to show that their need for the information sought outweighs the privacy right asserted.  *See, e.g., Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1497 (10th Cir. 1992) (denying discovery of names of participants in a medical study due to privacy interests of the individual participants).

Telephone:  202.955.8500
Facsimile:  202.467.0539
pblankenstein@gibsondunn.com
mlogan@gibsondunn.com

Attorneys for Defendant THE GEORGETOWN
SYNAGOGUE – KESHER ISRAEL
CONGREGATION

Dated: March 5, 2015  */s/Edward C. Bacon*
Edward C. Bacon, D.C. Bar No. 270124
Patricia M. Thornton, D.C. Bar No. 354951
BACON, THORNTON & PALMER, LLP
Capital Office Park
6411 Ivy Lane, Suite 500
Greenbelt, MD  20770-1411
Telephone:  301.345.7001
ebacon@lawbtp.com
pthornton@lawbtp.com

Attorneys for Defendant THE NATIONAL
CAPITAL MIKVAH, INC.

Dated: March 5, 2015  */s/Mark D. Harris*
Mark D. Harris, D.C. Bar No. 445900
Admitted *pro hac vice*
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
Telephone:  212.969.3530
mharris@proskauer.com

Attorney for Defendant RABBINICAL COUNCIL
OF AMERICA

## APPENDIX A[21]

| CASE | DESCRIPTION | AVERAGE AWARD *PER PLAINTIFF* |
|---|---|---|
| *Ocwen Fin. Corp. v. Kidder*[22] | Plaintiffs were recorded under their desks by a co-worker who shared the videos with other co-workers and sold the videos to pornographic websites. Defendant also peeped at plaintiffs through the ceiling of the women's restroom.  The jury awarded $1 million to each of the two plaintiffs for violations of Florida Civil Rights Act, Florida Whistleblower Act, negligent supervision and retention of employee. | $1 million |
| *Welsh v. Martinez*[23] | Plaintiff sued for invasion of privacy after discovering that her ex-boyfriend installed hidden cameras in her bedroom and bathroom, a computer keystroke tracker, and a GPS tracker on her car.  The jury awarded the plaintiff $2 million for invasion of privacy. | $2 million |
| *T.G. v. G4S Secure Solutions USA, Inc.*[24] | Plaintiff, a minor, sued private security employer for voyeuristic acts of employee, who pled guilty to two counts of video voyeurism.  The jury awarded the plaintiff $1,332,589 on claims of negligent security, negligent hiring, and negligent retention. | $1,332,589 |
| *Canalizo v. Powell*[25] | Victims brought suit after Powell was convicted of 14 counts of voyeurism in May 2012. Powell defaulted on the civil suit.  The plaintiffs were awarded $1.8 million, or approximately $900,000 each. | ~$900,000 |
| *Bradbury v. Kendrick*[26] | A jury awarded a single plaintiff $101,275 in compensatory damages and $200,000 in punitive damages due to defendant surreptitiously videotaping plaintiff showering in his condominium. | $301,275 |

---

[21] The opinions, verdicts and articles cited in this chart are compiled at Exhibit B herein.

[22] 950 So. 2d 480 (Fla. Dist. Ct. App. 2007); Christine Lagorio, *$2M Award In Video Voyeur Case*, CBSNews.com (Feb. 16, 2005), http://www.cbsnews.com/news/2m-award-in-video-voyeur-case/.

[23] Verdict for Plaintiff, *Welsh v. Martinez*, No. HHD–CV10–6012959–S (Conn. Super. Ct. June 25, 2012), 2012 WL 3767659; *see also* First Am. Compl., *Welsh v. Martinez*, No. HHD–CV10–6012959–S (Conn. Super. Ct. June 21, 2012), 2012 WL 3791798.

[24] No. 10–60245–CA–15 (Fla. Miami-Dade County Ct. May 15, 2014), *available at* http://verdictsearch.com/verdict/peeping-tom-victim-awarded-1-3m.

[25] No. 12–2–11541–4 (Wash., Pierce County Super. Ct. Aug, 28, 2013), *available at* https://linxonline.co.pierce.wa.us/linxweb/Case/CivilCase.cfm?cause_num=12-2-11541-4; *see also* Pat Reavy, *Judge Upholds $1.8 Million Judgment Against Steven Powell*, DESERET NEWS, Nov. 15, 2013, http://www.deseretnews.com/article/865590692/Judge-upholds-18-million-judgment-against-Steven-Powell.html?pg=all.

[26] Dkt. No 99, No. 23 C 02 000089 (Worcester Co., Md. Jan. 26, 2005), *available at* http://casesearch.courts.state.md.us/inquiry, *and summarized at* http://www.hollandlawfirm.com/pdf/media_verdicts.pdf.

| CASE | DESCRIPTION | AVERAGE AWARD *PER PLAINTIFF* |
|------|-------------|------------------------------|
| *Walsh v. McVettie*[27] | A jury awarded a single plaintiff $575,000 due to defendant's secretly videotaping plaintiff in a changing room. | $575,000 |
| *Kidd v. District of Columbia, et al.*[28] | A jury awarded a single plaintiff $258,000 in compensatory damages for sexual harassment and intentional infliction of emotional distress. | $258,000 |

---

[27]   No. 01–018487–NZ (Livingston Co., Mich. Feb. 7, 2003), *summarized at* http://www.schwartzlawfirmpc.com/Media/Jury-awards-aspiring-model-575-000-in-McVittie-case-Daily-Press-Argus-2-9-03.shtml; *see also* Case Summary, *Walsh v. McVettie*, No. 01–018487–NZ (Livingston Co., Mich. 2003) (showing judgment for plaintiff on Feb. 7, 2003).

[28]   No. 89–02695, 1990 DC Metro Verdicts Monthly LEXIS 526 (D.C. Sup. Ct. Oct. 12, 1990).

## <u>CERTIFICATE OF SERVICE</u>

I, Maura M. Logan, hereby certify that on this 5th day of March, 2015, I filed the

foregoing Memorandum Of Points And Authorities In Opposition To Plaintiffs' Motion For

Remand Or, In The Alternative, For Limited Jurisdictional Discovery, and the Accompanying

Exhibits A and B, Declarations, and Proposed Order with the Clerk of Court via the CM/ECF

system, which will send notification of such filing to the counsel of record in this matter who are

registered on the CM/ECF system.

<span style="padding-left:3em;"></span>*/s/Maura M. Logan*
Maura M. Logan (D.C. Bar No. 1010924)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 887-3617
E-mail: mlogan@gibsondunn.com