UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JANE DOE 1,**<br>**EMMA SHULEVITZ,**<br>**STEPHANIE SMITH,**<br><br>                    Plaintiffs,<br><br>         v.<br><br>**GEORGETOWN SYNAGOGUE-KESHER**<br>**ISRAEL CONGREGATION, <u>et al.</u>,**<br><br>                    Defendants. | Case No. 15-cv-00026 (CRC) |
| **JANE DOE 2,**<br><br>                    Plaintiff,<br><br>         v.<br><br>**GEORGETOWN SYNAGOGUE-KESHER**<br>**ISRAEL CONGREGATION, <u>et al.</u>,**<br><br>                    Defendants. | Case No. 15-cv-00028 (CRC) |

## <u>MEMORANDUM OPINION</u>

For twenty-five years, Bernard Fruendel was the sole rabbi for Kesher Israel Congregation, an Orthodox Jewish synagogue in Washington, D.C. During his tenure, he advocated for the construction of a nearby mikvah—a Jewish ritual bath most frequently used by married Orthodox women as well as by women undergoing the process of converting to Judaism—and served as its supervising rabbi after it opened in 2005. Earlier this year, Fruendal pled guilty, in a District of Columbia criminal proceeding, to illicitly filming numerous women as they used the mikvah. Two sets of Freundel's victims have brought class action lawsuits for negligence and vicarious liability against the synagogue, the mikvah, and the Rabbinical Council of North America—a professional

organization for Orthodox rabbis in which Fruendel held leadership positions—for allegedly failing to prevent his crimes.

Plaintiffs initially sued in the Superior Court of the District of Columbia, but the defendants removed the cases to federal court under the Class Action Fairness Act ("CAFA").  Plaintiffs now move to remand based primarily on CAFA's "interest of justice" exception, which permits federal courts to decline jurisdiction over predominately local disputes if between one-third and two-thirds of the proposed class members are citizens of the state forum.  The Court allowed the plaintiffs to conduct limited jurisdictional discovery on class citizenship.  Drawing reasonable inferences from the evidence presented by the parties, the Court finds that the plaintiffs have satisfied the numerical requirements of the interest-of-justice exception.  The Court further concludes that these cases are fundamentally local controversies.  While Fruendal's crimes have generated wider interest and may well have broader ramifications for the Orthodox community, these cases, at bottom, involve events, parties, and alleged harms in the District of Columbia and will be decided based solely on District of Columbia law.  The Court will, accordingly, grant the plaintiffs' motions and remand both cases to the Superior Court for District of Columbia.

## I.      Background

Throughout the relevant time period, 2005 to 2014, Fruendel served as the rabbi of Kesher Israel Congregation, as supervising rabbi of the National Capital Mikvah ("NCM"), and in various positions affiliated with the Rabbinical Council of America ("RCA"), including chairman of an RCA committee overseeing the standards for conversions to Orthodox Judaism.  Doe 1 Pls.' Am. Compl. ¶¶ 18, 23–26.  The four named plaintiffs in these two related cases all immersed in the NCM mikvah at Rabbi Fruendel's direction.  Jane Doe 1 is a third-year student at Georgetown University Law Center who took a Jewish law seminar co-taught by Fruendel.  Doe 1 Am. Comp.

¶¶ 2–3.  Emma Shulevitz is a 27 year-old woman who sought to convert to Orthodox Judaism under Fruendel's supervision but eventually completed the conversion process with a different rabbi.  Id. ¶¶ 4–5.  Stephanie Smith is a student at Towson University in Maryland who took a class on faith and medical ethics taught by Fruendel.  Id. ¶¶ 7–8.  And Jane Doe 2 is a 24 year-old resident of Florida who Fruendel guided in a recent conversion to Orthodox Judaism.  Doe 2 Compl. ¶ 2.  On December 18, 2014, Doe 1, Shulevitz, and Smith filed an amended class action complaint in Superior Court for the District of Columbia alleging various torts against Kesher Israel, NCM, and RCA stemming from Fruendel's voyeurism.  Doe 1 Pls.' Mot. to Remand at 3.[1]  Doe 2 filed a similar Superior Court complaint the same day against the same defendants.  Doe 2's Mot. to Remand at 4.  While the allegations in both complaints overlap, the proposed classes differ: Doe 1's proposed class consists of all women who Fruendel illicitly recorded during his tenure, while the proposed class in Doe 2 includes all women who used the mikvah during the same time period, regardless of whether they were recorded.[2]  Rabbi Freundel pled guilty in Superior Court to 52

---

[1]  Doe 1 also sued Georgetown University, where Freundel also taught a class, but those claims have been severed and remanded.

[2]  Specifically, the Doe 1 proposed class comprises:

> All women who participated in an immersion ritual at the NCM/Kesher Israel
> Mikvah (the "immersion"): (i) while Freundel was an actual and/or apparent agent,
> servant, and/or employee of Kesher Israel and/or NCM, (ii) where Freundel initiated,
> arranged, participated in or was otherwise involved in the immersion, and (iii) who
> were involuntarily and secretly photographed by any means or otherwise subjected
> to invasions of their privacy in connection with the immersion.

Doe 1 Am. Compl. ¶ 85.  The Doe 2 class comprises:

> Any and all women who used any portion of the mikvah utilized by Kesher
> Israel Synagogue, also known as [NCM], at any time since 2005 to the present,
> including but not limited to women who used any portion of the mikvah either
> because Rabbi Fruendel arranged their attendance at the mikvah and/or Rabbi

counts of voyeurism in February 2015.  Defs.' Opp'n to Doe 1 Pls.'s Mot. to Remand Ex. A at 2.

The factual proffer he signed acknowledges that police investigators found evidence that he

victimized as many as 100 additional women.  <u>Id.</u> at 8–9.

Kesher Israel and NCM removed both cases to this Court in January 2015 under the Class

Action Fairness Act ("CAFA"), 28 U.S.C. § 1332.  In response, both sets of plaintiffs sought

remand under two exceptions to federal court jurisdiction set forth in CAFA for matters that are

predominantly local in nature.  Alternatively, plaintiffs requested leave to conduct jurisdictional

discovery on class citizenship in order to establish that one of the CAFA exceptions applies.  After

a hearing, the Court granted limited jurisdictional discovery.  In an effort to balance the privacy

interests of the members of the proposed classes with the need for additional information, the Court

restricted discovery to "(1) information possessed by the United States Attorney's Office for the

District of Columbia regarding the state of residence of the 152 women that Rabbi Bernard

Freundel acknowledged secretly filming in his plea agreement; and (2) information possessed by

Defendant Georgetown Synagogue-Kesher Israel Congregation regarding the age and state of

residency of its married female members between 2005 and 2015."  Minute Order, April 6, 2015.

The membership data Kesher Israel provided in response shows that the synagogue had 294 female

members between 2005 and Fruendel's arrest, 163 of whom had a last known address in District of

Columbia.  Pls.' Renewed Mot. to Remand, Ex. A; Defs. Opp'n to Pls.' Renewed Mot. to Remand

at 16.  In response to plaintiffs' subpoena, the U.S. Attorney's Office indicated that it has

specifically identified 70 of Freudel's victims but has residency information for only 24.  Of those

---

Fruendel solicited, initiated, and/or participated in any way in their use of the
mikvah.

Doe 2 Compl. ¶ 25.

24, three are residents of the District of Columbia.  Pls.' Renewed Mot. to Remand, Decl. of

Gunella Lilly ¶ 3.  As part of the initial briefing, RCA provided data showing that 22 of the 96

women who converted under Fruendel's supervision in the relevant time frame for whom it has

records of residency were District of Columbia residents.  Defs.' Opp'n to Doe 1 Pls.'s Mot. to

Remand, Decl. of Rabbi Michoel Zylberman at 2.  None of the parties have furnished specific

information regarding the citizenship of the university students, like Doe 1 and Stephanie Smith,

who used the mikvah at Fruendel's invitation.  Plaintiffs now renew their motions to remand.

**II.      Standard of Review**

To remove a case to federal court, a defendant must file a notice "'containing a short and

plain statement of the grounds for removal,'" which is subject to the same rules that apply to the

general pleading requirements in Federal Rule of Civil Procedures 8(a).  Dart Cherokee Basin

Operating Co., LLC v. Owens, 135 S. Ct. 547, 553 (2014) (quoting 28 U.S.C. § 1446(a)).  "[N]o

antiremoval presumption attends cases invoking CAFA," as Congress designed the statute to

facilitate federal consideration of certain class actions.  Id. at 550 (citation omitted).  Under CAFA,

federal district courts have original jurisdiction over class actions where the class has more than 100

members, the parties are minimally diverse, and the "matter in controversy exceeds the sum or

value of $5,000,000."  Standard Fire Ins. Co. v. Knowles, 133 S. Ct. 1345, 1348 (2013) (quoting 28

U.S.C. § 1332(d)(2), (d)(5)(B)).  "The party supporting removal bears the burden of establishing the

Court's jurisdiction."  McMullen v. Synchrony Bank, No. CV 14-1983, 2015 WL 632212, at *1

(D.D.C. Feb. 13, 2015) (citing Breakman v. AOL LLC, 545 F.Supp.2d 96, 100 (D.D.C. 2008)); see

also Woods v. Standard Ins. Co., 771 F.3d 1257, 1262 (10th Cir. 2014) ("CAFA places the burden

on removing parties to establish that its basic requirements are met.").  Once removing parties have

done so, the burden shifts to parties seeking remand to show that one of CAFA's three exceptions

5

applies.  See McMullen, 2015 WL 632212 at*2; Woods, 771 F.3d at 1262 (collecting cases);

Greenwich Fin. Servs. Distressed Mortgage Fund 3 LLC v. Countrywide Fin. Corp., 603 F.3d 23,

26 (2d Cir. 2010) (same).  As relevant here, CAFA's "home state" exception *requires* the court to

remand a case where more than two-thirds of proposed class members, and the principal

defendants, are citizens of the state in which the action was originally filed, 28 U.S.C. §

1332(d)(4)(B) and the statute's "interest-of-justice" exception *permits* the court, "in the interests of

justice and looking at the totality of the circumstances, [to] decline to exercise jurisdiction" over a

class action in which greater than one-third but less than two-thirds of proposed class members, and

the primary defendants, are citizens of the state in which the action was originally filed.  Id. §

1332(d)(3).  In exercising its discretion whether to assert jurisdiction under the "interests of justice"

exception, CAFA instructs the court to consider whether:

> (A) the claims asserted involve matters of national or interstate interest;
> (B) the claims asserted will be governed by laws of the State in which the action was
> originally filed or by the laws of other States;
> (C) the class action has been pleaded in a manner that seeks to avoid federal
> jurisdiction;
> (D) the action was brought in a forum with a distinct nexus with the class members,
> the alleged harm, or the defendants;
> (E) the number of citizens of the State in which the action was originally filed in all
> proposed plaintiff classes in the aggregate is substantially larger than the number of
> citizens from any other State, and the citizenship of the other members of the
> proposed class is dispersed among a substantial number of States; and
> (F) one or more other class actions asserting the same or similar claims on behalf of
> the same or other persons have been filed during the 3-year period preceding the
> filing of the class action.

Id.  Citizenship of the proposed class members is determined as of the date the action was filed.  28

U.S.C. § 1332(d)(7).

## III.    Analysis

The parties here do not dispute that the class will have more than 100 members or that the

parties are minimally diverse.  They primarily disagree over the proportion of the proposed class

members who were District of Columbia citizens when the case was filed.  The Doe 1 plaintiffs also
dispute whether defendants have established that the amount in controversy exceeds $5 million.

### A.  Amount in Controversy

To determine the amount in controversy, the claims of all named and unnamed members of
the proposed class are aggregated.  Standard Fire Ins. Co. v. Knowles, 133 S. Ct. 1345, 1348 (2013)
(citing 28 U.S.C. § 1332(d)(6)).  When the plaintiff's complaint does not state the amount in
controversy—and neither complaint does here—the defendant may provide an amount in its notice
of removal.  28 U.S.C. § 1446(c)(2)(A).  The Supreme Court recently held that the defendant need
only "allege the requisite amount plausibly" and need not support the allegation with evidentiary
submissions.  Dart Cherokee, 135 S. Ct. at 551.  When a plaintiff contests the amount alleged by
defendants, however, "both sides submit proof and the court decides, by a preponderance of the
evidence, whether the amount-in-controversy requirement has been satisfied."  Id. at 554.  Here,
defendants have provided comprehensive information regarding similar voyeurism cases in which
individual plaintiffs recovered between $250,000 and $2 million, while plaintiffs have offered no
proof to the contrary.  Defs.' Opp'n to Doe 1 Pls.' Mot. to Remand App. A.  Using the low end of
this range, the classes proposed here would generate substantially more than $5 million in
controversy.  In light of defendants' evidence, the Court finds that the amount-in-controversy
requirement has been satisfied and—because the parties are also minimally diverse and the
proposed classes include more than 100 individuals—defendants have properly removed these cases
to this Court under CAFA.

### B.  Applicability of CAFA's Interest-of-Justice Exception

Remand under CAFA's interest-of-justice exception requires that greater than one-third but
less than two-thirds of potential class members and the primary defendants be citizens of the state in

which the case was originally filed.  28 U.S.C. § 1332(d)(3).[3]  To calculate this ratio, the Court first must define the overall membership of the proposed class (the denominator) and then determine, or at least estimate, how many members of the proposed class are local citizens (the numerator).  If the requisite numerical range is satisfied, the Court must then weigh the factors listed in the statute to determine if remand would be in the interests of justice.

### i.        Definition of the Proposed Class

Defining the relevant class here is complicated somewhat by the fact that the two sets of plaintiffs allege different proposed classes.  As noted above, the Doe 1 proposed class consists only of women who were illicitly recorded by Rabbi Fruendel while using the mikvah.  The Doe 2 proposed class encompasses the Doe 1 class but is larger, comprising all women who used the mikvah during Fruedel's tenure, regardless whether they were recorded.  The cases are otherwise closely related:  they are grounded on the same factual allegations, were filed simultaneously, and are subject to a pending motion to consolidate by the defendants.  Given the related nature of the cases, the Court need not engage in a separate citizenship analysis for each of the two proposed classes but rather will consider both class definitions together.

The defendants urge the Court to limit the definition of the Doe 2 class to only those women who were actually recorded.  They argue that Doe 2, who alleges she *was* recorded, does not have standing to represent members of the class who were not recorded and, therefore, the entire Doe 2 class will not qualify for class certification.  While that may or may not be so, CAFA instructs the

---

[3] Plaintiffs have also invoked CAFA's "home state" exception, which as noted above *requires* remand when two-thirds or more of the proposed plaintiff class, and the primary defendants, are citizens of the state in which the action was originally filed.  28 U.S.C. § 1332(d)(4)(b).  Because the Court finds that remand is appropriate under the interests-of-justice exception, it need not resolve whether the home state exception applies.

Court to assess citizenship based on the class as "proposed *or* certified."  28 U.S.C. § 1332(d)(1)(D) (emphasis added) (defining "class member" to "mean[] the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.").  At this stage, no class has been certified and it would be premature for the Court to base its class definition on the outcome of future class certification determinations that are not presently before it.

Defendants also contend that the Doe 2 class should be narrowed because plaintiffs who were not recorded are not entitled to relief.  Again, the defendants' argument is premature.  No motions to dismiss have been filed and the Court is obligated in any event to determine its jurisdiction before making decisions on the merits.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).  Accordingly, the Court will analyze CAFA's citizenship requirements based on the definitions of the proposed classes contained in the plaintiffs' complaints.

ii.      Citizenship of Proposed Class Members

The D.C. Circuit does not appear to have addressed the standard for assessing class citizenship for purposes of applying the CAFA exceptions.  See McMullen, 2015 WL 632212 at *2 n.6.  A fellow court in this district has observed, based on jurisprudence from other circuits, that "there must ordinarily be at least some facts in evidence from which the district court may make findings regarding class members' citizenship for purposes of CAFA's" exceptions.  Id. at *7 (quotation marks omitted) (citing Mondragon v. Capital One Auto Finance, 736 F.3d 880, 884 (9th Cir. 2013); In re Sprint Nextel Corp., 593 F.3d 669, 673–76 (7th Cir. 2010); Preston v. Tenet Healthsystem Memorial Med. Ctr., Inc., 485 F.3d 793, 798–802 (5th Cir. 2007)).  "[B]are assertion[s]" that the putative class members satisfy CAFA exceptions are insufficient, particularly when the relevant time period spans several years, as here.  McMorris v. TJX Companies, Inc., 493 F. Supp. 2d 158, 166 (D. Mass. 2007) (collecting cases).  At the same time, Plaintiffs are not

required to prove class citizenship with mathematical certainty. A court may employ "common sense and reasonable inferences" in assessing whether the CAFA citizenship exceptions apply. <u>Bey v. SolarWorld Indus. Am., Inc.</u>, 904 F. Supp. 2d 1096, 1102 (D. Or. 2012) (finding most class members who worked at a single location of an Oregon employer were likely citizens of Oregon) (citing <u>Caruso v. Allstate Ins. Co.</u>, 469 F.Supp.2d 364, 367–68 (E.D. La. 2007)); <u>see also</u> <u>Hollinger v. Home State Mut. Ins. Co.</u>, 654 F.3d 564, 573 (5th Cir. 2011) ("where a proposed class is discrete in nature, a common sense presumption should be utilized in determining whether [the CAFA exception's] citizenship requirements have been met"); <u>Lucker v. Bayside Cemetery</u>, 262 F.R.D. 185, 189 (E.D.N.Y. 2009) (drawing the "eminently reasonable inference that the majority—and certainly one-third—of those buried, or desiring to be buried, in a Queens cemetery are New York residents"). In short, determining class citizenship for the purposes of evaluating whether a CAFA exception applies requires more than merely conclusory statements but largely rests within the court's reasonable discretion, and a court need not use a precise mathematical formula or exact data in making such determinations.

In this case, plaintiffs argue that they have provided ample evidence that more than one-third of the potential class members are D.C. citizens. They note that common sense suggests that a substantial portion of the mikvah's users are members of Kesher Israel and many Orthodox Jews live within walking distance of their synagogue. Doe 1 Pls.' Reply at 6 & Ex. B. Moreover, they allege that Freundel required or strongly encouraged conversion candidates to live within the synagogue's ritual boundary area, which is entirely within the District. <u>Id.</u> at 7. Plaintiffs find further support for their position in the fact that 23 percent of those who converted under Fruendel's tutelage were District of Columbia citizens. Converts, they argue, constitute only one, small

subgroup of NCM users and likely consists of a disproportionate number of non-District of Columbia residents as compared to other subgroups.  Id. at 10.

Defendants respond that Kesher Israel members should be excluded from the citizenship calculations because Freundel was not involved in arranging the use of the mikvah by married women for ritual purification purposes and he did not record Kesher Israel members.  Defs.' Opp'n to Doe 1 Pls.'s Mot. to Remand at 16–17.  Defendants ground these assertions on two main considerations.  First, they explain that the NCM's procedures allowed for routine users of the mikvah—such as married Kesher Israel members or other married Orthodox women in the D.C. area who regularly used the NCM for ritual purification—to set up appointments or drop in without coordinating their visits with Freundel.  Id. at 16 – 17.  Second, defendants contend that Fruendel's admission in his plea agreement that he "periodically installed and removed the recording device," id. ex. A at 8, and the statement in his criminal sentencing memorandum that "[i]t is believed that [Freundel] brought the recording devices on each occasion that he recorded subjects, and removed the devices after he finished recording that day," Defs.' Opp'n to Pls.' Renewed Mots. to Remand, Ex. A at 5, show that he likely only recorded the converts and students whose visits he proactively arranged.  Both of these arguments fall short.  Fruendel's frequent installations and removals of recording equipment could easily have resulted from considerations—such as the battery life or storage capacity of the devices he used or his apparent desire to edit and catalog the video clips— that are irrelevant to the citizenship inquiry.  See id. at 5 – 6.  In fact, some evidence suggests that Fruendel did target members of Kesher Israel in addition to students and converts.  For example, the sentencing memorandum states that Fruendel specifically "exploit[ed] women he knew" and that "[h]e didn't choose random women."  Id. at 11 (quotation marks omitted).  And the Doe 1 plaintiffs provide an affidavit in their reply from a member of the congregation stating that she is "aware of

11

several instances in which Rabbi Freundel encouraged single Jewish women affiliated with Kesher

Israel to use the mikvah for purposes unrelated to conversion to Judaism" and is "specifically aware

that at least two of these individuals were filmed by Rabbi Fruendel." Doe 1 Pls.' Reply Ex. A

(Affidavit of Jane Doe 3) ¶¶ 6–7. Consequently, the Court cannot exclude Kesher Israel members

from its class citizenship analysis, as they clearly fall within the Doe 2 class and credible evidence

exists to suggest that Fruendel may have victimized them.

   When Kesher Israel members are included, the information provided by the parties, some

basic arithmetic, and common sense suggests that at least one-third of the proposed class members

are District of Columbia citizens. Although the data revealed through jurisdictional discovery is not

definitive, and the parties do not agree on the precise numbers, the Kesher Israel membership

information combined with the RCA conversion data is sufficient for the Court to draw "reasonable

inferences" about the composition of the proposed classes.[4] See Bey, 904 F. Supp. 2d at 1102;

Lucker, 262 F.R.D. at 189. The membership information furnished in limited discovery shows that

approximately 60 percent of married female Kesher Israel members at the time of filing, or 73 out

of 121, resided in D.C., and roughly 55 percent of the total married female members of the

synagogue from 2005 to 2014, or 163 of 294, had a last known address in the District of Columbia.

Doe 1 Pls.' Renewed Mot. to Remand 2–3 & Ex. A at 43–82.[5] Adding these figures to the data on

women who converted under Fruendel's tutelage for which RCA has residency information—22

---

[4] For example, defendants object to using last known addresses as indicative of proposed class
members' citizenship. For the purposes of a "reasonable inferences" analysis for determining the
applicability of CAFA jurisdiction exceptions, however, the Court views these addresses as an
acceptable proxy, particularly in light of its desire—which is shared by the defendants—to limit
incursions on the privacy of proposed class members.

[5] The parties calculate these ratios slightly differently based on the manual records provided by
Kesher Israel. The Court has endeavored to make its own calculation.

residents of the District out of 96 total—results in 185 D.C. residents out of 390 total proposed class members, or 47 percent, well over the one-third threshold that would permit the Court to remand the case under CAFA's "interest of justice" exception. Defs.' Opp'n to Doe 1 Pls.'s Mot. to Remand, Decl. of Rabbi Michoel Zylberman at 2.

The current record lacks specific information regarding the total number and citizenship of other NCM users. Defendants nonetheless argue that few of Fruendel's students were likely District citizens because students at both Georgetown and Towson hail largely from outside the city and out-of-town visitors to the NCM likely substantially outpaced in-town visitors. As a result, they assert, scores of additional NCM users who are not citizens of the District likely fall within the class definitions. Defendants further contend that the transient nature of Kesher Israel's membership suggests that many women whose last known address was in the District of Columbia likely moved out of the city before the complaint was filed, undercutting the utility of the membership data. Id. at 14–16. The Court is unpersuaded by all three propositions. First, it is far from clear that the subsets of women who used the NCM but were not Kesher Israel members or converts were overwhelmingly citizens of other states. The Court finds it equally plausible that a substantial number of D.C. citizens who were not members of Kesher Israel used the NCM for the same reasons that defendants argue out-of-town visitors or citizens of neighboring states would have. Because Orthodox married women who adhere to the family purity traditions have a limited period of time each month to immerse in the mikvah, and because the NCM and Fruendel were well-known and widely-respected in the Orthodox community and the NCM was open to the public seven days a week, it may have been the most convenient or most attractive option for Orthodox women in D.C. who were not Kesher Israel members. Similarly, Kesher Israel provides no evidence that the transience of its membership is a one-way ratchet: members are as likely to have

moved from a nearby Maryland town to the District—potentially to live closer to the synagogue—as from the District to Maryland.  Finally, neither party has provided particularized information regarding Fruendel's students; statistics about the general populations of Towson and Georgetown are far too broad to be useful here.  Accordingly, based on the best evidence available of class citizenship—the RCA conversion records and Kesher Israel membership records—the Court finds that the plaintiffs have met their burden to show that at least one-third of the proposed classes are more likely than not citizens of the District.[6]

### iii.  "Interests of Justice" Factors

The factors that the Court must consider in deciding whether to exercise jurisdiction under included in the "interests of justice" exception almost universally militate in favor of remand.  See 28 U.S.C. § 1332(d)(4).  The parties do not dispute that most if not all of the unlawful acts at issue occurred in the District.  Similarly, the District of Columbia has a distinct nexus to the alleged harm, as reflected by Fruendel's criminal prosecution in this forum and the D.C. citizenship of the primary defendants, Kesher Israel and the NCM.  Moreover, these cases will be governed by District of Columbia law, and plaintiffs' theories of liability, particularly with respect to women who were not recorded, may require interpreting legal issues of first impression in the jurisdiction—a role best performed by the District's courts.  And the plaintiffs filed their respective suits at essentially the same time and do not appear to have pled their claims in a deliberate attempt to avoid federal jurisdiction, alleviating the Section 1332(d)(4)(C) and 1332(d)(4)(F) concerns.  The final two "interests of justice" factors are less clear-cut, but still favor remand.   Although

---

[6]  The residency data provided by the U.S. Attorney's Office for Freundel's victims—3 D.C. residents out of 24 women identified—is too spotty to be of much use in the Court's analysis.  But even if that date were included, it would not reduce the overall ratio under the one-third threshold.

Fruendel's crimes have garnered national and international attention and involve a number of victims from beyond the District's borders, they fundamentally involve activities at a local synagogue and mikvah, making these claims of local, not national, interest.  Finally, while Maryland or Virginia may have a significant number of class members as well, the proportion of District of Columbia citizens is likely to be substantially larger than that of any other state.  The Court therefore concludes that the "interests of justice" factors weigh in favor of remand.

**IV.     Conclusion**

Because more than one-third of the proposed class members in these related actions are likely to be citizens of the District and CAFA's "interests of justice" factors favor it, the Court will remand these cases to Superior Court.  An appropriate order accompanies this memorandum opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge


Date:  \_\_July 24, 2015_____